Rick Richmond (SBN 194962)
*rrichmond@larsonllp.com*
Matthew S. Manacek (SBN 312834)
*mmanacek@larsonllp.com*
Timothy C. Tanner (SBN 318081)
*ttanner@larsonllp.com*
Troy S. Tessem (SBN 329967)
*ttessem@larsonllp.com*
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone:(213) 436-4888
Facsimile: (213) 623-2000

Attorneys for Defendant
THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JAMES HUNTSMAN, | Case No. 2:21-cv-02504 SVW (SK) |
| Plaintiff, | *Assigned to the Hon. Stephen V. Wilson, Ctrm. 10A* |
| vs. | **DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; and Does 1-10, | |
| Defendants. | [*Filed concurrently with Separate Statement; Declaration of Paul Rytting; Declaration of Rick Richmond; (Proposed) Order; and (Proposed) Judgment)*] |
| | Date:        August 30, 2021<br>Time:        1:30 p.m.<br>Ctrm:        10A |
| | Trial Date:    None Set |

## REDACTED VERSION OF DOCUMENT
## PROPOSED TO BE FILED UNDER SEAL

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 30, 2021 at 1:30 p.m., or as soon thereafter as this matter may be heard, in Courtroom 10A of the above-entitled Court, located at 350 W. 1st Street, 10th Floor, Los Angeles, California 90012, before the Honorable Stephen V. Wilson, Defendant The Church of Jesus Christ of Latter-day Saints (the "Church") will, and hereby does, move the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting summary judgment in favor of the Church and against Plaintiff James Huntsman.

This motion is made on the grounds that there is no genuine dispute of material fact regarding Plaintiff's claim and that the Church is entitled to judgment as a matter of law.  Specifically, the Church is entitled to summary judgment because: (1) the Church's statements are true; (2) Huntsman cannot establish reliance; and (3) the First Amendment prohibits Huntsman's claim.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently-filed Statement of Uncontroverted Facts and Conclusions of Law, the supporting Declarations of Paul Rytting and Rick Richmond, the pleadings and papers on file in this action, and any other evidence and argument as may be presented at the hearing on the motion.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place at the Status Conference on June 28, 2021.

Dated:  August 9, 2021                    LARSON LLP


                                          By:      /s/ Rick Richmond
                                          _____
                                          Rick Richmond
                                          Matthew S. Manacek
                                          Timothy C. Tanner
                                          Trov S. Tessem
                                          Attorneys for Defendant
                                          THE CHURCH OF JESUS CHRIST OF
                                          LATTER-DAY SAINTS

1

TABLE OF CONTENTS

STATEMENT OF FACTS ....................................................................................3

   A.   Church Background Facts ........................................................................3

      1.   Contributions to the Church ...........................................................3

      2.   History of Church Investments.......................................................4

   B.   Huntsman Background Facts ...................................................................5

   C.   Summary Judgment Facts .......................................................................5

      1.   Huntsman's Understanding of Tithing .........................................5

      2.   Huntsman's Awareness of the Church's Investments .................6

      3.   Huntsman's City Creek Claim .......................................................7

      4.   Funding of City Creek Project......................................................10

      5.   Huntsman's Beneficial Life Claim ...............................................11

LEGAL STANDARDS .......................................................................................11

   A.   Summary Judgment Standard................................................................11

   B.   Standards Relating to Fraud Claims .....................................................12

ARGUMENT .......................................................................................................13

I.    The Church's Statements Are True .......................................................14

II.   Huntsman Cannot Establish Reliance ..................................................18

   A.   *No Particularity.* ...................................................................................18

   B.   *No Actual Reliance.* .............................................................................18

   C.   *No Reasonable Reliance.* .....................................................................19

III.   The First Amendment Prohibits Huntsman's Claim ...................20

CONCLUSION.....................................................................................................24

LARSON LLP

LOS ANGELES

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Federal Cases**

4

5

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*,
    387 F. Supp. 3d 71 (D.D.C. 2019).................................................................21

6

7

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................................................................12

8

9

*In re Apollo Grp., Inc. Securities Litig.*,
    2011 WL 5101787 (D. Ariz. Oct. 27, 2011) ...............................................14

10

11

*Bell v. Presbyterian Church (U.S.A.)*,
    126 F.3d 328 (4th Cir. 1997) ......................................................................21

12

13

*Bennett v. H&R Block Fin. Advisors, Inc.*,
    2005 WL 8178042 (N.D. Cal. June 1, 2005) ..............................................14

14

15

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ....................................................................................12

16

*Elvig v. Calvin Presbyterian Church*,
    375 F.3d 951 (9th Cir. 2004) ......................................................................23

17

18

*Fraker v. Bayer Corp.*,
    2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) ..............................................14

19

20

*Great Pacific Securities v. Barclays Capital, Inc.*,
    743 F. App'x 780 (9th Cir. 2018)................................................................18

21

22

*Hobbie v. Unemployment Appeals Com'n of Florida*,
    480 U.S. 136 (1987) ....................................................................................22

23

24

*Jesse v. Malcmacher*,
    2016 WL 9450683 (C.D. Cal. April 5, 2016) (Wilson, J.)..................... 14, 17

25

26

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in
    North America*,
    344 U.S. 94 (1952) ...............................................................................20, 22

27

28

*Lazar v. Grant*,
    2017 WL 4805067 (C.D. Cal. June 22, 2017)............................................12

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................ 12

*N.L.R.B. v. Catholic Bishop of Chicago*,
    440 U.S. 490 (1979) ........................................................................ 23

*Nunn v. Black*,
    506 F. Supp. 444 (W.D. Va. 1981)................................................... 21

*Oracle Corp. v. Warranty Corp. of Am.*,
    2005 WL 226163 (N.D. Cal. Jan. 28, 2005) .................................... 20

*Serbian E. Orthodox Diocese for U. S. of Am. & Canada v.*
    *Milivojevich*,
    426 U.S. 696 (1976) ........................................................................ 20

*Ebeid ex rel. U.S. v. Lungwitz*,
    616 F.3d 993 (9th Cir. 2010) ........................................................... 12

*United States v. Alcaraz-Garcia*,
    79 F.3d 769 (9th Cir. 1996) ............................................................. 14

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ......................................................... 17

*Veterans Rideshare, Inc. v. Navistar Int'l Corp.*,
    2021 WL 2206479 (S.D. Cal. June 1, 2021) .................................... 18

