Rick Richmond (SBN 194962)
*rrichmond@larsonllp.com*
Matthew S. Manacek (SBN 312834)
*mmanacek@larsonllp.com*
Timothy C. Tanner (SBN 318081)
*ttanner@larsonllp.com*
Troy S. Tessem (SBN 329967)
*ttessem@larsonllp.com*
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone:   (213) 436-4888
Facsimile:   (213) 623-2000

Attorneys for Defendant
THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JAMES HUNTSMAN, | Case No. 2:21-cv-02504 SVW (SK) |
| Plaintiff, | *Assigned to the Hon. Stephen V. Wilson, Ctrm. 10A* |
| vs. | **DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW** |
| CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; and Does 1-10, | [*Filed concurrently with Defendant's Motion for Summary Judgment; Declarations of Paul Rytting and Rick Richmond; and (Proposed) Order*] |
| Defendants. | Date:          August 30, 2021<br>Time:          1:30 p.m.<br>Ctrm.:         10A |
| | Trial Date:          None Set |

# REDACTED VERSION OF DOCUMENT
# PROPOSED TO BE FILED UNDER SEAL

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 1. | The Church was founded in upstate New York in 1830 by a prophet named Joseph Smith. | Declaration of Paul Rytting ("Rytting Decl."), ¶ 3. |
| 2. | The Church migrated to the Utah Territory in large numbers beginning in 1847 and continuing throughout the 1860s. | Rytting Decl., ¶ 3. |
| 3. | As the successor to Joseph Smith, Brigham Young led the Church members to Utah and continued to serve as the president of the Church until his death in 1877. | Rytting Decl., ¶ 3. |
| 4. | In the Church's early years in Utah, the Church used some of the contributions it received from members to construct the well-known temple in downtown Salt Lake City and its adjoining tabernacle, which was home for decades to the Mormon Tabernacle Choir, now known as the Tabernacle Choir at Temple Square. | Rytting Decl., ¶ 3. |
| 5. | The Salt Lake City temple is located in what is known as Temple Square. | Rytting Decl., ¶ 3. |
| 6. | The Church's worldwide headquarters are located contiguous to Temple Square. | Rytting Decl., ¶ 3. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 7. | During the era of the pioneer migration, Utah was relatively unconnected to the rest of the country, especially before the transcontinental railroad was completed with the joining of the rail lines on Utah's Promontory Summit in 1869. | Rytting Decl., ¶ 4. |
| 8. | Brigham Young knew that the Church and its members needed to become self-sufficient and so he established numerous commercial enterprise to help members become self-sufficient, including Zion's Cooperative Mercantile Institution ("ZCMI"), which was a general goods store founded by the Church in 1868 and financed with contributions made to the Church.  The ZCMI Center Mall, which was across the street from the temple and the tabernacle, was a prominent feature of downtown Salt Lake City. | Rytting Decl., ¶ 4. |
| 9. | From 2006 to 2012, the ZCMI Center Mall was transformed into what became known as City Creek Center. | Rytting Decl., ¶ 4. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 10. | The Church also created and owned Hotel Utah, a chain of book stores called Deseret Book, a newspaper called *Deseret News,* and a popular downtown gym called Deseret Gym. | Rytting Decl., ¶ 4. |
| 11. | The Church contributions fall into different categories. | Rytting Decl., ¶ 5. |
| 12. | Tithing, fast offerings, missionary contributions, and humanitarian aid are the most common types of contribution the Church receives. | Rytting Decl., ¶ 5; Declaration of Rick Richmond ("Richmond Decl."), ¶ 2, Ex. A, [[Huntsman Dep. Tr.], 52:22-53:3, 53:8-10, 53:15-17.] |
| 13. | Tithing is the principal contribution to the Church. | Rytting Decl., ¶ 5. Richmond Decl., ¶ 2, Ex. A, 52:22-24. |
| 14. | Members of the Church pay tithing, meaning a tenth of their annual increase or income. | Rytting Decl., ¶ 5; Richmond Decl., ¶ 2, Ex. A, 20:9-11, 121:16-18. |
| 15. | Devout Church members consider tithing to be a law or commandment from God. | Richmond Decl., ¶ 2, Ex. A, 20:2-5. |