*Watson v. Jones*,
    80 U.S. 679 (1871) .......................................................................... 20

*Yu-Sze Yen v. Buchholz*,
    2013 WL 1165013 (N.D. Cal. Mar. 20, 2013) ................................. 15

**California Cases**

*Graham v. Bank of Am., N.A.*,
    226 Cal. App. 4th 594 (2014) .................................................... 13, 14

*Molko v. Holy Spirit Assn.*,
    46 Cal. 3d 1092 (1988) (Anderson, J., concurring and dissenting) .................. 22

*Perlas v. GMAC Mortgage, LLC*,
    187 Cal. App. 4th 429 (2010) .................................................... 13, 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Slakey Bros. Sacramento v. Parker,*
    265 Cal. App. 2d 204 (1968) ............................................................. 18

*Taylor v. Taylor,*
    66 Cal. App. 2d 390 (1944) ............................................................... 14

*Whiteley v. Philip Morris Inc.,*
    117 Cal. App. 4th 635 (2004) ........................................................... 18

**Other State Cases**

*El Pescador Church, Inc. v. Ferrero,*
    594 S.W.3d 645 (Tex. App. 2019) ................................................... 21

*In re Godwin,*
    293 S.W.3d 742 (Tex. App. 2009) ................................................... 21

*Harris v. Matthews,*
    361 N.C. 265 (2007) ......................................................................... 21

*Hawthorne v. Couch,*
    911 So. 2d 907 (La. App. 2 Cir. 2005) ............................................ 21

*Stone v. Salt Lake City,*
    11 Utah 2d 196 (1960) ...................................................................... 16

*The Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith*
    *of Washington D.C. v. Beards,*
    680 A.2d 419 (D.C. App. 1996) ...................................................... 22

*Wolter v. Delgatto,*
    2006 WL 664214 (Tex. App. 2006) ................................................ 21

**Other Authorities**

First Amendment ..........................................................................*passim*

Fed. R. Civ. P. 9(b) ................................................................... 12, 17

Fed. R. Civ. P. 56(a) .......................................................................... 12

*Salt Lake Tribune* ............................................................................. 10

*Washington Post* .........................................................................*passim*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Plaintiff James Huntsman seeks an extraordinary remedy—the refund of his voluntary, unrestricted contributions to his former church, The Church of Jesus Christ of Latter-day Saints (the "Church")[1].  Huntsman quit making contributions and resigned from the Church because he had a crisis of faith and no longer believes in certain religious doctrines or practices.  Huntsman attempts to avoid the obvious obstacles to seeking a refund by cloaking his claim in the garb of a fraud action.  But his effort fails for three reasons, entitling the Church to summary judgment.

*First,* and most important, summary judgment should be granted because the statements by the Church on which Huntsman relies, are true.  The first of the five statements identified by Huntsman is the most specific, with the other four following along in kind.  The first statement was made by the Church's then-president with respect to a particular Church-financed project to invest in and revitalize the area next to Church headquarters in downtown Salt Lake City, Utah, known as the City Creek project.  The president said the funding for the project would come from "earnings of invested reserve funds" and from "commercial entities" owned by the Church, rather than from "tithing funds."  The undisputed summary judgment record confirms that the statement was entirely true:  no tithing funds were used.  The undisputed evidence shows that the other allegedly fraudulent statements are likewise true.

In contrast to the actual facts presented here, Huntsman's fraud claim is not based on any facts at all, but rests on unfounded speculation derived from a document Huntsman read in the *Washington Post*.  Huntsman had no personal knowledge of any facts about the funding of the City Creek project at the time the

---

[1]  Huntsman sued the Corporation of the President of the Church of Jesus Christ of Latter-day Saints, the entity he tithed to.  That entity has since been renamed to the Church of Jesus Christ of Latter-day Saints, a Utah corporation.

Church's statements were made, and he has none today. Nor does the *Washington Post* document support his claim. There is nothing in that document that alters the facts about how the project was funded.

We agree with the hope expressed by Huntsman in his complaint that "this lawsuit will put an end" to the questions about how City Creek was funded, "once and for all so that the Church can refocus its attention and efforts on following the path of righteousness" rather than dealing with the distraction of a frivolous lawsuit. (Compl. ¶ 30.) Summary judgment will do just that.

*Second*, although the Court need not reach this second ground, summary judgment should also be granted because Huntsman cannot establish reliance on the Church's statements. Fraud claims must be pled and proved with particularity. Fraud claimants cannot identify statements made years earlier and then later claim they subjectively relied on those statements when the evidence shows such claimed reliance is unreasonable and unjustified. Here, Huntsman regularly tithed and made other contributions to his Church for all of his adult life until he lost his faith. Huntsman makes vague allegations that he made his annual contributions over the course of more than two decades because he believed none of them would be used for long-term investments. But these allegations are an advocate's afterthoughts. Huntsman is a sophisticated businessman who grew up in an environment in which the Church owned and operated many long-term investments and he began making tithing contributions after the Church made clear its plan to invest some amount of tithing contributions into reserve funds to save for a rainy day. Because Huntsman's purported reliance is unjustified, summary judgment is warranted on this ground as well.

*Third*, summary judgment is also appropriate because the First Amendment prohibits plaintiffs from using the courts as vehicles to conduct fishing expeditions into how and why churches use their unrestricted, voluntary contributions to further their useful purposes. Here, Huntsman appears to be interested in generating

publicity and embarrassing his former Church in whose doctrines and practices he no longer believes. He has made no secret of his intention to attempt wide-ranging discovery into how the Church uses the contributions it receives, naming the Church's three highest ecclesiastical authorities as people "likely to have discoverable information" about the church's "use of tithing funds." (SUF 126.) Any such discovery would be an impermissible intrusion on the Church's First Amendment-protected ability to use the voluntary contributions it receives as it sees fit.

In the balance of this memorandum, we first provide context in background sections about the Church and Huntsman. Next, we present the facts necessary for summary judgment. Finally, in an argument section, we explain in more detail the three reasons why summary judgment should be granted in this case.

## STATEMENT OF FACTS

### A.    Church Background Facts

The Church of Jesus Christ of Latter-day Saints (the "Church") is a Christian religion, with its worldwide headquarters in Salt Lake City, Utah.

#### 1.    Contributions to the Church

Contributions to the Church come in several categories, including tithing, fast offerings, missionary contributions, and humanitarian aid. (SUF 11, 12.)