| 16. | Fast offerings are intended to help feed and clothe those in need. | Rytting Decl., ¶ 5; Richmond Decl., ¶ 2, Ex. A, 53:1-7. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 17. | Missionary contributions are intended to fund the efforts of the Church's missionaries and missionary work. | Rytting Decl., ¶ 5; Richmond Decl., ¶ 2, Ex. A, 53:8-10. |
| 18. | Humanitarian aid contributions are intended to address disasters such as hurricanes, floods, droughts, and more. | Rytting Decl., ¶ 5; Richmond Decl., ¶ 2, Ex. A, 53:15-17. |
| 19. | Each year, the Church sets aside a fixed percentage of the donations it receives to build a reserve fund to prepare for possible future needs. | Rytting Decl., ¶ 6. |
| 20. | During the Church's April 1991 General Conference (a semi-annual event consisting of worship services and messages from Church leaders broadcast to the worldwide Church), President Gordon B. Hinckley, then-First Counselor of the First Presidency of the Church, explained the following: "In the financial operations of the Church, we have observed two fixed principles: One, the Church will live within its means.  It will not spend more than it receives.  Two, a fixed percentage of income will be set aside to build reserves against what might be called a possible 'rainy day.'" | Rytting Decl., ¶ 6. Ex. 1 [Gordon B. Hinckley's April 1991 General Conference address]. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 21. | During the Church's October 1995 General Conference, President Hinckley, then-president of the Church, reiterated this position: "Not only are we determined to live within the means of the Church, but each year we put into the reserves of the Church a portion of our annual budget. . . . Should there come a time of economic distress, we would hope to have the means to weather the storm." | Rytting Decl., ¶ 7, Ex. 2 [Gordon B. Hinckley's October 1995 General Conference address]. |
| 22. | In September of 1997, the Church incorporated Ensign Peak Advisors, Inc. ("Ensign Peak") to be the Church's primary investment vehicle for the Church's reserve funds in stocks, bonds, and securities. | Rytting Decl., ¶ 8. |
| 23. | The Church provided Ensign Peak with an initial grant ██████████ in late 1997. | Rytting Decl., ¶ 8, Ex. 3 [EPA's 1997 Statement of Financial Position]. |
| 24. | Prior to the creation of Ensign Peak, Church reserves were managed and invested by the Church's Investment Securities Department. | Rytting Decl., ¶ 8. |
| 25. | By the end of the 1997, Ensign Peak had net assets of ██████████. | Rytting Decl., ¶ 8, Ex. 3. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 26. | Property Reserve, Inc. ("PRI"), a nonprofit entity, was established to invest Church resources in commercial real estate. | Rytting Decl., ¶ 9. |
| 27. | During the Church's April 2003 General Conference (a semi-annual event consisting of worship services and messages from Church leaders broadcast to the worldwide Church), Church President Gordon B. Hinckley announced that the Church would redevelop a shopping mall and other commercial buildings in downtown Salt Lake City (the "City Creek project"). | Rytting Decl., ¶ 10, Ex. 4 [Gordon B. Hinckley's April 2003 General Conference address]. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 28. | In his April 2003 address, President Hinckley explained that Church leaders felt they had "a compelling responsibility to protect the environment of the Salt Lake Temple" and that it was "imperative to do something to revitalize this area."  President Hinckley also explained that the Church already owned "most of the ground on which this mall stands," but that it "needs very extensive and expensive renovation."  He then explained how the purchase and renovation would be funded:  "I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property.  Nor will they be used in developing it for commercial purposes.  Funds for this have come and will come from those commercial entities owned by the Church.  These resources, together with the earnings of invested reserve funds, will accommodate this program." | Complaint, ¶¶ 18, 33; Rytting Decl., ¶ 10, Ex. 4. |
| 29. | As of December 31, 2003, Ensign Peak's net assets had grown to ███████. | Rytting Decl., ¶ 11, Ex. 5, p. 2. [EPA's 2003 Statement of Financial Position]. |