**Tithing.** The principal contribution is tithing. (SUF 13.) Tithing is an ancient religious practice that has biblical origins as far back as the book of Genesis, which describes Abraham as providing tithes to the great High Priest Melchizedek, who, in turn, gave Abraham a blessing from God for his faithfulness. (Genesis 14:18-20.) Tithing in the Church is supposed to reflect one-tenth of one's annual increase or income. (SUF 14; Doctrine & Covenants 119:4.) Devout Church members consider tithing to be a law or commandment from God. (SUF 15.) As in ancient times, once their annual tithing contributions are made, the Church and its members believe in the biblical instruction that "all the tithe of the land . . . is the

Lord's; it is holy unto the Lord." (Leviticus 27:30.)  Church members believe that the disposition of the tithes is determined according to God's "own voice" unto those who are responsible to spend or invest the contributions.  (Doctrine & Covenants 120:1.)

**Fast offerings**.  Another form of contributions is known as fast offerings. (SUF 12.)  Fast offerings have similar ancient biblical origins (Deuteronomy 15:11; Isaiah 58:6-12) and are intended to help feed and clothe those who are in need. (SUF 16.)

**Missionary contributions**.  A third form of contributions is for missionary work.  (SUF 12.)  As recorded in the Bible's New Testament, the Church believes it has a mandate to preach the gospel of Jesus Christ.  (Matthew 28:19-20.) Missionary contributions are intended to fund the Church's missionary efforts. (SUF 17.)

**Humanitarian aid**.  A fourth form of contributions is for humanitarian aid. (SUF 12.)  These contributions are meant to relieve the suffering of those who have been subjected to unanticipated challenges, such as droughts, hurricanes, floods, etc. (SUF 18.)  This kind of contribution, too, has its roots in the biblical scriptures that command God's followers to "love thy neighbor as thyself." (Leviticus 19:18; Matthew 22:39.)

### 2.  History of Church Investments

The Church was founded in upstate New York in 1830 by a prophet named Joseph Smith, who was directed by God to restore the Christian faith to its ancient origins.  (SUF 1.)  After Joseph Smith's martyrdom, and led by Joseph Smith's successor, Brigham Young, the general body of the Church migrated to the Utah Territory in large numbers beginning in 1847 and continuing throughout the 1860s. (SUF 2, 3.)

Early on, the Church used some of the contributions it received to construct the well-known temple in downtown Salt Lake City and its adjoining tabernacle,

1   which has been the home for decades to the Mormon Tabernacle Choir, now known

2   as the Tabernacle Choir at Temple Square.  (SUF 4.)  That area of downtown Salt

3   Lake City is known as Temple Square.  (SUF 5.)  The Church's worldwide

4   headquarters are located contiguous to Temple Square.  (SUF 6.)

5       Brigham Young also recognized that the Church and its members needed to

6   become self-sufficient.  (SUF 8.)  During the era of the pioneer migration, Utah was

7   relatively unconnected to the rest of the country, especially before the

8   transcontinental railroad was completed with the joining of the rail lines on Utah's

9   Promontory Summit in 1869.  (SUF 7.)  In addition to Temple Square, Brigham

10  Young began establishing numerous commercial enterprises.  (SUF 8.)  These were

11  also financed with contributions made to the Church.  (*Id.*)

12      **B.      Huntsman Background Facts**

13      Huntsman was born into a family of devout Church members and spent most

14  of his childhood in Utah.  (SUF 51, 52.)  His maternal grandfather, David Haight,

15  was a member of the Quorum of the Twelve Apostles, making him one of the

16  highest-ranking leaders in the Church.  (SUF 53.)  Huntsman's grandfather was

17  serving in this high-level position in 2003 when Church President Gordon B.

18  Hinckley made statements about protecting the environment surrounding Temple

19  Square through the City Creek project.  (SUF 54.)  Huntsman's father was also a

20  high ranking ecclesiastical leader in the Church.  (SUF 55.)  As an adult, Huntsman

21  considered himself to be one of the Church's most devout members.  (SUF 56.)

22      **C.      Summary Judgment Facts**

23          **1.      <u>Huntsman's Understanding of Tithing</u>**

24      As a boy and as a teenager, Huntsman learned about tithing from his parents

25  and from Church meetings he attended.  (SUF 57.)  He understood tithing to be a

26  commandment of God and is aware that tithing had its origins in the Bible.

27  (SUF 58.)

28

In early 1990, when he was 19 years old, Huntsman was ordained an Elder in the Church and accepted an assignment to serve as a full-time missionary in Germany for two years. (SUF 59.) As a missionary, Huntsman taught people that tithing was a sacred law of God and that God would bless those who tithed. (SUF 60.) Huntsman also taught people that tithing meant one-tenth of their incomes and they should expect to make tithing contributions if they became members of the Church. (SUF 61.)

Huntsman paid tithing for 22 years of his adult life, from 1993 until 2015. (SUF 62-81; Compl. ¶ 16.) While he usually paid tithing directly, sometimes Huntsman paid tithing through a family-owned entity known as Brownie Capital LLC. (SUF 82.) Huntsman's contributions to the Church were always voluntary, with no restrictions on how those contributions could be used by the Church. (SUF 83.) When Huntsman made tithing contributions, he believed he was obeying one of God's commandments and would receive blessings from God for doing so. (SUF 84.)

Huntsman stopped making tithing contributions after his final contribution on January 9, 2015. (SUF 85.) His decision to stop making tithing and other contributions had nothing to do with how City Creek was funded because, in Huntsman's own words, whether tithing was used to fund City Creek "was not discovered by me until 2019." (SUF 86.) Instead, Huntsman and his family quit making contributions in 2015 over a growing disillusionment with other doctrinal aspects of the Church. (SUF 87.) Huntsman and his wife Marianne eventually resigned their memberships from the Church in 2020 because, as he described it, they "stopped believing certain doctrines unique to Mormonism." (SUF 88.)