DEFENDANT'S SEPARATE STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

LARSON LLP
LOS ANGELES

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 30. | In 2003 alone, Ensign Peak accumulated ██████████████ ███████████████ ██████████ | Rytting Decl., ¶ 11, Ex. 5, p. 2. |
| 31. | The City Creek project received funding from Ensign Peak ███████ ██████████████ ██████████ | Rytting Decl., ¶ 12. |
| 32. | In 2004, consistent with President Hinckley's explanation in April 2003, the Church earmarked ████████ ██████████ █████████████ █████████████ █████████ | Rytting Decl., ¶ 13, Ex. 6 [2004 Notification for Common Fund Investment / Withdrawal]. |
| 33. | On January 1, 2004, Ensign Peak allocated ███████████████ ██████████████ ███████████████ ████████ | Rytting Decl., ¶ 13, Ex. 6. |
| 34. | Reserves ██████████ ████████████ Ensign Peak were withdrawn to fund the ████████ | Rytting Decl., ¶ 13, Ex. 6. |

DEFENDANT'S SEPARATE STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---------|------------------------------------------|----------------------|
| 35. | ███████████████████████ ████████████████████ ████████████████ | Rytting Decl., ¶ 13, Ex. 6. |
| 36. | The ████████████████████ ████ was reinvested in securities and continued to generate earnings. | Rytting Decl., Ex. 7. |
| 37. | The initial reserve of ████████████ ███████████ came exclusively from earnings on funds invested by Ensign Peak. | Rytting Decl., ¶ 14. |
| 38. | In 2007, the Church established a new nonprofit 501(c)(3) organization called City Creek Reserve, Inc. ("CCRI"), to manage and own the Church's investment in City Creek project. | Rytting Decl., ¶ 15. |
| 39. | CCRI owned and made further investments in City Creek property, most of which it then rented to a separate for-profit company to operate the shopping center. | Rytting Decl., ¶ 16. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 40. | During the course of the City Creek project (between 2007 and 2012), ████ ██████████████████████ ██████████████████████ ████—authorized appropriations for the City Creek project.  With Church authorization, Ensign Peak then periodically granted funds to CCRI ██████████ ████████████████. | Rytting Decl., ¶ 17, 18. |
| 41. | When the Church authorized Ensign Peak to grant funds to CCRI, ████████ ██████████████████████ ██████████████ ██████████████████ ████████████ ██████████████████ was periodically "drawn down" during the lifetime of the City Creek project while continually accruing investment earnings. | Rytting Decl., ¶ 19. |
| 42. | ██████████   contained sufficient funds for each grant made from Ensign Peak to CCRI. | Rytting Decl., ¶ 20, Ex. 8. |
| 43. | The funds ██████████ decreased as they were drawn down to provide grants to CCRI. | Rytting Decl., ¶ 21, Ex. 8. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 44. | As of April 30, 2007, before any grants were issued ███████████████ ████████████████ ███████████ | Rytting Decl., ¶ 22, Ex. 8. |
| 45. | On March 31, 2012, ████████ had a market value ████████████ ██████████ █████████████ ██████████ █████████ | Rytting Decl., ¶ 22, Ex. 8. |
| 46. | Ensign Peak granted CCRI █████████ ████████████ ███████████ █████████████ ████████████ █████████ ██████████ █████████████ ████████████ █████████████ ██████ | Rytting Decl., ¶ 23. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 47. | In addition to Ensign Peak's grants from ██ ████████ Ensign Peak also made two other grants to CCRI ████████ ████████████ ████████████ ████████████ ██████ | Rytting Decl., ¶ 24, Exs. 9, 10. [Authorizations of Grants] |
| 48. | The Church already owned much of the land associated with the City Creek project; PRI—a nonprofit commercial real estate investment company affiliated with the Church—which owned the relevant properties, granted them to CCRI. | Rytting Decl., ¶ 25. |