## 2.  Huntsman's Awareness of the Church's Investments

The Church owns a number of separate corporations conducting various commercial activities. By the time he was a teenager, Huntsman was aware of several of the largest of these. For example, Huntsman was aware of the ZCMI

department store chain and visited the ZCMI Center Mall, which was one of the largest shopping malls in Salt Lake City.  (SUF 89.)  Huntsman was aware that the ZCMI investment was owned by the Church.  (*Id*.)  Huntsman was aware of the Hotel Utah, which was a well-known hotel in downtown Salt Lake City and he was aware that the Hotel Utah was owned by the Church.  (SUF 90.)  Huntsman was aware of a chain of bookstores called Deseret Book, and he knew that Deseret Book was owned by the Church.  (SUF 91.)  Huntsman was aware of the *Deseret News*, which was one of two major newspapers in Salt Lake City, and he was aware that the *Deseret News* was owned by the Church.  (SUF 92.)  Huntsman was aware of the Deseret Gym which, at one time, was a popular gym in downtown Salt Lake City, and he was aware that the Deseret Gym was owned by the Church.  (SUF 93.)  Huntsman admits that he wondered about where the money came from to start and fund these investments owned by the Church, but he never asked any Church leaders.  (SUF 94.)

### 3.    Huntsman's City Creek Claim

Huntsman's claim in this case is specifically focused on the Church's funding of the Church-financed project to acquire the real estate and facilitate the development of a shopping center known as City Creek Center, and the Church's financial support of Beneficial Life Insurance Company.  (SUF 95-97.)  Huntsman says his claim is not based on a general complaint about tithing funds being used for the Church's commercial activities.  (SUF 98.)

Huntsman's fraud claim is based on five statements regarding the City Creek project.  (SUF 96.)

**Statement #1:**  The first statement was made by the president of the Church, President Gordon B. Hinckley, at a worldwide semi-annual general conference of the Church in April 2003.  (SUF 27, 106-107.)  President Hinckley explained:

> "Faith in the payment of tithes and offerings increases despite the straitened economic circumstances in which we find ourselves.  We are

LARSON LLP
LOS ANGELES

able to go forward with the building of meetinghouses and temples, with our vast education program, with the very many activities which are conditioned upon the tithing income of the Church.  I promise you that we will not put the Church in debt.  We will strictly tailor the program to the tithing income and use these sacred funds for the purposes designated by the Lord.

"I call attention to that which has received much notice in the local press.  This is our decision to purchase the shopping mall property immediately to the south of Temple Square.

"We feel we have a compelling responsibility to protect the environment of the Salt Lake Temple.  The Church owns most of the ground on which this mall stands.  The owners of the buildings have expressed a desire to sell.  The property needs very extensive and expensive renovation.  We have felt it imperative to do something to revitalize this area.  But I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property.  Nor will they be used in developing it for commercial purposes.

"Funds for this have come and will come from those commercial entities owned by the Church.  These resources, together with the earnings of invested reserve funds, will accommodate this program."
(SUF 27-28, 106-107; Compl., ¶ 17.)  Huntsman did not hear this statement when it was made, but claims he read the statement sometime following the conference. (SUF 108.)

Huntsman's allegation that tithing funds were used to acquire and develop City Creek, rather than funds from earnings on invested reserves or from other Church commercial entities, is based on his reading of an unverified and contested document published by the *Washington Post* and nothing else.  (SUF 109.) Huntsman does not know either one of the two Nielsen brothers responsible for the

preparation of the document and does not know if they are honest men.  (SUF 101-102.)

**Statement #2:**  The second statement about the funding of City Creek was made by Presiding Bishop H. David Burton at an October 8, 2003 press conference, as reported in the *Ensign* magazine:  "None of this money comes from the tithing of our faithful members.  That is not how we use tithing funds."  (SUF 110; Compl., ¶ 19.)  Huntsman claims he "would have read about" this press conference sometime "after" the press conference occurred.  (SUF 111-113.)  Huntsman has no basis on which to challenge this statement beyond the *Washington Post* document.  (SUF 114.)

**Statement #3:**  The third statement appeared in the *Ensign* magazine, but the statement is not attributed to any particular person: "The Church first announced three years ago it was planning to redevelop the downtown area to energize the economy of the city that houses its headquarters and to bolster the area near Temple Square.  No tithing funds will be used in the redevelopment."  (SUF 115; Compl., ¶ 20.)  Huntsman claims he read this statement sometime after it was published in the December 2006 *Ensign* magazine, but he cannot remember when he read it.  (SUF 116)  Huntsman has no basis on which to challenge this statement beyond the *Washington Post* document.  (SUF 117.)

**Statement #4:**  The fourth statement appeared in the *Deseret News* newspaper on March 27, 2007, but the statement is not attributed to any particular person: "Money for the project is not coming from LDS Church members' tithing donations.  City Creek Center is being developed by Property Reserve, Inc., the Church's real-estate development arm, and its money comes from other real-estate ventures."  (SUF 118; Compl. ¶ 21.)  Huntsman claims he read this 2007 statement in the *Deseret News* on-line, but he cannot remember when he read it.  (SUF 119.)  Huntsman has no basis on which to challenge this statement beyond the *Washington Post* document.  (SUF 120.)

**Statement #5:**  The fifth statement appeared in the *Salt Lake Tribune* newspaper on October 5, 2012, and is attributed to Keith B. McMullin, who was (and is) the head of a Church-affiliated commercial entity known as Deseret Management Corporation: "McMullin said not one penny of tithing goes to the Church's for-profit endeavors.  Specifically, the Church has said no tithing went towards City Creek Center."  (SUF 121; Compl., ¶ 22.)  Huntsman claims he read this 2012 statement in the S*alt Lake Tribune*, but he cannot remember when he read it.  (SUF 122.)  Huntsman has no basis on which to challenge this statement beyond the *Washington Post* document.  (SUF 123.)

### 4.   Funding of City Creek Project

Property Reserve, Inc. ("PRI"), a nonprofit 501(c)(3) organization, is the Church affiliate primarily responsible for holding commercial real estate investments as part of the Church's reserves.  (SUF 26.)  PRI invests in commercial real estate.  (*Id*.)  As part of the City Creek project, PRI granted much of the relevant properties needed for the project.  (SUF 48.)  In addition, PRI also expended ████████████████████████████████████████████████  ████████████████ (SUF 49.)  No tithing funds were used as part of PRI's expenditures.  (*Id*.)

In September 1997, Ensign Peak Advisors, Inc. ("Ensign Peak"), a nonprofit 501(c)(3) organization, was incorporated as the Church's primary investment vehicle for reserve funds in stocks, bonds, and securities.  (SUF 22.)  As explained by President Hinckley in 1991, Ensign Peak was created and exists to further the Church's principles in its financial operations: (1) the Church lives within its means; and (2) the Church saves a fixed percentage of income for the future to build reserves for a possible "rainy day," i.e., to "weather the storm" in the event of economic distress.  (SUF 20-21.)