| 49. | PRI also expended approximately ████████████████ ████████████ No tithing funds were used as part of PRI's expenditures. | Rytting Decl., ¶ 26. |
| 50. | ████████████ ████████████ ████████████ ████████████ ████████████ ██████████. | Rytting Decl., ¶ 27. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 51. | Huntsman was born into a family of devout Church members. | Richmond Decl., ¶ 2, Ex. A, 16:6-11; 104:25-105:12. |
| 52. | Huntsman spent most of his childhood in Utah. | Richmond Decl., ¶ 2, Ex. A, 67:3-11. |
| 53. | Huntsman's maternal grandfather, David Haight, was a member of the Quorum of the Twelve Apostles—making him one of the highest-ranking leaders in the Church. | Richmond Decl., ¶ 2, Ex. A, 103:8-13, 106:21-107:1. |
| 54. | Huntsman's grandfather was serving in this high-level position in 2003 when Church President Gordon B. Hinckley made statements about acquiring and developing City Creek. | Richmond Decl., ¶ 2, Ex. A, 107:3-8. |
| 55. | Huntsman's father was a high ranking ecclesiastical leader in the Church. | Richmond Decl., ¶ 2, Ex. A, 112:21-113:2. |
| 56. | As an adult, Huntsman considered himself to be one of the Church's most devout members. | Richmond Decl., ¶ 2, Ex. A, 16:17-20. |
| 57. | As a boy and as a teenager, Huntsman learned about tithing from his parents and from Church meetings he attended. | Richmond Decl., ¶ 2, Ex. A, 19:18-20:1. |
| 58. | Huntsman understood tithing to be a commandment of God and is aware that tithing had its origins in the Bible. | Richmond Decl., ¶ 2, Ex. A, 20:2-5, 20:12-23; 68:25-69:5. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 59. | In early 1990, when he was 19 years old, Huntsman was ordained an Elder in the Church and accepted an assignment to serve as a full-time missionary in Germany for two years. | Richmond Decl., ¶ 2, Ex. A, 30:18-20, 31:3-8. |
| 60. | As a missionary, Huntsman taught people that tithing was a sacred law of God and that God would bless those who tithed. | Richmond Decl., ¶ 2, Ex. A, 37:10-13, 37:23-38:13. |
| 61. | Huntsman also taught people that tithing meant one-tenth of their incomes and they should expect to pay tithing if they became members of the Church. | Richmond Decl., ¶ 2, Ex. A, 37:14-22. |
| 62. | Huntsman paid tithing for 22 years of his adult life, from 1993 until 2015. | Richmond Decl., ¶ 2, Ex. A, 45:13-15, 52:3-7., |
| 63. | In 2003, Huntsman made a contribution of $50,000 in cash, allocating $45,000 to tithing and $5,000 to fast offerings. | Richmond Decl., ¶ 2, Ex. A, 58:21-59:5, 68:7-23. |
| 64. | In 2004, Huntsman contributed $45,000 in tithing donations. | Richmond Decl., ¶ 2, Ex. A, 132:16-133:8 |
| 65. | In 2005, Huntsman contributed $325,000 in tithing donations. | Richmond Decl., ¶ 2, Ex. A, 141:16- 142:23. |
| 66. | In 2006, Huntsman contributed $171,600 in tithing donations. | Richmond Decl., ¶ 2, Ex. A, 160:18-161:14. |
| 67. | In 2007, Huntsman contributed $405,135 in cash tithing donations. | Richmond Decl., ¶ 2, Ex. A, 164:2-22 |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---------|------------------------------------------|----------------------|
| 68. | On December 7, 2007, Huntsman also contributed 1,500 shares of Sigma Designs stock to the Church, allocating 1,357 of those shares to tithing, and the remaining 143 shares to fast offerings. | Richmond Decl., ¶ 2, Ex. A, 165:18-166:6, 167:14-168:2. |
| 69. | On December 21, 2007, Huntsman contributed 500 shares of Sigma Designs stock to the Church as a tithing donation. | Richmond Decl., ¶ 2, Ex. A, 168:3-169:1. |
| 70. | In December of 2008, Huntsman authorized UBS to contribute $30,000 in tithing donations and $2,000 in fast offering donations. | Richmond Decl., ¶ 2, Ex. A, 179:8-180:3. |