The Church provided Ensign Peak with an initial grant ████████████ ████████ (SUF 23.)  Prior to that time Church reserves were managed and invested

by the Church's Investment Securities Department.  (SUF 24.)  By the end of 2003, Ensign Peak's net assets had grown ███████████████ (SUF 29.)  The net investment income, or earnings, for that year alone (2003) amounted ██████ ███████ (SUF 30, 32.)

On January 1, 2004, following President Hinckley's 2003 statement, Ensign Peak created ████████████████████████ ██████████████████████████████████ ███████████████ (SUF 33.)  As of April 30, 2007—before any grants were issued from the Reserve Fund for City Creek—████████████ ███████████████████████████ (SUF 44.) During the course of the City Creek project, Ensign Peak made grants ██████ ████████████████████ (SUF 46.)  Tithing funds were not part of the Reserve Fund used for the City Creek project.  (SUF 37.)

In addition, Ensign Peak granted █████████████████████ ██████████████████████████ ████████████ (SUF 47.)

### 5.  <u>Huntsman's Beneficial Life Claim</u>

In addition to his City Creek allegations, Huntsman also asserts that tithing, fast offering, missionary, and humanitarian aid contributions were improperly used as a loan or other source of funding for the Beneficial Life Insurance Company. (SUF 124.)  Huntsman's assertion is simply not true, but in any event, Huntsman cannot point to statements by Church leaders that his contributions to the Church would not be used to make any such additional investments in Beneficial Life, which was ultimately owned by the Church and its nonprofit affiliates.  (SUF 125.)

## <u>LEGAL STANDARDS</u>

### A.  **Summary Judgment Standard**

Summary judgment is properly granted where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of a genuine dispute of material fact, i.e., a fact that can affect the outcome of the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). After the moving party meets its initial burden to show the absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to demonstrate that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. If the non-moving party fails to submit sufficient facts showing genuine issues for trial, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

## B. Standards Relating to Fraud Claims

Under California law there are three relevant common law fraud theories: (1) fraudulent misrepresentation; (2) fraudulent concealment; and (3) promissory fraud. Huntsman's fraud claim proceeds under two of them—fraudulent misrepresentation and fraudulent concealment—both of which Huntsman must plead and prove with particularity to satisfy Rule 9(b)'s "more exacting pleading requirement." Fed. R. Civ. P. 9(b); *Lazar v. Grant*, 2017 WL 4805067, at \*2 (C.D. Cal. June 22, 2017); *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("In alleging fraud or mistake, Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged.").

***Fraudulent Misrepresentation.*** "To establish a claim for fraudulent misrepresentation, the plaintiff must prove: (1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the

1  defendant made the representation recklessly and without regard for its truth; (4) the

2  defendant intended that the plaintiff rely on the representation; (5) the plaintiff

3  reasonably relied on the representation; (6) the plaintiff was harmed; and (7) the

4  plaintiff's reliance on the defendant's representation was a substantial factor in

5  causing that harm to the plaintiff." *Perlas v. GMAC Mortgage, LLC*,

6  187 Cal. App. 4th 429, 434 (2010).

7        ***Fraudulent Concealment.*** "The required elements for fraudulent

8  concealment are: (1) concealment or suppression of a material fact; (2) by a

9  defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended

10  to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the

11  plaintiff was unaware of the fact and would not have acted as he or she did if he or

12  she had known of the concealed or suppressed fact; and (5) plaintiff sustained

13  damage as a result of the concealment or suppression of the fact." *Graham v. Bank*

14  *of Am., N.A.*, 226 Cal. App. 4th 594, 606 (2014).

15        <u>**ARGUMENT**</u>

16        Huntsman asserts a single claim for common law fraud, alleging that the

17  statements about the source of funds for the development of City Creek were false.

18  (SUF 95, 96.) He also alleges that the Church concealed that tithing funds would be

19  used to develop City Creek. (SUF 97.)

20        Huntsman is wrong. The statements were absolutely true and can be proved

21  with the indisputable evidence described in these moving papers. Huntsman's claim

22  is based on nothing more than an unproven document he read in a newspaper, which

23  is an inadequate substitute for actual facts[2] and cannot justify Huntsman's attempt to

24

25  _____

  [2] Huntsman bases his allegation that tithing funds were used for City Creek "on

26  information and belief," not on personal knowledge. *See* Compl. ¶ 23. Huntsman's

27  deposition confirms that the sole basis for his fraud claim is the allegations in the

*Washington Post* document. (SUF 109, 114, 117, 120, 123.) Courts do not allow

28  plaintiffs to lift "allegations from other complaints" and use them to support claims

1   claw back his voluntary, unrestricted contributions, which are an irrevocable gift

2   under California law.[3]  Huntsman's fraud claim fails because the statements about

3   the funding of City Creek were true.  That alone is reason enough to grant summary

4   judgment, and the Court should do so on that basis.

5   **I.      THE CHURCH'S STATEMENTS ARE TRUE**

6          To prevail on a fraud claim, Huntsman must establish that the Church made a

7   material false representation or concealed a material fact.  *Perlas*, 187 Cal. App. 4th

8   at 434; *Graham,* 226 Cal. App. 4th at 606.  Here, Huntsman claims the Church lied

9   about, and concealed, how it funded the City Creek project by alleging that the

10  Church used tithing funds for the project.[4]  (SUF 95-97.)  Huntsman points to five

11  _____

12  for fraud because "allegations from other complaints are unproven and contested"
    and therefore present no facts.  *See, e.g., In re Apollo Grp., Inc. Securities Litig.,*

13  2011 WL 5101787, at *10, n. 5 (D. Ariz. Oct. 27, 2011); *Bennett v. H&R Block Fin.*

14  *Advisors, Inc.,* 2005 WL 8178042, at *4 (N.D. Cal. June 1, 2005) (pleading based on
    unadjudicated administrative complaint did not meet particularity standard for

15  securities and common law fraud); *Fraker v. Bayer Corp*., 2009 WL 5865687, at *6

16  (E.D. Cal. Oct. 6, 2009) (striking allegations lifted from FTC complaint because
    plaintiff did not independently acquire evidence to support fraud allegations and

17  dismissing complaint because there were no other facts showing fraudulent

18  conduct).
    [3]  *E.g., United States v. Alcaraz-Garcia*, 79 F.3d 769, 775 (9th Cir. 1996)

19  (discussing elements of a gift). Huntsman made voluntary donations to the Church,

20  divested his control of such funds with no restrictions, and did so with no
    expectation of a return from the Church.  SUF 83; *see Taylor v. Taylor*, 66 Cal. App.