| 71. | In January of 2009, the Church recorded a donation from Huntsman for tithing in the amount of $32,000. | Richmond Decl., ¶ 2, Ex. A, 187:12-188:1. |
| 72. | In January of 2010, Huntsman contributed 6,310 shares of Huntsman Corporation stock and $600 as a humanitarian aid contribution. | Richmond Decl., ¶ 2, Ex. A, 207:22-208:6 |
| 73. | On December 14, 2010, Huntsman donated 6,310 shares of Huntsman Corporation stock to the Church, allocating 5,679 to tithing and 631 to fast offerings. | Richmond Decl., ¶ 2, Ex. A, 206:24-207:11. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---------|------------------------------------------|----------------------|
| 74. | In 2011, Huntsman contributed $100,000 to the Church, allocating $95,000 as a tithing donation and $5,000 as a fast offering donation. | Richmond Decl., ¶ 2, Ex. A, 210:14-211:13. |
| 75. | In 2012, Huntsman contributed 5,472 shares of Huntsman Corporation stock to the Church, allocating 4,843 of those shares to tithing and 629 of those shares to fast offerings. | Richmond Decl., ¶ 2, Ex. A, 218:10-24. |
| 76. | In 2012, Huntsman made a $1,000 humanitarian aid donation to the Church. | Richmond Decl., ¶ 2, Ex. A, 219:21-220:4. |
| 77. | In 2013, Huntsman believes he donated $6,800 to the Church's missionary fund as part of funding his son Michael's mission. | Richmond Decl., ¶ 2, Ex. A, 225:7-12, 225:23-226:10, 226:17-227:6. |
| 78. | On December 18, 2013, Huntsman donated 10,200 shares of Huntsman Corporation stock to the Church, allocating 10,000 shares to tithing and 200 shares to fast offerings. | Richmond Decl., ¶ 2, Ex. A, 227:17-228:12. |
| 79. | In 2013, Huntsman donated $2,000 to the Church's humanitarian aid fund. | Richmond Decl., ¶ 2, Ex. A, 229:4-12, 229:25-230:3. |
| 80. | In 2014, Huntsman donated $6,400 to the Church, likely to the missionary fund in support of his son Joshua who was serving a mission in Uruguay at the time. | Richmond Decl., ¶ 2, Ex. A, 234:6-235:4. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 81. | On January 9, 2015, Huntsman donated 1,500 shares of Huntsman Corporation stock as a tithing donation. | Richmond Decl., ¶ 2, Ex. A, 238:8-239:2. |
| 82. | Huntsman usually tithed directly, but sometimes contributed tithing through Brownie Capital, a family LLC. | Richmond Decl., ¶ 2, Ex. A, 57:20-24, 58:3-11. |
| 83. | Huntsman's contributions to the Church were voluntary, with no restrictions on how those contributions could be used by the Church. | Richmond Decl., ¶ 2, Ex. A, 61:4-7, 61:21-24, 62:2. |
| 84. | When Huntsman made tithing contributions, he believed he was obeying one of God's commandments and would receive blessings from God for doing so. | Richmond Decl., ¶ 2, Ex. A, 68:25-69:5, 69:21-25. |
| 85. | Huntsman's final tithing contribution was on January 9, 2015. | Richmond Decl., ¶ 2, Ex. A, 248:4-10. |
| 86. | Huntsman's decision to stop paying tithing and making other contributions had nothing to do with how City Creek was funded because, in Huntsman's own words, whether tithing was used to fund City Creek "was not discovered by me until 2019." | Richmond Decl., ¶ Ex. A, 280:12. |
| 87. | Huntsman and his family quit making contributions over a growing disillusionment with other doctrinal aspects of the Church. | Richmond Decl., ¶ 2, Ex. A, 248:12-249:1, 253:7-10. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 88. | Huntsman and his wife Marianne eventually resigned their memberships from the Church in 2020 because they "stopped believing certain doctrines unique to Mormonism." | Richmond Decl., ¶ 2, Ex. A, 263:10-15, 264:2-6. |
| 89. | Huntsman was aware of the ZCMI department store chain and visited the ZCMI Center Mall, which was one of the largest shopping malls in Salt Lake City.  He was also aware that ZCMI was owned by the Church. | Richmond Decl., ¶ 2, Ex. A, 24:8-18, 26:1-5. |