21  2d 390, 399 (1944) ("A voluntary gift divests the donor of his property and invests

22  the donee with title irrevocably.").
    [4]  Huntsman also alleges that the Church fraudulently misrepresented that tithing

23  funds would not be used for "the bailout" of Beneficial Life Insurance Company.

24  Compl. ¶ 34.  But Huntsman does not identify a single misrepresentation with
    respect to Beneficial Life.  *See generally* Compl.  Nor can he, as he admitted in

25  deposition that he cannot identify statements by Church leaders that tithing funds,

26  fast offerings, missionary contributions, or humanitarian funds would not be used to
    fund Beneficial Life.  (SUF 125.)  Consequently, Huntsman cannot proceed under a

27  fraudulent misrepresentation theory as to Beneficial Life's purported bailout.  *See*

28  *Jesse v. Malmacher*, 2016 WL 9450683, at *7 (C.D. Cal. April 5, 2016) (Wilson,

statements, beginning with the 2003 statement by then-President Gordon B. Hinckley, who announced the City Creek project to the worldwide membership of the Church.  (SUF 27, 96, 106.)  President Hinckley explained that the funds for the City Creek project would come from two sources, which were "commercial entities owned by the Church" and "the earnings on invested reserve funds."  (SUF 28.)  He also assured members that tithing funds would not be used.  (SUF 28.)  The other four statements that Huntsman references follow in kind and reiterate that no tithing would be used for the City Creek project.  (SUF 110, 115, 118, 121)

What Huntsman alleges are false statements, were, in fact, true—both when they were made and throughout the entire development of City Creek.  In other words, the Church did not use tithing funds for the City Creek project.  Rather, what President Hinckley explained would occur, did occur, because the City Creek project received funding from PRI (a nonprofit entity affiliated with the Church that invests in commercial real estate), from Ensign Peak, and ███████████  ████████████████████████████████████████████  Each source  of City Creek funding is briefly addressed in turn.

**_PRI._**  PRI is the Church's affiliated nonprofit entity primarily responsible for holding real estate investments.  ███████████████████████  ████████████████  (SUF 48.)  PRI also expended ███████████████  ███████████████████████████████  (SUF 49.)  No tithing funds were used as part of PRI's expenditures.   (SUF 49.)

████████████████████████████████████████  ██████████████████████████  entirely funded by Ensign

_____

J.).  Nor does this allegation meet the requirements of fraudulent concealment, as the Church did not conceal or suppress any material fact, i.e., any fact relating to how it funded City Creek.  _See Yu-Sze Yen v. Buchholz_, 2013 WL 1165013, at *5 (N.D. Cal. Mar. 20, 2013) (granting summary judgment because plaintiff had "not identified a false statement of material fact").

1   Peak, a non-profit entity affiliated with the Church that was formed to invest the

2   Church's reserve funds.  (SUF 22; *see generally Stone v. Salt Lake City*, 11 Utah 2d

3   196, 200–201 (1960) (holding that investing donation funds does not divert them

4   from a church's religious mission).  Ensign Peak was created and exists to further

5   the Church's principles in its financial operations as explained by President

6   Hinckley in 1991: (1) the Church lives within its means; and (2) the Church saves a

7   fixed percentage of income for the future to build reserves for a possible "rainy

8   day," i.e. to "weather the storm" in the event of economic distress.  (SUF 21.)  It

9   was the earnings from the Church reserves managed by Ensign Peak that produced

10  the money used to fund the City Creek project.  (SUF 42-43.)

11      The Church provided Ensign Peak with an initial grant ███████████

12  ███████   (SUF 23.)  On December 31, 2003—after President Hinckley's April

13  2003 statement—███████████████████████████████████

14  ██████████████████   (SUF 29.)  During that same year, 2003, the

15  Church's reserve funds ████████████████████████   (SUF 30.)

16  Consistent with President Hinckley's April 2003 statement, Ensign Peak allocated

17  ████████████████████████████   (SUF 32, 33.)  As stated, the

18  Church's ████████████████████ in 2003 was more than sufficient

19  to cover this allocation.  (SUF 32.)  Throughout the City Creek project ████████

20  ████  continued to generate earnings, which the Church also used for City Creek.

21  (SUF 41.)

22      In 2007, the Church created a new nonprofit 501(c)(3) organization called

23  City Creek Reserve, Inc. ("CCRI") to manage and hold the Church's investment in

24  City Creek.  (SUF 38.)  CCRI owned and made further investments in City Creek

25  property, most of which it then rented to a separate for-profit company to operate

26  the shopping center.  As a result ████████████████ additional earnings, ████

27  ████████████████████████████ available even before the first

28  dollar was disbursed to fund the City Creek project.  (SUF 44.)  ████████████

1  (again, funded by earnings on reserve funds—not tithing) had a positive balance

2  during the entire life of the City Creek development and never required additional

3  funding.  (SUF 44.)  During the development of City Creek, ████████████ was

4  periodically drawn down as grants were made by Ensign Peak to CCRI to cover

5  development expenses.  (SUF 41.)  Between 2007 and 2012, Ensign Peak granted

6  ██████████████████████████████  (SUF 46.)  At the end of the City

7  Creek project (March 31, 2012), ████████████ had ████████████████

8  ████████████  (SUF45.)

9       In addition to the grants issued from ████████████, the Church also

10  authorized Ensign Peak to grant ████████████████████████████████

11  ████████████████████████  (SUF 47.)  ████████████████

12  ████████████████████████████████████████████████████████

13  ██████   (SUF 47.)  Notably, the earnings on the general reserve funds managed by

14  Ensign Peak in 2003 totaled ████████████████████████ which was

15  more than enough to "accommodate [the City Creek] program," just as President

16  Hinckley said.  (SUF 30.)  Simply put, because none of City Creek's funding came

17  from tithing, all of the purported false statements identified in Huntsman's

18  complaint are, in fact, true, meaning both of Huntsman's fraud theories fail.  *Jesse*,

19  2016 WL 9450683, at *7; *see also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,

20  1106 (9th Cir. 2003) (requiring plaintiff under Rule 9(b) to "set forth what is false or

21  misleading about" statements at issue "and why [they are] false").