| 90. | Huntsman was aware of the Hotel Utah, which was a well-known hotel in downtown Salt Lake City and was aware that the Hotel Utah was owned by the Church. | Richmond Decl., ¶ 2, Ex. A, 27:5-13. |
| 91. | Huntsman was aware of a chain of bookstores called Deseret Book, and he knew that Deseret Book was owned by the Church. | Richmond Decl., ¶ 2, Ex. A, 27:14-22. |
| 92. | Huntsman was aware of the *Deseret News*, which was one of two major newspapers in Salt Lake City, and was aware that the *Deseret News* was owned by the Church. | Richmond Decl., ¶ 2, Ex. A, 27:23-28:6. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 93. | Huntsman was aware of the Deseret Gym, which was at one time a popular gym in downtown Salt Lake City, and was aware that the Deseret Gym was owned by the Church. | Richmond Decl., ¶ 2, Ex. A, 26:7-12, 26:16-18. |
| 94. | Huntsman wondered about where the money came from to start and fund these investments owned by the Church but he never asked any Church leaders. | Richmond Decl., ¶ 2, Ex. A, 28:23-29:7, 30:3-10. |
| 95. | Huntsman filed his complaint against the Church on March 22, 2021, alleging that the Church committed fraud. | Dkt. No. 1 ("Complaint"). |
| 96. | Huntsman alleges that the Church stated in five purported misrepresentations that it would not use tithing funds to purchase and develop the City Creek Project or to support a private insurance company, Beneficial Life Insurance. | Complaint, ¶¶ 2-6; Richmond Decl., ¶ 2, Ex. A, 77:10-22. |
| 97. | Huntsman also alleges that the Church fraudulently concealed the intended use of tithing funds for commercial purposes, including the developing City Creek Mall and supporting Beneficial Life Insurance. | Complaint, ¶¶ 35-36. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 98. | Huntsman's claim is not based on a general complaint about tithing funds being used for the Church's investments. | Richmond Decl., ¶ 2, Ex. A, 77:10-22. |
| 99. | In December of 2019, Lars Nielsen and his twin brother David Nielsen ( a former EPA employee), submitted a whistleblower to the IRS alleging that the Church misused contribution it received. | Complaint, ¶¶ 27-28; Richmond Decl., ¶ 2, Ex. A, 90:6-93:15. |
| 100. | Huntsman's claim that the funds to acquire and develop City Creek did not come from commercial entities owned by the Church or from earnings on invested reserve funds is based solely on the document produced by Lars and David Nielsen. | Richmond Decl., ¶ 2, Ex. A, 89:12-16, 96:11-97:20. |
| 101. | Huntsman does not know either of the Nielsen brothers responsible for the preparation of the document and does not know if they are honest men. | Richmond Decl., ¶ 2, Ex. A, 90:15-92:17. |
| 102. | Huntsman does not know whether the Nielsen brothers are honest men. | Richmond Decl., ¶ 2, Ex. A, 91:10-14, 92:13-17. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 103. | Before filing his Complaint, Huntsman communicated with the *Washington Post* reporter named Michelle Boorstein about this case because she was the one who wrote the story about the document prepared by the Nielsen brothers. | Richmond Decl., ¶ 2, Ex. A, 265:24-266:3, 266:17-20, 267:3-9. |
| 104. | Huntsman's lawyer gave the reporter a copy of the complaint in this case before it was filed. | Richmond Decl., ¶ 2, Ex. A, 267:16-268:2. |
| 105. | Huntsman has admitted that he wants publicity from this case. | Richmond Decl., ¶ 2, Ex. A, 268:24-269:3. |
| 106. | The first alleged misrepresentation identified by Huntsman was made by the president of the Church, President Gordon B. Hinckley, at a worldwide semi-annual general conference of the Church in April 2003. | Complaint, ¶¶ 18, 33; Richmond Decl., ¶ 2, Ex. A, 80:12-21. |