22       The Court could and should stop reading right here, put an end once and for

23  all to the frivolous claims of fraud about the funding of City Creek, and enter

24  summary judgment.  We encourage the Court to do just that, but for the sake of

25  completeness, we also explain two other grounds on which the Court could grant

26  summary judgment.

27

28

## II.   HUNTSMAN CANNOT ESTABLISH RELIANCE

Huntsman cannot establish reliance because he fails to plead with particularity when he heard or read the purported misrepresentations, and he fails to establish actual and justifiable reliance on the statements made by Church leaders.

### A.   *No Particularity.*

As an initial matter, Huntsman does not—and cannot—allege that he received the specific representations identified in his complaint.  This failure is dispositive because "[a] party cannot be defrauded by misrepresentations which never reached him and of which he had no knowledge at the time of his loss." *Slakey Bros. Sacramento v. Parker*, 265 Cal. App. 2d 204, 208 (1968).  Indeed, Huntsman does not remember when he read or heard the purported misrepresentations, but merely asserts that he became aware of them at some point.  (SUF 108, 112, 116, 119, 122.)  This, of course, is insufficient because it means Huntsman cannot show "with particularity the who, what, when, where, and how of [his] reliance" and so his claim must fail.  *Barclays Capital*, 743 F. App'x at 783; *Veterans Rideshare, Inc. v. Navistar Int'l Corp.,* 2021 WL 2206479, at *11 (S.D. Cal. June 1, 2021) (dismissing fraud claims because plaintiff did not identify with particularity that he received, read, and relied on alleged misrepresentations); *see also Great Pacific Securities v. Barclays Capital, Inc.*, 743 F. App'x 780, 783 (9th Cir. 2018).

### B.   *No Actual Reliance.*

Actual reliance means a misrepresentation substantially influenced a plaintiff's decision to act.  *Whiteley v. Philip Morris Inc.,* 117 Cal. App. 4th 635, 678 (2004).  Actual reliance is judged subjectively given "a plaintiff's particular knowledge and experience." *Hoffman,* 228 Cal. App. 4th at 1194.  According to Huntsman, he relied on the initial statement by President Hinckley and it, along with the other identified statements, affected his decision whether to pay tithing each year.  (SUF 127.)  This is an advocate's afterthought.  For more than two decades, Huntsman's devout faith in the Church led him to make tithing contributions.

(SUF 62-81.)  Indeed, Huntsman's tithing contributions began upon the completion of his missionary service in 1993, where he taught that tithing was a commandment from God and those who paid tithing would receive blessings from God.  (SUF 84.) When Huntsman began making his tithing contributions in 1993, it was two years after President Hinckley announced in 1991 that the Church would set aside a portion of contributions to build a reserve.  (SUF 62.)  Huntsman's tithing contributions continued unabated for more than two decades, only ending in 2015 for reasons entirely unrelated to City Creek.  (SUF 62-81, 85-87.)  And when Huntsman resigned his membership in the Church in 2020—after the *Washington Post* document surfaced in 2019 on which he bases his claim—he did so because he stopped believing in the Church's teachings, practices, and doctrine, citing primarily a non-tithing issue.  (SUF88.)  Measured against this factual backdrop, there is no triable issue on Huntsman's actual reliance.

### C.   *No Reasonable Reliance.*

Reasonable reliance means "(1) the matter was material in the sense that a reasonable person would find it important in determining how he or she would act; and (2) it was reasonable for the plaintiff to have relied on the misrepresentation." *Hoffman*, 228 Cal. App. 4th at 1194 (citations omitted).  Like actual reliance, reasonable reliance "is judged subjectively given a plaintiff's particular knowledge and experience." *Id.*  A plaintiff cannot recover on a fraud claim when his conduct is unreasonable in light of his own intelligence and information. *Id.*

Here, Huntsman's purported reliance is unreasonable.  Huntsman's family background and his service in Church leadership positions provided him with a certain level of sophistication about the Church.  (SUF 51-61.)  Huntsman was aware of several of the Church's largest investments and even wondered where the money came from to fund these investments, but never inquired. (SUF 89-94.) Huntsman began making tithing contributions in 1993 after President Hinckley referenced the setting aside of funds for a rainy day  in 1991—financed in part with

1  contributions—to make investments for the Church's benefit.  (SUF 62.)  Taking all

2  of this together, it is unreasonable to conclude that Huntsman relied on the five

3  alleged misrepresentations when he was making his tithing contributions.  *Oracle*

4  *Corp. v. Warranty Corp. of Am.*, 2005 WL 226163, at *3 (N.D. Cal. Jan. 28, 2005)

5  (finding that plaintiff's reliance on misrepresentation was not objectively

6  reasonable).

7          For all of these reasons, Huntsman cannot establish reliance and his claim

8  fails for this reason, which is another reason to grant summary judgment.

9  **III.    THE FIRST AMENDMENT PROHIBITS HUNTSMAN'S CLAIM**

10         Finally, Huntsman's claim is independently barred by the First Amendment.

11  As Huntsman admitted in his deposition, his complaint is focused on the source of

12  funds used for City Creek.  (SUF 95.)  Yet that complaint remains littered with

13  references to the use of Church funds for what he calls "purely commercial"

14  endeavors.  (Compl. ¶¶ 2, 29, 34, 35.)  In other words, Huntsman is implicitly

15  asking the Court to second-guess the Church's ecclesiastical priorities and to

16  endorse his own view on how the Church should spend and invest its donations.

17  (*Id.*)  The First Amendment bars any such claim.

18         For 150 years, the Supreme Court has held that, under the First Amendment,

19  courts possess "no jurisdiction" to decide any matter that is "ecclesiastical in its

20  character."  *Watson v. Jones*, 80 U.S. 679, 733 (1871).  Such questions include

21  "matters of church government as well as those of faith and doctrine."  *Kedroff v.*

22  *Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S.

23  94, 116 (1952).  And on all such matters of ecclesiastical governance, courts must

24  defer to the judgments of religious organizations and their duly constituted

25  authorities.  *See Serbian E. Orthodox Diocese for U. S. of Am. & Canada v.*

26  *Milivojevich*, 426 U.S. 696, 709 (1976).