| 107. | In his April 2003 address, President Hinckley explained with respect to the funding for the acquisition and development of City Creek: | Complaint, ¶¶ 18, 33; Richmond Decl., ¶ 2, Ex. A, 80:25-82:2. |
|------|-----|-----|
| | "Faith in the payment of tithes and offerings increases despite the straitened economic circumstances in which we find ourselves. We are able to go forward with the building of meetinghouses and temples, with our vast education program, with the very many activities which are conditioned upon the tithing income of the Church.  I promise you that we will not put the Church in debt.  We will strictly tailor the program to the tithing income and use these sacred funds for the purposes designated by the Lord. | |
| | I call attention to that which has received much notice in the local press.  This is our decision to purchase the shopping mall property immediately to the south of Temple Square. | |
| | We feel we have a compelling responsibility to protect the environment of the Salt Lake Temple.  The Church owns most of the ground on which this mall stands.  The owners of the buildings have expressed a desire to sell.  The property | |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| | needs very extensive and expensive renovation.  We have felt it imperative to do something to revitalize this area.  But I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property.  Nor will they be used in developing it for commercial purposes.<br><br>        Funds for this have come and will come from those commercial entities owned by the Church.  These resources, together with the earnings of invested reserve funds, will accommodate this program." | |
| 108. | Huntsman did not hear President Hinckley's 2003 statement when it was made, but claims he read the statement sometime following the conference. | Richmond Decl., ¶ 2, Ex. A, 79:7-16. |
| 109. | Huntsman's claim that tithing funds were used to acquire and develop City Creek is solely based on Huntsman's reading of the document that was published by the *Washington Post*. | Richmond Decl., ¶ 2, Ex. A, 87:9-12, 88:14-89:8, 95:18-22, 96:1-6. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 110. | The second statement identified by Huntsman was made by Presiding Bishop H. David Burton at an October 8, 2003 press conference, as reported in the *Ensign* magazine: "None of this money comes from the tithing of our faithful members. That is not how we use tithing funds." | Complaint, ¶ 19; Richmond Decl., ¶ 2, Ex. A; 120:18-121:4. |
| 111. | Huntsman testified that he "would have read about" the Presiding Bishop H. David Burton press conference sometime "after" the press conference occurred. | Richmond Decl., ¶ 2, Ex. A, 120:2-12. |
| 112. | Huntsman does not recall where he read David Burton's statement. | Richmond Decl., ¶ 2, Ex. A, 120:11-12. |
| 113. | Huntsman's memory of reading about the press conference was that "tithing funds would not be used for commercial or non-charitable purposes," not that it had anything to do with City Creek. | Richmond Decl., ¶ 2, Ex. A, 120:13-17. |
| 114. | Huntsman testified that he has no basis on which to challenge the second statement beyond the document that was published by the *Washington Post*. | Richmond Decl., ¶ 2, Ex. A, 121:5-8. |