27         Applying these principles, courts across the country have consistently held

28  that civil courts lack jurisdiction under the First Amendment to resolve complaints

about the use of church funds—that such ecclesiastical questions are beyond judicial review.[5]  As one court put it: "How a church spends worshippers' contributions" is "central to the exercise of religion."  *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71, 80 (D.D.C. 2019).  That common-sense principle governs here.

Huntsman's claim is strikingly similar to the claim rejected in *Wolter v. Delgatto*, 2006 WL 664214 (Tex. App. 2006).  The plaintiff there accused her church of conversion and misuse of donated funds in connection with a development project, arguing that the First Amendment did not bar her claim because it involved financial and not doctrinal matters.  The court disagreed, rejecting plaintiff's attempt to frame her claims "in civil terms" and explaining that the case concerned whether the church followed its own constitution when it became involved with a housing and urban development project.  *Id*. at *2.  The court thus concluded that her claims, "viewed substantively and considering the effect of their resolution by a civil court, relate to how and when [the church] may spend its resources and are thus ecclesiastical in nature."  *Id*.  So too here.

As courts have held, a "determination of whether [the church's] financial expenditures were proper … requires an inquiry into whether the expenditures were justified in light of [the church's] religious doctrines and practices"—just "the type of ecclesiastical inquiry courts are forbidden to make."  *In re Godwin*, 293 S.W.3d at 750.  The complaint here questions the legitimacy of the Church's religious beliefs and the truthfulness of the prophecies and revelations on which they are

---

[5]  *See, e.g., Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 329 (4th Cir. 1997); *Ambellu*, 387 F. Supp. 3d at 80; *In re Godwin*, 293 S.W.3d 742, 750 (Tex. App. 2009); *Harris v. Matthews*, 361 N.C. 265, 273 (2007); *Hawthorne v. Couch*, 911 So. 2d 907, 910 (La. App. 2 Cir. 2005); *El Pescador Church, Inc. v. Ferrero*, 594 S.W.3d 645, 658 (Tex. App. 2019); *Nunn v. Black*, 506 F. Supp. 444, 446 (W.D. Va. 1981).

based.  (Compl. ¶¶ 2, 6.)   But as President Hinckley explained, Church leaders felt they had "a compelling responsibility to protect the environment of the Salt Lake Temple"—one of the Church's holiest sites.  (SUF 107).  That is exactly the type of ecclesiastical decision-making that the First Amendment is designed to protect.  *See also The Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington D.C. v. Beards*, 680 A.2d 419, 429 (D.C. App. 1996) ("[A] church's financial regime, including any required reports to members, necessarily reflects an array of decisions about a member's obligation to pledge funds, and about the leaders' corresponding responsibility to account for those funds, that a civil court cannot arbitrate without entangling itself in doctrinal interpretations[.]"); *Hobbie v. Unemployment Appeals Com'n of Florida*, 480 U.S. 136, 144 n.9 (1987) ("In applying the Free Exercise Clause, courts may not inquire into the truth, validity, or reasonableness of a claimant's religious beliefs."); *Kedroff*, 344 U.S. at 116.[6]

More specifically, under these unique facts, this Court could not address issues relating to the Church's alleged intent to defraud or Huntsman's actual or justifiable reliance without first adjudicating the nature and status of Church doctrine and practice in light of its sacred religious history.  This case does not involve a preacher's one-time pitch to contribute money to local flood victims, where the money was actually spent on the preacher's new office or vacation home. Tithing, by contrast, is a deeply engrained, longstanding Church doctrine and practice with a sacred history going back to the 1830s and indeed millennia earlier. The heart of Huntsman's claim is that President Hinckley changed that doctrine and

---

[6] As with Huntsman, any believer's "[r]eligious behavior change induced by the mystery of faith cannot be proved or disproved" in a court of law, "which limits its scope of inquiry to tangible, rational and logical phenomena, comprehensible and explainable by human reasons."  *Molko v. Holy Spirit Assn.*, 46 Cal. 3d 1092, 1138 (1988) (superseded by statute on other grounds) (Anderson, J., concurring and dissenting).

1   practice—and that he relied on that change—with a single statement whose

2   interpretation is hotly contested.  We have shown that his statement was true—that

3   no tithing money went to the City Creek project—and thus that the fraud claim

4   necessarily fails without the need to address First Amendment issues.  But if this

5   Court believes there is a disputed issue on that point and a potentially viable fraud

6   claim exists, the First Amendment bars any further adjudication because it would

7   require the Court to determine whether a true change to Church doctrine and

8   religious practice—one that both bound the Church's future actions and one on

9   which Huntsman had reasonably relied as a faithful Church member—had indeed

10  been made.

11      For well over a century and a half, Church leaders had always had the

12  ecclesiastical authority to use member contributions as they felt inspired to advance

13  the religious mission and interests of the Church, its members, and the community.

14  Did President Hinckley suddenly abdicate that ecclesiastical authority?  Was it

15  reasonable for a member like Huntsman to believe such a momentous religious

16  change had occurred?  These questions are unavoidably entangled with questions of

17  religious doctrine, polity, practice, and history.  Because the First Amendment

18  prohibits the Court from inquiring into such doctrinal and ecclesiastical matters—

19  even through the process of discovery—Huntsman's claim cannot proceed.  *See*

20  *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 958 (9th Cir. 2004) (finding that

21  the First Amendment prohibits an "evaluation of religious doctrine or the

22  reasonableness of the religious practices followed within the [religious institution].")

23  (citations omitted); *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502

24  (1979) (declining to extend labor laws to Catholic parochial schools because even

25  "the very process of inquiry" regarding compliance with the law "may impinge on

26  rights guaranteed by the Religion Clauses" of the First Amendment).

27

28

1

## <u>CONCLUSION</u>

2      The challenged statements attributed to the Church were true; Huntsman

3  cannot establish reliance; and his fraud claim will run afoul of the First Amendment.

4  Accordingly, the Church's motion for summary judgment should be granted.

5

6  Dated:  August 9, 2021              LARSON LLP

7

8

9                                     By:  /s/ Rick Richmond
                                        Rick Richmond
10                                       Matthew S. Manacek
                                        Timothy C. Tanner
11                                       Troy S. Tessem
12                                     Attorneys for Defendant
                                      THE CHURCH OF JESUS CHRIST OF
13                                     LATTER-DAY SAINTS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28