LARSON LLP
LOS ANGELES

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 115. | The third statement appeared in the *Ensign* magazine, but is not attributed to any person: "The Church first announced three years ago it was planning to redevelop the downtown area to energize the economy of the city that houses its headquarters and to bolster the area near Temple Square.  No tithing funds will be used in the redevelopment." | Compl., ¶ 20; Richmond Decl., ¶ 2, Ex. A, 158:11-24. |
| 116. | Huntsman states he read the third statement sometime after it was published in the December 2006 *Ensign* magazine, but cannot remember when he read it. | Richmond Decl., ¶ 2, Ex. A, 159:5-160:4. |
| 117. | Huntsman has no basis on which to challenge the third statement beyond the document published by the *Washington Post*. | Richmond Decl., ¶ 2, Ex. A, 160:6-13. |
| 118. | The fourth statement identified by Huntsman appeared in the *Deseret News* newspaper on March 27, 2007, but the statement is not attributed to any particular person: "Money for the project is not coming from LDS Church members' tithing donations.  City Creek Center is being developed by Property Reserve, Inc., the Church's real-estate development arm, and its money comes from other real-estate ventures." | Compl. ¶ 21; Richmond Decl., ¶ 2, Ex. A, 172:4-16. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 119. | Huntsman states he read the 2007 statement in the *Deseret News* on-line, but he cannot remember when he read it. | Richmond Decl., ¶ 2, Ex. A, 172:19-22, 173:8-10. |
| 120. | Huntsman has no basis on which to challenge the statement in the *Deseret News* beyond the document published by the *Washington Post*. | Richmond Decl., ¶ 2, Ex. A, 173:11-16. |
| 121. | The fifth statement identified by Huntsman appeared in the *Salt Lake Tribune* newspaper on October 5, 2012, and is attributed to Keith B. McMullin, who was the head of a Church commercial entity known as Deseret Management Corporation: "McMullin said not one penny of tithing goes to the Church's for-profit endeavors.  Specifically, the Church has said no tithing went towards City Creek Center." | Richmond Decl., ¶ 2, Ex. A, 215:18-216:10 |
| 122. | Huntsman states he read the 2012 statement in the S*alt Lake Tribune*, but he cannot remember when he read it. | Richmond Decl., ¶ 2, Ex. A, 216:13-16. |
| 123. | Huntsman has no basis on which to challenge the fifth statement beyond the document published by the *Washington Post*. | Richmond Decl., ¶ 2, Ex. A, 217:24-218:3. |

| SUF No. | Moving Party's Undisputed Material Facts | Supporting Evidence: |
|---|---|---|
| 124. | Huntsman contends that tithing, fast offering, missionary, and humanitarian aid contributions were improperly used as a loan or other source of funding for the Beneficial Life Insurance Company. | Richmond Decl., ¶ 2, Ex. A, 126:4-10, 127:20-23, 128:11-15, 129:9-12. |
| 125. | Huntsman testified that he cannot identify statements by Church leaders that such contributions would not be used as a loan or other funding for Beneficial Life. | Richmond Decl., ¶ 2, Ex. A, 127:11-18, 127:24-128:3, 128:24-129:3, 129:7, 129:21-24, 130:1. |
| 126. | Huntsman has expressed his intent to take discovery into how the Church uses the contributions it receives, naming the Church's three highest ecclesiastical authorities as people "likely to have discoverable information" about the church's "use of tithing funds." | Richmond Decl., ¶ 3, Ex. B. |
| 127. | Huntsman also claims that President Hinckley's statement influenced his decision whether to pay tithing in 2003. | Richmond Decl., ¶ 2, Ex. A, 83:1-16, 59:17-25, 60:15-22. |

DEFENDANT'S SEPARATE STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

LARSON LLP
LOS ANGELES

1  Dated:  August 9, 2021          LARSON LLP

2

3

4                                  By: /s/ Rick Richmond

5                                      Rick Richmond
                                       Matthew S. Manacek
6                                      Timothy C. Tanner
                                       Troy S. Tessem
7                                  Attorneys for Defendant
                                   THE CHURCH OF JESUS CHRIST OF
8                                  LATTER-DAY SAINTS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28