Rick Richmond (SBN 194962)
*rrichmond@larsonllp.com*
Matthew S. Manacek (SBN 312834)
*mmanacek@larsonllp.com*
Timothy C. Tanner (SBN 318081)
*ttanner@larsonllp.com*
Troy S. Tessem (SBN 329967)
*ttessem@larsonllp.com*
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone:(213) 436-4888
Facsimile: (213) 623-2000

Attorneys for Defendant
THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JAMES HUNTSMAN,<br><br>Plaintiff,<br><br>vs.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; and Does 1-10,<br><br>Defendants. | Case No. 2:21-cv-02504 SVW (SK)<br><br>*Assigned to the Hon. Stephen V. Wilson, Ctrm. 10A*<br><br>**DECLARATION OF RICK RICHMOND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[*Filed concurrently with Motion for Summary Judgment; Separate Statement; Declaration of Paul Rytting; (Proposed) Order; and (Proposed) Judgment)]*<br><br>Date:        August 30, 2021<br>Time:        1:30 p.m.<br>Ctrm.:        10A<br><br>Trial Date:        None Set |

## <u>DECLARATION OF RICK RICHMOND</u>

I, Rick Richmond declare and state as follows:

1.      I am a partner with Larson LLP, attorneys of record for THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS.  I have personal knowledge of the facts set forth herein.  If called as a witness, I could and would competently testify to the matters stated herein.  I make this declaration in support of Defendant's Motion for Summary Judgment.

2.      On July 16, 2021, I took the deposition of Plaintiff James Huntsman. Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the transcript of Huntsman's deposition, plus the Errata Sheet signed by Mr. Huntsman on July 28, 2021.

3.      Attached hereto as **Exhibit B** is a true and correct copy of Plaintiff's Initial Disclosures, dated June 23, 2021.  As set forth in his Initial Disclosures, Plaintiff seeks to obtain discovery

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 9th day of August, 2021, at Los Angeles, California.

/s/ Rick Richmond
RICK RICHMOND

DECLARATION OF RICK RICHMOND

**EXHIBIT A**

```
 1            UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3     _____
                                   )
 4     JAMES HUNTSMAN,             )
                                   )
 5          Plaintiff,             )
                                   )
 6        vs.                      )Case No.
                                   )2:21-cv-02504
 7     CORPORATION OF THE PRESIDENT )SVW (SKx)
       OF THE CHURCH OF JESUS CHRIST)
 8     OF LATTER-DAY SAINTS; and   )
       DOES 1-10,                  )
 9                                 )
            Defendants.            )
10     _____)
       _____
11
12
13
14
15     VIDEO-RECORDED DEPOSITION OF JAMES H. HUNTSMAN
16                VIA REMOTE COUNSEL
17                Buffalo, New York
18             Friday, July 16, 2021
19                   Volume I
20
21     Reported by:
       LORI SCINTA, RPR
22     CSR No. 4811
23     Job No. 4700665
24
25     PAGES 1 - 280
```

Page 1

```
 1        A   Yes.

 2        Q   And at some point in time your father

 3   assumed complete control of the company; is that

 4   correct?

 5        A   Yes.                                  08:17:42

 6        Q   As you were growing up in Salt Lake City,

 7   you and your family were members of the Church,

 8   correct?

 9        A   Yes.

10        Q   Your family would have been considered a   08:17:57

11   devout family in the Church, I take it?

12            MR. JONELIS:  Objection.  Calls for

13   speculation and lacks foundation.

14            You can answer, James.

15            THE WITNESS:  Yes.                     08:18:12

16   BY MR. RICHMOND:

17        Q   As an adult, in fact, you considered

18   yourself to be one of the Church's most devout

19   members.  Am I right?

20        A   Yes.                                   08:18:23

21        Q   As a boy growing up, you prayed together as

22   a family in your home, I suppose?

23            MR. JONELIS:  Objection.  Calls for

24   speculation, lacks foundation, and irrelevant.

25            You can answer.                        08:18:41
```

Page 16

```
 1        Q    And you know what I'm talking about when I

 2    say "seminary," right?

 3        A    Yes.

 4        Q    Seminary is a religious class that high

 5    school students go to, generally speaking, every day    08:20:50

 6    school is in session, right?

 7        A    Yes.

 8        Q    Did you attend seminary when you were a

 9    teenager?

10        A    Sporadically.                                  08:21:01

11        Q    Was your seminary held in a building close

12    to the high schools that you attended?

13        A    Not all the time.

14        Q    While you were growing up, your father

15    served in various leadership positions in the           08:21:23

16    Church, correct?

17        A    Yes, he did.

18        Q    As a boy and as a teenager, you learned

19    about tithing, correct?

20        A    Yes.                                           08:21:34

21        Q    You learned about tithing from meetings you

22    attended at Church, correct?

23        A    Yes.

24        Q    You learned about tithing from your parents

25    to some degree.  Am I right?                            08:21:49
```

                                                     Page 19

1         A    Yes.

2         Q    You understood as a boy and a teenager that

3    tithing is a commandment of God or at least that's

4    how it was taught, correct?

5         A    Correct --                              08:22:00

6              MR. JONELIS:   Objection, compound.

7              Sorry, James.

8    BY MR. RICHMOND:

9         Q    You understood that tithing meant a tenth,

10   right?                                            08:22:06

11        A    Yes.

12        Q    You were aware as a boy and a teenager that

13   the principle of tithing had its origins in the

14   Bible, correct?

15        A    Yes.                                    08:22:22

16        Q    Do you remember learning the story of

17   Abraham paying tithing to the great High Priest

18   Melchizedek?

19        A    I do recall that.

20        Q    Do you remember that Melchizedek gave      08:22:40

21   Abraham a blessing from God for making his tithing

22   contribution?

23        A    I do remember that reference.

24        Q    Did you ever wonder what the Priest

25   Melchizedek actually did with the tithing money or   08:22:57

                                                   Page 20

```
 1    bishop of your congregation once toward the end of

 2    each year to participate in a tithing settlement?

 3            MR. JONELIS:  Objection.  Vague and

 4    ambiguous.

 5            You can answer.                          08:24:26

 6            THE WITNESS:  Can you -- can you restate

 7    the question?  It's a very broad --

 8    BY MR. RICHMOND:

 9        Q   Sure.

10        A   -- period of time.                       08:24:35

11        Q   Sure.

12            If I say the term "tithing settlement," you

13    know what I'm talking about, don't you?

14        A   I know exactly what that is.

15        Q   And that's a meeting toward the end of each  08:24:42

16    year where a person comes in and talks to the bishop

17    of the congregation to settle up the tithing

18    account, correct?                         .

19        A   Yes.  I'm aware of the meetings.

20        Q   Did you participate in tithing settlements   08:24:58

21    as a boy and as a teenager, to your memory?

22        A   I don't recall.

23        Q   Did you participate in tithing settlements

24    as an adult?

25        A   Once.                                    08:25:09
```

                                              Page 22

```
 1    had made to the Church headquarters in Salt Lake

 2    City?

 3           MR. JONELIS:  Calls for speculation, vague

 4    and ambiguous, lacks foundation.

 5           You can answer.                        08:26:27

 6           THE WITNESS:  Yes.

 7    BY MR. RICHMOND:

 8       Q    When you were a teenager living in Utah,

 9    you were aware of the department chain in Salt Lake

10    City called ZCMI, correct?                    08:26:38

11       A    Yes.

12       Q    One of the biggest shopping malls in Salt

13    Lake City when you were growing up was called the

14    ZCMI Center Mall, right?

15       A    Yes.                                  08:26:52

16       Q    As a teenager, you went to the ZCMI Center

17    Mall, didn't you?

18       A    Yes.

19       Q    Would you agree that the ZCMI Center Mall

20    along with the Crossroads Mall was the biggest mall  08:27:08

21    in Salt Lake City when you were a teenager?

22           MR. JONELIS:  Objection.  Compound, calls

23    for speculation.

24           You can answer.

25           THE WITNESS:  No.                      08:27:18
```

Page 24

```
1        Q    Was there some point in your life when you
2    realized that ZCMI was owned by the Church?
3            MR. JONELIS:  Same objections.
4            You can answer.
5            THE WITNESS:  Yes.                          08:28:37
6    BY MR. RICHMOND:
7        Q    When you were a teenager, were you aware of
8    the Deseret Gym?
9        A    Yes.
10       Q    You knew that Deseret Gym was a popular gym  08:28:48
11   in downtown Salt Lake City, correct?
12       A    Yes.
13       Q    You knew Deseret Gym was owned by the
14   Church.  Am I right?
15       A    I don't recall.                             08:29:04
16       Q    At some point, you learned that Deseret Gym
17   was owned by the Church.  Am I right?
18       A    Yes.
19       Q    When you were a teenager, you were aware of
20   the Hotel Utah, weren't you?                         08:29:16
21       A    Yes.
22       Q    When you were a teenager, the Hotel Utah
23   was a well-known hotel in downtown Salt Lake City,
24   correct?
25           MR. JONELIS:  Calls for speculation, vague   08:29:29
```

Page 26

```
 1    and ambiguous.

 2            You can answer.

 3            THE WITNESS:  What was the question?

 4    BY MR. RICHMOND:

 5        Q   You knew that the Hotel Utah was a          08:29:35

 6    well-known hotel in downtown Salt Lake City when you

 7    were a teenager, correct?

 8            MR. JONELIS:  Same objections.

 9            THE WITNESS:  Yes.

10    BY MR. RICHMOND:                                    08:29:44

11        Q   You learned at some point that the

12    Hotel Utah was owned by the Church, correct?

13        A   Yes.

14        Q   When you were a teenager, you were aware of

15    a chain of bookstores called Deseret Book, right?   08:29:58

16        A   Yes.

17        Q   Deseret Book published books and other

18    materials written by a variety of authors, correct?

19        A   Yes.

20        Q   You knew at some point that Deseret Book    08:30:14

21    was owned by the Church, correct?

22        A   Yes.

23        Q   When you were a teenager, there were two

24    major newspapers in Salt Lake City, weren't there?

25        A   Yes.                                        08:30:31
```

Page 27

```
 1        Q    One of those newspapers was called the

 2   Deseret News.  Am I right?

 3        A    Yes.

 4        Q    And, at some point, you learned that the

 5   Deseret News was owned by the Church, correct?       08:30:42

 6        A    Yes.

 7        Q    Would it be fair to say that at least by

 8   your 20s and 30s, you knew that the Church owned

 9   several commercial ventures including a department

10   store chain, a large shopping mall, a hotel, a        08:31:04

11   downtown gym, a bookstore chain and a major

12   newspaper?

13        A    I don't have specifics on this -- the

14   particular assets that the Church had in its

15   portfolio.                                            08:31:21

16        Q    Of those items that we've already covered,

17   how old were you, would you say, when you realized

18   those were owned by the Church?

19             MR. JONELIS:  Lacks foundation, calls for

20   speculation.                                          08:31:36

21             THE WITNESS:  I don't recall.

22   BY MR. RICHMOND:

23        Q    Have you ever wondered where the money came

24   from that allowed the Church to start and fund the

25   various commercial enterprises I've just discussed    08:31:50
```

Page 28

1    with you?

2            MR. JONELIS:  Same objections.

3            THE WITNESS:  Yes.

4    BY MR. RICHMOND:

5        Q    Did you ever ask any Church leaders where    08:32:01

6    that money came from?

7        A    No.

8        Q    As a teenager and young adult, did you ever

9    wonder about how the Church's leaders were spending

10   and investing your tithing contributions?            08:32:20

11           MR. JONELIS:  Compound, vague and

12   ambiguous, and lacks foundation.

13           You can answer.

14           THE WITNESS:  Can you repeat the question,

15   please.                                              08:32:33

16   BY MR. RICHMOND:

17       Q    Sure.

18           As a teenager and young adult, did you ever

19   wonder about how the Church leaders were spending

20   and investing your tithing contributions?            08:32:41

21           MR. JONELIS:  Same objections.

22           THE WITNESS:  Can you define "young adult"?

23   BY MR. RICHMOND:

24       Q    Well, let me just ask it differently.

25           In your 20s and 30s, did you ever wonder      08:32:51

Page 29

```
 1    about how the Church's highest lead- -- I'm sorry.

 2    I'll ask it differently.

 3          In your 20s and 30s, did you ever wonder

 4    how the Church leaders were spending and investing

 5    your tithing contributions?                    08:33:05

 6        A   Yes.

 7        Q   Did you ever ask any Church leaders how

 8    your tithing contributions were being spent and

 9    invested?

10        A   No.                                    08:33:18

11        Q   Is there a reason why you did not ask?

12        A   Yes.

13        Q   What was that reason?

14        A   Because the answer at the time was provided

15    in Church manuals, priesthood manuals, General    08:33:35

16    Conference, Church magazines, and Sunday school.

17          So there's no need to ask the question.

18        Q   After high school, you decided to serve a

19    two-year mission for the Church, correct?

20        A   Yes.                                    08:33:56

21        Q   In early 1990, you had the Melchizedek

22    priesthood conferred on you before your missionary

23    service began, correct?

24        A   Yes.

25        Q   Was the Melchizedek priesthood conferred on  08:34:09
```

Page 30

```
 1    you by your father?

 2         A    Yes.

 3         Q    Your father ordained you to the office of

 4    an elder in the Church, correct?

 5         A    Yes.                                    08:34:20

 6         Q    You submitted your papers and received a

 7    call to serve in Germany as a missionary, correct?

 8         A    Yes.

 9         Q    In early 1990, you spend several weeks in

10    Provo, Utah at the missionary training center,       08:34:35

11    correct?

12         A    Yes.

13         Q    While you were in the missionary training

14    center, you began the process of learning how to

15    speak, read and write German, correct?              08:34:48

16         A    Yes.

17         Q    While you were in the missionary training

18    center, you learned the six missionary lessons that

19    would be used to teach people who were learning

20    about the Church when you were a missionary,         08:35:03

21    correct?

22              MR. JONELIS:  Vague and ambiguous.

23              You can answer.

24              THE WITNESS:  I did.

25    BY MR. RICHMOND:                                    08:35:11
```

Page 31

```
 1              THE WITNESS:  I did.

 2    BY MR. RICHMOND:

 3         Q   If you turn to the third page of Tab 4,

 4    there was a page devoted to the "Law of Tithing."  I

 5    know it's super small text but I have typed it out      09:01:30

 6    for myself.  I can read it to you.

 7              But do you see the heading, "The Law of

 8    Tithing"?

 9         A   Yes.

10         Q   Do you remember as a missionary teaching      09:01:38

11    people in Germany that tithing was a sacred law of

12    God?

13         A   I do.

14         Q   Do you remember teaching people in Germany

15    as a missionary that tithing meant one-tenth of our    09:01:54

16    income?

17         A   I do.

18         Q   Do you remember encouraging people who

19    decided they might want to become members of the

20    Church that they should plan to begin paying tithing   09:02:13

21    when they became a member of the Church?

22         A   I did.

23         Q   Do you remember teaching people in Germany

24    when you were a missionary that if they would pay

25    their tithing, God would open the windows of heaven    09:02:29
```

Page 37

| 1 | and pour out on them a blessing that there shall not |
| 2 | be room enough to receive it? |
| 3 | A   That was the text in the document, yes. |
| 4 | Q   And do you remember that that particular |
| 5 | teaching, that is, that the windows of heaven would   09:02:47 |
| 6 | be opened and a blessing would be poured out, that |
| 7 | comes from the Book of Malachi in the Old Testament? |
| 8 |      Do you remember that? |
| 9 |      MR. JONELIS:  Lacks foundation, assumes |
| 10 | facts not in evidence.                                09:03:03 |
| 11 |      You can answer. |
| 12 |      THE WITNESS:  I'm aware of that scripture. |
| 13 | BY MR. RICHMOND: |
| 14 | Q   After you completed your two-year mission |
| 15 | in Germany, you returned to Utah in early 1992; is    09:03:10 |
| 16 | that correct? |
| 17 | A   Yes. |
| 18 | Q   And very shortly thereafter, you began |
| 19 | working for your father's company while you were in |
| 20 | Utah, correct?                                        09:03:24 |
| 21 | A   Continued working. |
| 22 | Q   You had worked there before your mission, |
| 23 | also, I take it. |
| 24 | A   Correct. |
| 25 | Q   So when you returned from your mission, you   09:03:35 |

Page 38

```
 1    request that I received as I understood it was to

 2    provide records of the tithings at issue in the

 3    complaint filed by my client which pursuant to the

 4    complaint start in 2003, is when the alleged fraud

 5    begins, until there was no more tithing donations.      09:10:54

 6    So those are the records that were provided.

 7            So just to be clear as to whether there's

 8    other records that, Rick, you may have or that my

 9    client may have, the scope of what was provided was

10    within the purview of the time frame in the            09:11:12

11    complaint.  That's why that was provided.

12    BY MR. RICHMOND:

13        Q    Mr. Huntsman, did you pay tithing from 1993

14    to 2005, to your best memory or understanding?

15        A    Yes.                                          09:11:28

16        Q    Beginning in 2005, as a public company, the

17    Huntsman Corporation was required to make public

18    disclosures about the compensation of Huntsman

19    family members, correct?

20        A    Yes.                                          09:11:49

21        Q    And those public disclosures by the

22    Huntsman Corporation about the compensation of

23    Huntsman family members were made in filings to the

24    Securities and Exchange Commission, to your

25    understanding?                                         09:12:02
```

Page 45

```
 1    a variety of subjects, correct?

 2         A   I did.

 3         Q   Did you pay any tithing to the Church in

 4    2002, to your memory?

 5             MR. JONELIS:  Asked and answered.        09:22:15

 6             You can answer.

 7             THE WITNESS:  I believe yes.

 8    BY MR. RICHMOND:

 9         Q   You believe you paid other kinds of

10    contributions to the Church in 2002?              09:22:23

11             MR. JONELIS:  Vague and ambiguous.

12             You can answer.

13             THE WITNESS:  I need to check my specific

14    documents, tax returns and donations for that year,

15    to give you an exact amount of what was given to the  09:22:35

16    Church in what specific areas.

17    BY MR. RICHMOND:

18         Q   So just to set the stage for the rest of

19    the deposition, there are different categories of

20    contributions I want to ask you questions about with  09:22:50

21    respect to the Church.

22             So one kind of contribution to the Church

23    is generally known as tithing, correct?

24         A   That's correct.

25         Q   And we've discussed that one already.      09:23:01
```

Page 52

```
 1          There's another kind of contribution called

 2     fast offerings, correct?

 3          A    Yes.

 4          Q    What is your understanding of what fast

 5     offerings are used for?                          09:23:15

 6          A    To help the poor and needy and those that

 7     are suffering.

 8          Q    There's another kind of contribution called

 9     missionary, correct?

10          A    There is.                              09:23:29

11          Q    What is your understanding of what

12     missionary contributions are used for?

13          A    I don't know the specifics.  It was never

14     articulated where those monies went.

15          Q    There's another kind of contribution called  09:23:45

16     humanitarian aid, correct?

17          A    There is.

18          Q    What is your understanding of what

19     humanitarian aid contributions were used for?

20          A    I don't know.  I don't know the specifics  09:23:59

21     of how the Church allocated those funds.

22          Q    And did -- you made contributions to

23     humanitarian aid at different points, correct?

24               MR. JONELIS:  Lacks foundation and calls

25     for speculation.                                 09:24:16
```

                                              Page 53

```
 1        Q    And that's you and your wife, correct?

 2        A    That is correct.

 3        Q    That 500 Huntsman Way in Salt Lake City is

 4   the Huntsman Corporation headquarters address,

 5   correct?                                          09:28:22

 6        A    That is correct.

 7        Q    Did your wife, Marianne, work outside of

 8   the home in 2003?

 9             MR. JONELIS:  Vague and ambiguous.

10             You can answer.                         09:28:39

11             THE WITNESS:  She did not.

12   BY MR. RICHMOND:

13        Q    Did your wife, Marianne, work outside of

14   the home at any time from 2003 to 2020?

15        A    She did not.                            09:28:50

16        Q    Did your wife, Marianne, receive any income

17   herself apart from your income from any source

18   between 2003 and 2020?

19        A    She did not.

20        Q    From 2003 to 2020, did you or your wife,   09:29:12

21   Marianne, ever make any tithing or other

22   contributions to the Church through a family

23   foundation, an LLC, or other entities that you

24   remember?

25             MR. JONELIS:  Compound, vague and        09:29:27
```

Page 57

1    ambiguous.

2            You can answer.

3            THE WITNESS:  Yes.

4    BY MR. RICHMOND:

5        Q    What were those other entities?        09:29:40

6        A    The family LLC that my wife and I owned.

7        Q    So some of your contributions came from

8    that LLC between 2003 and 2020?

9        A    I believe so.

10       Q    What is the name of that LLC?          09:30:01

11       A    Brownie Capital.

12       Q    Are there any other entities that would

13   have been the vehicle to make contributions to the

14   Church for your wife or yourself other than

15   Brownie Capital?                                09:30:23

16       A    Not that I'm aware of.

17       Q    Going back to Tab 7 -- I will have this

18   marked in a moment -- but just looking at the first

19   page of 2000- -- I'm sorry.  I'll say it

20   differently, Mr. Huntsman.                      09:30:41

21           Looking at the first page of Tab 7 for the

22   year 2003, it shows a contribution for you and your

23   wife of $50,000 in cash.

24           Do you see that?

25       A    I do.                                  09:30:53

                                                Page 58

```
 1        Q    When you made this $50,000 cash

 2   contribution to the Church, the donation was

 3   voluntary.

 4            Am I correct?

 5        A    It was.                                09:31:07

 6        Q    In 2003 when you made your $50,000 cash

 7   contribution to the Church, you attached no strings

 8   to the contribution and placed no restrictions on

 9   it, correct?

10            MR. JONELIS:  Compound, vague and        09:31:20

11   ambiguous.

12            You can answer.

13            THE WITNESS:  I didn't need to.

14   BY MR. RICHMOND:

15        Q    So the answer to my question is -- let me  09:31:27

16   ask it again.

17            In 2003 when you made your $50,000 cash

18   contribution to the Church, you attached no strings

19   to the contribution, correct?

20            MR. JONELIS:  Vague and ambiguous,        09:31:40

21   argumentative.

22            You can answer.

23            And lacks foundation.  Sorry.

24            You can answer.

25            THE WITNESS:  I did not.                  09:31:50
```

Page 59

```
1    BY MR. RICHMOND:

2        Q   And in 2003 when you made your $50,000 cash

3    contribution to the Church, you placed no

4    restrictions on how it would be used, correct?

5            MR. JONELIS:  Vague and --                    09:32:02

6            THE WITNESS:  I didn't --

7            MR. JONELIS:  -- calls for speculation,

8    lacks foundation, and argumentative.

9            You can answer.

10           THE WITNESS:  I didn't need to.              09:32:11

11   BY MR. RICHMOND:

12       Q   Let me just ask it again, Mr. Huntsman.  I

13   know you may have reasons that you'll be free to

14   explain in the litigation.

15           But in 2003 -- so here's my question -- in  09:32:21

16   2003 when you made your $50,000 cash contribution to

17   the Church, did you place any restrictions on how

18   that contribution would be used?

19           MR. JONELIS:  Vague and ambiguous, calls

20   for speculation, lacks foundation, argumentative.    09:32:37

21           You can answer, James.

22           THE WITNESS:  I did not.

23   BY MR. RICHMOND:

24       Q   All of your contributions to the Church

25   from 2003 to 2020 were voluntary contributions,     09:32:52
```

Page 60

```
 1    correct?

 2         A    I'm sorry.  Those years are incorrect.

 3         Q    Okay.  I understand what you're saying.

 4              All of your contributions to the Church

 5    from 2003 to 2015 were voluntary contributions,      09:33:11

 6    correct?

 7         A    That is correct.

 8         Q    You did not attach -- I'm sorry.  Let me

 9    ask it differently.

10              You did not place any restrictions on how  09:33:25

11    your contributions would be used by the Church from

12    2003 to 2015, correct?

13              MR. JONELIS:  Lacks foundation, vague and

14    ambiguous, assumes facts not in evidence, calls for

15    speculation and argumentative.                       09:33:41

16              You can answer.

17              THE WITNESS:  No.

18    BY MR. RICHMOND:

19         Q    I'm sorry.  Either I asked it wrong or you

20    answered wrong, so let me ask it again.              09:33:52

21              Did you place any restrictions on the

22    contributions you made to the Church between 2003

23    and 2015 in terms of how those contributions could

24    be used by the Church?

25              MR. JONELIS:  Same objections.             09:34:10

                                              Page 61
```

```
 1              You can answer.

 2              THE WITNESS:  No.

 3       BY MR. RICHMOND:

 4          Q   In 1995, your father made a $100 million

 5       donation to the University of Utah.              09:34:21

 6              Do you remember that?

 7              MR. JONELIS:  Lacks foundation.

 8              You can answer.

 9              THE WITNESS:  I do.  I don't have the exact

10       year of that donation -- (not understandable).  09:34:33

11              THE REPORTER:  I'm sorry.  What was the end

12       of the answer?

13              THE WITNESS:  I don't have the exact year

14       of that donation.

15       BY MR. RICHMOND:                                09:34:45

16          Q   At some point in the mid-'90s, your father

17       donated $100 million to the University of Utah to

18       build a world-class cancer institute, correct?

19              MR. JONELIS:  Lacks foundation and calls

20       for speculation.                                09:35:00

21              You can answer.

22              THE WITNESS:  He did.

23       BY MR. RICHMOND:

24          Q   And that donation was restricted in the

25       sense that the University of Utah could not use the  09:35:07
```

Page 62

```
 1        Q   Well, I'll just take some general time
 2    frames.
 3            Between the time you were, say, two years
 4    old and nine years old, you lived in Utah, correct?
 5        A   Correct.                              09:47:46
 6        Q   And then you were in Washington, D.C. for
 7    three years while your father served as a mission
 8    president.  And you came back when you were 12, and
 9    you were there throughout your teenage years until
10    your mission, correct?                        09:48:00
11        A   That is correct.
12        Q   And then after your mission, you came back
13    when you were 21 years old.  And in 2003, you were
14    32 years old.  So that time frame, as well, correct?
15        A   No.                                   09:48:13
16        Q   Did you live somewhere else as an adult
17    between age 21 and 32?
18        A   I did.
19        Q   Where was that?
20        A   Texas.                                09:48:24
21        Q   How many years were you in Texas?
22        A   Approximately 15 years.
23        Q   In -- we're going to go back to what is
24    Tab 7, Mr. Huntsman.  We were looking at that before
25    break.  We had been looking at the first page, and I  09:48:47
```

Page 67

1    now want to look at the second page.

2           Do you see that?

3       A   I do.

4       Q   And that is a letter from you and your wife

5    to a Lori P. Timothy at UBS PaineWebber, correct?        09:49:09

6       A   Correct.

7       Q   And the letter is signed by you and your

8    wife and dated late December 2003.

9           Do you see that at the bottom?

10      A   Correct.                                          09:49:24

11      Q   And this refers to the $50,000 cash

12   contribution you made to the Church in 2003,

13   correct?

14      A   I'm just looking for this specific date on

15   this document.  Oh, there it is at the bottom.          09:49:43

16          Yep, 2003.  Yes.

17      Q   In 2003, you designated $45,000 of your

18   $50,000 contribution to be paid as a tithing to the

19   Church, correct?

20      A   Yes, I did.                                       09:50:00

21      Q   In 2003, you designated $5,000 of your

22   $50,000 contribution to be paid as fast offerings to

23   the Church, correct?

24      A   That is correct.

25      Q   In 2003, at that time, did you believe you     09:50:13

Page 68

```
 1    were obeying one of God's commandments by paying
 2    tithing?
 3            MR. JONELIS:  Objection.  Vague and
 4    ambiguous, lacks foundation, argumentative.
 5            THE WITNESS:  I was.  I did.            09:50:26
 6            MR. JONELIS:  I'm sorry, Rick.  Did my -- I
 7    got a notification on my screen.  It says my --
 8    (audio distortion) -- has changed.
 9            I'm not doing anything.  I'm just talking.
10    Can you hear me?                                 09:50:48
11            MR. RICHMOND:  Yes.
12            MR. JONELIS:  And it says, "Cannot start
13    video."
14            But you can hear me okay?
15            MR. RICHMOND:  Yes, I can hear you        09:50:55
16    although, weirdly, it looks like your mute button --
17    oh, yeah.  There you are.
18            MR. JONELIS:  Strange.  Okay.  I apologize.
19    Just want to make sure I was heard.
20            MR. RICHMOND:  That's okay.              09:51:06
21       Q    In 2003, at that time when you paid your
22    tithing, did you believe you would receive blessings
23    from God?
24            MR. JONELIS:  Same objections.
25            THE WITNESS:  I did.                     09:51:16
```

Page 69

```
 1        Q   So let me --
 2        A   I don't know if -- I'm sorry.  I still
 3     don't know of you're referencing to a specific line
 4     in the document, if you're quizzing me on certain
 5     quotes given in 2003.                          10:00:51
 6             I don't mean to be argumentative.  I just
 7     want to be sure I answer the question correctly.
 8        Q    Got it.  And I am just trying to figure out
 9     whether you -- because I just want it to be clear.
10             So I'm trying to make sure so there's no    10:01:06
11     misunderstanding that it is your claim in this case
12     that Church leaders repeatedly assured Church
13     members and the general public that tithing funds
14     would not be used to fund any commercial profit
15     ventures.                                      10:01:25
16             Is that your claim in this case?
17             MR. JONELIS:  The document speaks for
18     itself.
19             You can answer.
20             THE WITNESS:  I think the claim is      10:01:41
21     specifically involving the City Creek Mall and
22     Beneficial Life.
23             Now, whether or not the Church had other
24     interests or investments at the time, I do not know.
25     They very well could have.  I just don't know.  10:01:53
```

Page 77

```
 1    vague and ambiguous.

 2            You can answer.

 3            THE WITNESS:  Yes.

 4    BY MR. RICHMOND:

 5       Q   Did you watch the April conference in 2003?   10:03:03

 6       A   I don't recall.

 7       Q   Do you remember hearing President Hinckley

 8    give any talk in April of 2003?

 9       A   My practice at the time was to read the

10    complete conference sessions in the Ensign Special   10:03:26

11    Edition, which was printed two months after

12    conference.

13       Q   In mid-2003, did you, in fact, read

14    President Hinckley's talks from the April conference

15    of that year?                                        10:03:44

16       A   I did.

17       Q   And when you read President Hinckley's

18    discussion of City -- well, let me back up.

19            Did you read the talk in which President

20    Hinckley talked about City Creek?                    10:03:59

21       A   I did.  I would have read all of

22    President Hinckley's addresses in 2003.

23            MR. RICHMOND:  All right.  Let's turn to

24    Tab 8.

25            Well, let me go back.  Let's mark your       10:04:09
```

                                                    Page 79

1    complaint as an exhibit.  What are we up to?  3?

2              MR. JONELIS:  3.

3              MR. RICHMOND:  We'll mark Tab 1 as

4    Exhibit 3.

5              (Exhibit 3 was marked for              10:04:19

6              identification by the court reporter

7              and is attached hereto.)

8              MR. RICHMOND:  All right.  Let's turn to

9    Tab 8.

10        Q    Do you have that, Mr. Huntsman?          10:04:30

11        A    I do.

12        Q    And you see at the bottom this is taken

13   from the Church's website and it's from General

14   Conference 2003 for the meeting in the month of

15   April.                                           10:04:50

16             Do you see that?

17        A    I do.

18        Q    All right.  This talk is given by Gordon B.

19   Hinckley, who was president of the Church in 2003.

20             Do you see that?                        10:04:58

21        A    I do.

22        Q    All right.  Now turn to the second page of

23   the talk and, about halfway down the page, there are

24   three paragraphs.

25             They say, "I call attention to that     10:05:12

                                                    Page 80

```
 1              which has received much notice in the

 2              local press.  This is our decision to

 3              purchase the shopping mall property

 4              immediately to the south of Temple

 5              Square.                                    10:05:25

 6              "We feel we have a compelling

 7              responsibility to protect the

 8              environment of the Salt Lake Temple.

 9              The Church owns most of the ground on

10              which this mall stands.  The owners of     10:05:35

11              the buildings have expressed a desire

12              to sell.  The property needs very

13              extensive and expensive renovations.

14              We have felt it imperative to do

15              something to revitalize this area.         10:05:49

16              But I wish to give the entire Church

17              the assurance that tithing funds have

18              not and will not be used to acquire

19              this property.  Nor will they be used

20              in developing it for commercial            10:05:59

21              purpose.

22              "Funds for this have come and will

23              come from those commercial entities

24              owned by the Church.  These resources,

25              together with the earnings of invested     10:06:08
```

Page 81

1          reserve funds, will accommodate this

2          program."

3          Do you see that language?

4      A   I do see it.

5      Q   Did you read that language in mid-2003?          10:06:18

6      A   Yes, I did.

7      Q   When you read that language, did you say

8   anything to anybody like, "Phew, I'm sure glad

9   President Hinckley confirmed that earnings on

10  reserve funds and funds from commercial ventures     10:06:35

11  will be used for City Creek and not tithing funds

12  themselves"?

13          MR. JONELIS:  Vague and ambiguous,

14  compound, argumentative.

15          You can answer.                                10:06:45

16          THE WITNESS:  I don't recall.

17  BY MR. RICHMOND:

18      Q   When you read that statement in mid-2003,

19  did you say, "Oh, good" -- to yourself, did you say,

20  "I'm so glad to know that.  I guess I'll pay my      10:06:56

21  tithings this year"?

22          MR. JONELIS:  Same objections.

23          THE WITNESS:  I don't recall what I would

24  have said to myself in 2003.

25  BY MR. RICHMOND:                                     10:07:07

                                                    Page 82

```
 1        Q   In 2003 when you read those words from
 2   President Hinckley, did it have any effect on you at
 3   all as to whether you were or were not going to pay
 4   tithing that year?
 5            MR. JONELIS:  Vague and ambiguous,          10:07:19
 6   compound.
 7            You can answer.
 8            THE WITNESS:  It was a reassurance that
 9   tithing would be used in the way that the Church
10   taught that it would be used.                        10:07:34
11   BY MR. RICHMOND:
12        Q   And, on that basis, you decided to pay your
13   tithing that year?
14        A   It would have influenced my decision to pay
15   tithing.                                             10:07:45
16        Q   Were there other -- you say, "It would
17   have."
18            Did it or did it not?
19        A   It did.
20            MR. RICHMOND:  Now, in -- let's go ahead    10:07:50
21   and mark that Tab 8 as Exhibit 4.
22            (Exhibit 4 was marked for
23            identification by the court reporter
24            and is attached hereto.)
25   BY MR. RICHMOND:                                     10:08:03
```

Page 83

```
 1    tithing funds were used to acquire the City Creek

 2    property?

 3              MR. JONELIS:  Misstates prior testimony,

 4    lacks foundation, vague and ambiguous.

 5              You can answer.                          10:11:45

 6              THE WITNESS:  Can you repeat the question?

 7    BY MR. RICHMOND:

 8         Q    Sure.

 9              What is your -- what is the basis for your

10    belief that tithing funds were used to acquire     10:11:54

11    City Creek property?

12         A    The whistleblower complaint.

13         Q    Any other basis for your belief that -- let

14    me ask it differently.

15              Is the whistleblower complaint your sole   10:12:12

16    basis for believing that tithing funds were used to

17    acquire the City Creek property?

18              MR. JONELIS:  Vague and ambiguous, lacks

19    foundation.

20              You can answer.                          10:12:25

21              THE WITNESS:  Are you -- can you repeat the

22    question?

23    BY MR. RICHMOND:

24         Q    Sure.

25              Before I repeat the question, I'll just say   10:12:37
```

Page 87

1   as the preface, you have told me that you believe a

2   certain portion of President Hinckley's statements

3   were outright lies.  I'm focused on the first

4   sentence which is when he says, "I wish to give the

5   entire Church the assurance that tithing funds have        10:12:54

6   not and will not be used to acquire this property,"

7   referencing City Creek.

8           You have told me you believe that's an

9   outright lie.  I've asked you the basis for your

10   belief on why you believe tithing was used to              10:13:06

11   acquire the City Creek property.

12           So far you have identified something you've

13   called the whistleblower report.

14           So here's my question.  Apart from the

15   whistleblower report, is there any other basis for         10:13:19

16   your belief that tithing funds were used to acquire

17   the City Creek property?

18           MR. JONELIS:  Misstates prior testimony.

19           You can answer.

20           THE WITNESS:  No.                                  10:13:30

21   BY MR. RICHMOND:

22       Q   Let's go to the next sentence, which was,

23   "Nor will they be used in developing it for

24   commercial purposes."

25           What is the basis for your belief that             10:13:42

Page 88

| | |
|---|---|
| 1 | tithing money was used to develop City Creek for |
| 2 | commercial purposes? |
| 3 | A   The whistleblower complaint. |
| 4 | Q   Apart from the whistleblower complaint, is |
| 5 | there any other basis for your belief that tithing   10:13:59 |
| 6 | was used to develop City Creek for commercial |
| 7 | purposes? |
| 8 | A   No. |
| 9 | Q   Moving to the next sentence, "Funds from |
| 10 | this have come and will come from those commercial   10:14:12 |
| 11 | entities owned by the Church." |
| 12 | My question for you is:  What is the basis |
| 13 | for your belief that the funds that were used to |
| 14 | acquire and develop City Creek did not come from |
| 15 | commercial entities owned by the Church?   10:14:27 |
| 16 | A   I refer to the whistleblower complaint. |
| 17 | Technically, I don't believe it's a complaint.  I'd |
| 18 | just like to state for the record that I'm just |
| 19 | going to refer to it as the whistleblower documents. |
| 20 | Q   Okay.  That's fine.  Let's --   10:14:47 |
| 21 | MR. JONELIS:  And that's, Rick, why I |
| 22 | objected.  I mean, you haven't laid foundation for |
| 23 | what that is.  There is a bunch of, as you know, |
| 24 | documents, including evidence that was attached, |
| 25 | testimony, all of those things.   10:15:00 |

Page 89

```
 1          Can we just lay some foundation as to when
 2   we talk about what you said is the whistleblower
 3   report and what my client said is the whistleblower
 4   complaint, that we're not like talking about a
 5   single piece of paper or a million pieces of paper.   10:15:13
 6          I'd like to establish that universe so
 7   we're not locking in either you or my client into
 8   something inaccurate.
 9   BY MR. RICHMOND:
10       Q   When you say "whistleblower complaint" or   10:15:24
11   "whistleblower" -- let me -- when you talk about
12   "whistleblower," what are you talking about,
13   Mr. Huntsman?
14          MR. JONELIS:  Thank you.
15          THE WITNESS:  I'm referring to the         10:15:36
16   documents that were submitted to the IRS by a former
17   employee of Ensign Peak Advisors.
18   BY MR. RICHMOND:
19       Q   Do you know that employee?
20          MR. JONELIS:  Vague and ambiguous.          10:15:49
21          You can answer.
22          THE WITNESS:  Not personally.
23   BY MR. RICHMOND:
24       Q   I'm sorry.  I didn't hear your answer.
25       A   Not personally.                            10:15:55
```

Page 90

```
 1        Q    Do you know who David Nielsen is?

 2        A    I know of him.

 3        Q    And what do you know of him?

 4        A    Not very much.

 5        Q    Do you know anything?                    10:16:09

 6        A    Well, yes.

 7        Q    What do you know?

 8        A    That he was a former employee of Ensign

 9   Peak Advisors.

10        Q    Do you have any idea whether David Nielsen   10:16:22

11   is an honest man?

12        MR. JONELIS:   Vague and ambiguous, calls

13   for speculation, and argumentative.

14        THE WITNESS:   I don't know.

15   BY MR. RICHMOND:                                 10:16:32

16        Q    Do you know who Lars Nielsen is?

17        A    I do.

18        Q    Who is he?

19        A    His twin brother.

20        Q    That is to say, Lars Nielsen is the twin   10:16:42

21   brother of David Nielsen; is that correct?

22        A    I believe so.

23        Q    Do you know anything else about

24   Lars Nielsen other than that he's the twin brother

25   of David Nielsen?                                10:16:55
```

Page 91

```
 1              MR. JONELIS:  Vague and ambiguous, calls
 2   for a narrative.
 3              You can answer.
 4              THE WITNESS:  I think he graduated from
 5   UCLA Business School.                            10:17:03
 6   BY MR. RICHMOND:
 7        Q    Do you know anything else about
 8   Lars Nielsen?
 9        A    No --
10              MR. JONELIS:  Same objections.        10:17:09
11              THE WITNESS:  Not really.
12   BY MR. RICHMOND:
13        Q    Do you know whether Lars Nielsen is an
14   honest man?
15              MR. JONELIS:  Vague and ambiguous, calls  10:17:15
16   for speculation and argumentative.
17              THE WITNESS:  I don't know.
18   BY MR. RICHMOND:
19        Q    I'm going to come back to Tab 8, but let's
20   turn to Tab 44, please.                          10:17:29
21              Do you have Tab 44 opened up there,
22   Mr. Huntsman?
23        A    I do.
24        Q    The first page says a "Letter to an IRS
25   Director," and on the bottom it's copyrighted 2019  10:17:59
```

Page 92

```
 1    by Lars Nielsen.

 2           Do you see that?

 3       A   I do.

 4       Q   This particular document print is -- at the

 5    bottom of the pages, you'll see that that Lars        10:18:12

 6    Nielsen reference runs throughout the document at

 7    least up until the exhibits.

 8           Do you see that?

 9       A   I do.

10       Q   And there are a lot of exhibits attached       10:18:29

11    running from A through S, and some of those exhibits

12    have multiple subparts like E.1, .2, .3; F.1, .2;

13    H.1, .2, things like that.

14           Do you see that?

15       A   I do.                                          10:18:43

16       Q   So you've said the basis for your -- at

17    least some of your claims of the Church telling

18    outright lies in this case are something that you

19    called the whistleblower complaint, and then you

20    said whistleblower documents.                        10:19:01

21           Is Exhibit 44 what you mean when you make

22    that reference?

23           THE REPORTER:  "Exhibit 44"?

24           MR. RICHMOND:  I am sorry.  Tab 44.

25           THE WITNESS:  It appears to be.               10:19:11
```

Page 93

```
 1    And then he just showed you that document.

 2           We are just trying to -- so for consistency

 3    sake, what are we going to call that?  When you say

 4    "whistleblower complaint," is it that document, just

 5    so we're consistent in what we're talking about?      10:20:47

 6           THE WITNESS:  Right.  And I think I said

 7    "whistleblower document" is how I would refer to it.

 8    BY MR. RICHMOND:

 9      Q    So going forward, are we referring to

10    Exhibit 5, which is under Tab 44, as "whistleblower    10:20:59

11    document"?

12      A    Under 44?  I believe -- yes, I believe

13    that's the right one.

14      Q    So back to Exhibit 8 [sic], in -- with the

15    first sentence we have already asked several          10:21:17

16    questions about that, so I'll just give the wrap-up

17    question to make sure there is no confusion.

18           Other than the whistleblower document which

19    we've now marked as Exhibit 5, do you have any other

20    basis for your belief that tithing funds were used    10:21:33

21    to acquire the City Creek property?

22      A    Not at this time.

23      Q    And now on to the next sentence, we had

24    asked a number of questions, and so I want to be

25    clear for the wrap-up.                                10:21:48
```

Page 95

```
 1          Again, the question is:  Other than the

 2    whistleblower document marked as Exhibit 5, do you

 3    have any other basis for your belief that tithing

 4    funds were used to develop City Creek for commercial

 5    purposes?                                    10:22:04

 6          A    Not at this time.

 7          Q    All right.  Next sentence, said, "Funds for

 8    this have come and will come from those commercial

 9    entities owned by the Church."

10          And I may have asked you this.  If I did, I   10:22:18

11    apologize.  But what is the basis for your belief

12    that the funds to acquire and develop City Creek did

13    not come from commercial entities owned by the

14    Church?

15          A    The whistleblower document.          10:22:37

16          Q    Other than the whistleblower document, is

17    there any other basis for your belief that the funds

18    for the acquisition and development of City Creek

19    did not come from commercial entities owned by the

20    Church?                                       10:22:53

21          A    Can you repeat the question?

22          Q    Sure.

23          Other than the whistleblower document that

24    we've identified as Exhibit 5, do you have any other

25    basis for your belief that the funds used to acquire  10:23:05
```

Page 96

```
 1   and develop City Creek did not come from commercial

 2   entities owned by the Church?

 3        A    Not at this time.

 4        Q    Last sentence, "These resources, together

 5   with the earnings of invested reserve funds, will      10:23:19

 6   accommodate this program."

 7             What is the basis for your belief that the

 8   resources necessary to acquire and develop City

 9   Creek did not come from earnings on invested reserve

10   funds at the Church?                                    10:23:36

11             MR. JONELIS:  Misstates the document,

12   but -- vague and ambiguous.

13             You can answer if you understand it.

14             THE WITNESS:  The whistleblower document.

15   BY MR. RICHMOND:                                        10:23:48

16        Q    Other than the whistleblower document, is

17   there any other basis for your belief that earnings

18   from invested reserve funds of the Church were not

19   used to acquire and develop the City Creek

20   property -- the City Creek?                             10:24:04

21        A    Not at this time.

22        Q    Have you personally read the whistleblower

23   document marked as Exhibit 5?

24        A    Yes.

25        Q    What does the whistleblower document         10:24:25
```

Page 97

```
 1    President Hinckley made these outright lies.

 2          Your middle name, Haight, is a family name,

 3    correct?

 4        A   Correct.

 5        Q   Your mother's maiden name was Haight,        10:33:43

 6    right?

 7        A   Correct.

 8        Q   Your mother's father was named David B.

 9    Haight, correct?

10        A   That is correct.                            10:33:53

11        Q   That means David B. Haight was your

12    grandfather, correct?

13        A   Correct.

14        Q   You remember your Grandfather Haight very

15    well, don't you?                                    10:34:02

16        A   I do.

17        Q   Would you agree that your Grandfather

18    Haight was a kind man with a gentle spirit?

19          MR. JONELIS:  Vague and ambiguous.

20          THE WITNESS:  I would agree with that         10:34:16

21    assessment.

22    BY MR. RICHMOND:

23        Q   You would agree that your Grandfather

24    Haight was an honest man, wouldn't you?

25          MR. JONELIS:  Calls for speculation, vague    10:34:24
```

Page 103

```
 1    and ambiguous.

 2            THE WITNESS:  As far as I know.

 3    BY MR. RICHMOND:

 4        Q   In fact, your Grandfather Haight believed

 5    that honesty is not only the best policy, it's the      10:34:33

 6    only policy, right?

 7            MR. JONELIS:  Vague and ambiguous,

 8    argumentative, calls for speculation.

 9            THE WITNESS:  Is that his quote?  I don't

10    know what --                                            10:34:50

11    BY MR. RICHMOND:

12        Q   Okay.  Let's turn to Tab 9 if you would,

13    please.

14            Are you there at Tab 9?

15        A   I am.                                           10:35:11

16        Q   Are you aware that your Grandfather Haight

17    wrote a book called, "A Light Unto the World"?

18        A   I am not aware of this book.

19        Q   Were you aware that your Grandfather Haight

20    wrote a book called "A Light Unto the World"?          10:35:23

21            MR. JONELIS:  Asked and answered.

22            THE WITNESS:  I don't recall this book.

23    I've never read it.

24    BY MR. RICHMOND:

25        Q   Your Grandfather Haight in your view was a      10:35:37
```

Page 104

```
 1    devout member of the Church, wasn't he?

 2           MR. JONELIS:  Vague and ambiguous, calls

 3    for speculation.

 4           You can answer.

 5           THE WITNESS:  For certain parts of his    10:35:48

 6    life, yes.

 7    BY MR. RICHMOND:

 8       Q   Certainly in the later years of his life,

 9    he was a devout member, correct?

10           MR. JONELIS:  Vague and ambiguous,        10:35:58

11    argumentative, and calls for speculation.

12           THE WITNESS:  I assume he was, yes.
```

```
13    BY MR. RICHMOND:

14       Q   In your understanding, the Church is led at

15    the very stop by a first presidency consisting of a   10:36:12

16    president and two counselors, correct?

17       A   That is my understanding, yes.

18       Q   When you were a teenager, the president of

19    the Church was Spencer W. Kimball.  And then, after

20    he died, Ezra Taft Benson, correct?               10:36:29

21       A   Correct.

22       Q   And the counselors that served these two

23    presidents had been serving in the Quorum of the

24    Twelve Apostles prior to being counselors, correct?

25       A   I believe that is correct.                10:36:45
```

Page 105

```
 1        Q    And do you remember that apostles who

 2   served as counselors in the first presidency when

 3   you were a teenager included N. Elden Tanner,

 4   Marion G. Romney, and Gordon B. Hinckley?

 5        A    I'd have to look back at the specifics of      10:37:05

 6   Church leadership at that period of time.  I don't

 7   know off the top of my head who the first presidency

 8   was when I was a teenager.

 9        Q    You knew at some point in time before he

10   became president of the Church Gordon B. Hinckley      10:37:15

11   had been a counselor to other presidents, correct?

12        A    Yes.

13        Q    When you were about five years old, your

14   Grandfather Haight was called to serve as an apostle

15   of the Quorum of the Twelve Apostles, correct?        10:37:29

16            MR. JONELIS:  Lacks foundation, calls for

17   speculation.

18            THE WITNESS:  I don't recall the specifics

19   of that event when I was five.

20   BY MR. RICHMOND:                                        10:37:39

21        Q    You know that when you were a young boy,

22   your Grandfather Haight was called to be an apostle

23   and a member of the Quorum of the Twelve Apostles,

24   correct?

25            MR. JONELIS:  Same objections.                 10:37:50
```

Page 106

```
 1              THE WITNESS:  Yes.
 2    BY MR. RICHMOND:
 3        Q    In 2003 when you claim President Hinckley
 4    told these outright lies, your Grandfather Haight
 5    was serving as one of the Twelve Apostles of the      10:37:59
 6    Church, correct?
 7        A    In 2003, he was one of the Twelve Apostles,
 8    yes.
 9        Q    And, to your understanding, in the Church
10    hierarchy, the Quorum of the Twelve Apostles is       10:38:10
11    equal in authority and power to the first
12    presidency, correct?
13              MR. JONELIS:  Calls for an expert opinion,
14    vague and ambiguous, calls for speculation.
15              THE WITNESS:  That's the policy of the      10:38:21
16    Church.
17    BY MR. RICHMOND:
18        Q    And as a member of the Quorum of the Twelve
19    Apostles, your Grandfather Haight served right
20    alongside Gordon B. Hinckley, correct?               10:38:33
21              MR. JONELIS:  Same objections.
22              THE WITNESS:  They served together, yes.
23    BY MR. RICHMOND:
24        Q    Did you ever hear your Grandfather Haight
25    accuse Gordon B. Hinckley of being a dishonest man?  10:38:45
```

Page 107

```
 1        Q   Do you blame your Grandfather Haight in any

 2   way for the Church in how it used funds to develop

 3   City Creek?

 4            MR. JONELIS:  Argumentative, calls for

 5   speculation, vague and ambiguous.                    10:43:09

 6            THE WITNESS:  I don't believe he's part of

 7   this process.

 8   BY MR. RICHMOND:

 9        Q   What makes you say that?

10            MR. JONELIS:  Calls for speculation, lacks  10:43:20

11   foundation.

12            You can answer.

13            THE WITNESS:  Because I'm not relying on

14   any of his specific comments on the issue.

15   BY MR. RICHMOND:                                     10:43:26

16        Q   Your father's name was Jon Huntsman, Sr.,

17   correct?

18        A   Yes.

19        Q   Your father was a Church leader, correct?

20        A   He was.                                     10:43:42

21        Q   For a time, your father served as a member

22   of the Quorum of the Seven in the Church, correct?

23        A   In the Fifth Quorum, yes.

24        Q   When you say the Fifth Quorum, you mean

25   that your father for a time served in the Fifth      10:43:55
```

Page 112

```
 1    Quorum of the Seventy of the Church, correct?

 2        A   I believe it was the Fifth Quorum, yes.

 3        Q   In the Church hierarchy, the Quorums of the

 4    Seventy are equal in authority to the Quorum of the

 5    Twelve Apostles, according to your understanding,      10:44:12

 6    correct?

 7            MR. JONELIS:  Lacks foundation, calls for

 8    expert testimony.

 9            You can answer.

10            THE WITNESS:  I don't know how that applies    10:44:19

11    in operating the Church.

12    BY MR. RICHMOND:

13        Q   Let me just ask you, just as a general

14    matter, is it your understanding that the Quorums of

15    Seventy are equal in authority to the Quorum of the    10:44:32

16    Twelve Apostles in the -- in the Church?

17            MR. JONELIS:  Same objections.

18            THE WITNESS:  I never saw that in practice.

19    BY MR. RICHMOND:

20        Q   Let me just ask you again.                     10:44:44

21            Well, let me do this differently.  If

22    you'll turn to Tab 10, please.

23            Do you have Tab 10 in front of you,

24    Mr. Huntsman?

25        A   I do.                                          10:45:08
```

                                               Page 113

```
 1        Q    Yeah.

 2             Paragraph 19 talks about a press conference

 3   on October 8th, 2003?

 4             Do you see that?

 5        A    Yes.                                    10:52:10

 6        Q    Did you watch that press conference?

 7        A    I don't believe so.

 8        Q    How was it that you know what was said at

 9   the press conference?

10        A    I would have read about it after.       10:52:28

11        Q    And where would you have read that?

12        A    I don't recall.

13        Q    And what is it that you remember reading

14   about that press conference?

15        A    Further reliance that tithing funds would   10:52:45

16   not be used for commercial and non-charitable

17   efforts.

18        Q    Now, Paragraph 19 of your complaint says,

19             "Shortly thereafter, at a press conference

20             on October 8th, 2003 concerning the      10:53:13

21             development of the City Creek Mall,

22             Presiding bishop H. David Burton

23             doubled down on the LDS Corporation's

24             misrepresentations, stating: 'None of

25             this money comes from the tithing of     10:53:30
```

Page 120

```
 1              our faithful members.  That is not how

 2              we use tithing funds.'"

 3              Do you see that?

 4       A   I do.

 5       Q   Other than the whistleblower document, do      10:53:39

 6  you have any basis for believing that what Presiding

 7  bishop David Burton said was not true?

 8       A   Not at this time.

 9       Q   Now, just generally -- well, I'll ask it

10  specifically and then generally.                        10:54:01

11              Specifically in 2003, did you pay a full

12  tithing?

13              MR. JONELIS:  Vague and ambiguous.

14              THE WITNESS:  Yes, I did.

15  BY MR. RICHMOND:                                        10:54:11

16       Q   And what is your understanding of what a

17  full tithing consists of?

18       A   10 percent of one's increase.

19       Q   And when you paid tithing during the years

20  you paid it, did you include the gross amount of        10:54:29

21  your compensation from the Huntsman Corp. or just

22  the net when you paid tithing?

23              MR. JONELIS:  Vague and ambiguous.

24              THE WITNESS:  I paid 10 percent of my

25  increase.                                               10:54:43
```

Page 121

1        A    Right.

2        Q    Is it your claim in this case -- well, let

3    me ask it differently.

4           Do you believe that tithing was used --

5    improperly used as a loan or other source of funding    10:59:42

6    for the Beneficial Life Insurance Company?

7           MR. JONELIS:  Calls for a legal conclusion,

8    vague and ambiguous.

9           You can answer.

10          THE WITNESS:  I do.                               10:59:50

11   BY MR. RICHMOND:

12       Q    Can you point to any statements by Church

13   leaders that tithing funds would not be used as a

14   loan or other source of funding for the Beneficial

15   Life Insurance Company?                                 11:00:03

16       A    I didn't have to.  I relied on Sunday

17   school manuals, Conference addresses.

18          MR. RICHMOND:  Move to strike as

19   nonresponsive, Mr. Huntsman.  Let me ask you again.

20       Q    Can you point to any statements by Church      11:00:18

21   leaders that tithing funds would not be used as a

22   loan or other source of funding for the Beneficial

23   Life Insurance Company?

24          MR. JONELIS:  Same objections.

25          THE WITNESS:  No, because I relied on their      11:00:33

                                                    Page 126

```
 1    statements as to what tithing would be used for.

 2             MR. RICHMOND:   Okay.  Move to strike

 3    everything after the word, "No."

 4             Let me ask the question again.

 5       Q    And the preface to this is you pointed to        11:00:45

 6    specific statements by President Hinckley and others

 7    that are specifically about City Creek and that

 8    tithing funds would not be used for City Creek.

 9             I'm trying to ask you the same question

10    about Beneficial Life Insurance.                         11:00:57

11             So here's my question.  Can you point to

12    any statements by Church leaders that tithing funds

13    would not be used as a loan or other source of

14    funding for the Beneficial Life Insurance Company?

15             MR. JONELIS:   Asked and answered,             11:01:09

16    argumentative.

17             You can answer.

18             THE WITNESS:   I cannot.

19    BY MR. RICHMOND:

20       Q    Do you believe that fast offerings were         11:01:15

21    improperly used as a loan or other source of funding

22    for the Beneficial Life Insurance Company?

23       A    Yes.

24       Q    Can you point to any statements by Church

25    leaders that fast offerings would not be used as a      11:01:28
```

                                                    Page 127

1    loan or other source of funding for the Beneficial

2    Life Insurance Company?

3         A    No.

4         Q    Do you believe that missionary

5    contributions were improperly used as a loan or        11:01:41

6    other source of funding for the Beneficial Life

7    Insurance Company?

8         A    I cannot.

9         Q    I asked if you believe, so let me ask you

10   the question again.                                    11:01:56

11        Do you believe that missionary

12   contributions were improperly used as a loan or

13   other source of funding for the Beneficial Life

14   Insurance Company?

15        A    I believe, yes.                              11:02:07

16        Q    Can you point to any statements by Church

17   leaders that missionary contributions would not be

18   used as a loan or other source of funding for the

19   Beneficial Life Insurance Company?

20        A    I cannot.  I relied on Church leaders.       11:02:23

21        MR. RICHMOND:  Move to strike everything

22   after, "I relied on Church" -- after the words, "I

23   cannot."

24        Q    So let me ask you the question again.  Can

25   you point to any statements by Church leaders that     11:02:36

                                                   Page 128

```
 1   missionary contributions would not be used as a loan

 2   or other source of funding for the Beneficial Life

 3   Insurance Company?

 4          MR. JONELIS:  Asked and answered,

 5   argumentative.                                    11:02:46

 6          You can answer.

 7          THE WITNESS:  I cannot.

 8   BY MR. RICHMOND:

 9      Q   Do you believe that humanitarian aid funds

10   were improperly used as a loan or other source of   11:02:54

11   funding for the Beneficial Life Insurance Company?

12      A   Yes.

13      Q   Can you point to any statements by Church

14   leaders that humanitarian aid funds would not be

15   used as a loan or other source of funding for the   11:03:08

16   Beneficial Life Insurance Company?

17      A   I relied on Church leaders for specific

18   directions on humanitarian funds.

19          MR. RICHMOND:  Move to strike as

20   nonresponsive.                                    11:03:21

21      Q   Can you point to any statements by Church

22   leaders that humanitarian aid funds would not be

23   used as a loan or other funding for the Beneficial

24   Life Insurance Company?

25          MR. JONELIS:  Asked and answered.         11:03:31
```

                                                    Page 129

```
 1              THE WITNESS:  I cannot.

 2              MR. RICHMOND:  All right.  Let's move on to

 3      2004.

 4              THE REPORTER:  Would this be a good --

 5              MR. JONELIS:  If we're -- I'm sorry.        11:03:41

 6              THE REPORTER:  Go ahead.

 7              MR. JONELIS:  I was going to say I'd

 8      request another bathroom break.  We've gone about

 9      another hour, 15 since we broke last.

10              MR. RICHMOND:  Sounds good.                11:03:53

11              THE VIDEOGRAPHER:  We're going off the

12      record.  The time is 11:03 Pacific Daylight Time,

13      and this is the end of media unit No. 4.

14              (Recess taken.)

15              THE VIDEOGRAPHER:  Okay.  We're going back  11:17:03

16      on the record.  The time is 11:16 A.M. Pacific

17      Daylight Time, and this is the start of media unit

18      No. 5.

19      BY MR. RICHMOND:

20          Q   Mr. Huntsman, before our break, we had     11:17:27

21      finished up with the year 2003.  I now want to turn

22      to the year 2004.

23              And to do that, let's turn back to Tab 6

24      which we've marked as exhibit No. 1.

25              Are you there, Mr. Huntsman?               11:17:57
```

                                                Page 130

```
 1    remember at this point, or not?

 2        A    I would need to go check specifically what

 3    those years were in terms of my income.

 4        Q    Other than your stock portfolio, were there

 5    any other sources that you remember having that          11:19:44

 6    might have produced income for you in 2004?

 7        A    I don't recall at this time.

 8        Q    Let's turn to -- let me just -- let's turn

 9    to Tab 13, please.

10             Are you there, Mr. Huntsman?                     11:20:28

11        A    I am.

12        Q    Tab 13 is titled, "Annual Charitable Cash

13    Contributions."

14             Do you see that, Mr. Huntsman?

15        A    I do.                                            11:20:38

16        Q    It says, "This statement contains a

17             record of voluntary contributions to

18             The Church of Jesus Christ of

19             Latter-day Saints by the named

20             donor(s) during the year 2004."              11:20:49

21             Do you see that in the box?

22        A    Yes.

23        Q    And donors are listed as you and your wife,

24    Marianne, correct?

25        A    Correct.                                         11:20:59
```

Page 132

```
 1       Q    And your total contributions to the Church
 2   in 2004 were $45,000, correct?
 3       A    Yes.
 4       Q    Do you know how much of your $45,000 cash
 5   contribution to the Church in 2004 was designated      11:21:10
 6   for tithing as opposed to any others -- funds?
 7       A    I don't recall.  I believe it was all
 8   tithing, but I'd have to verify for sure.
 9            MR. RICHMOND:  Let's mark Tab 13 as
10   Exhibit 6.                                             11:21:34
11            (Exhibit 6 was marked for
12            identification by the court reporter
13            and is attached hereto.)
14   BY MR. RICHMOND:
15       Q    All right.  Let's turn to 2005.              11:21:38
16            So we've finished with 2002, 2003, 2004,
17   and now we're on 2005.
18            In early 2005, your father's company went
19   public and was listed on the New York Stock
20   Exchange, correct?                                     11:21:55
21       A    Yes.
22       Q    Your father's company going public was an
23   exciting time for the extended Huntsman family, I
24   take it --
25            MR. JONELIS:  Calls for speculation.         11:22:05
```

Page 133

```
 1    those investments, so I just don't recall exactly

 2    what that looked like.

 3         Q    From 2005 to the present, do you -- have

 4    you periodically received distributions of cash or

 5    stock or other payments from the Huntsman family      11:31:44

 6    office?

 7         A    No.

 8         Q    In 2005, did you receive income from any

 9    sources other than the Huntsman Corporation?

10         A    I'd have to check my financial records.      11:31:58

11         Q    Let's move to Tab 16, please.

12              Are you there at Tab 16, Mr. Huntsman?

13              It glitched for just a second,

14    Mr. Huntsman.  Are you there at Tab 16?

15         A    Yes, I am.                                   11:32:35

16         Q    You'll see the top of Tab 16, it says,

17    "Annual Charitable Cash Contributions."

18              Do you see that?

19         A    I do.

20         Q    In the box, it says, "This statement       11:32:48

21              contains a record of voluntary

22              contributions to The Church of Jesus

23              Christ of Latter-day Saints made by

24              the named donor(s) during the year

25              2005."                                       11:33:01
```

Page 141

```
1           Do you see that?

2      A    Yes.

3      Q    And the named donors are you and your wife,

4  Marianne, correct?

5      A    Yes.                                        11:33:07

6      Q    And the total contributions to the Church

7  listed for 2005 is $325,000, correct?

8      A    Yes.

9      Q    Of your $325,000 in cash contributions to

10 the Church in 2005, how much of that represented     11:33:23

11 tithing as opposed to other funds?

12     A    I believe all of it was tithing.

13     Q    So if you extrapolated out $325,000, it

14 would suggest that you had $3.25 million of income

15 in 2005.                                             11:33:45

16          Is that correct?

17     A    Not necessarily.

18     Q    So can you tell me why you paid $325,000 in

19 tithing in 2005?

20          MR. JONELIS:  Calls for speculation.       11:34:00

21          You can answer.

22          THE WITNESS:  Because it would have

23 represented 10 percent of my increase --

24 BY MR. RICHMOND:

25     Q    And -- I'm sorry.  Go ahead.               11:34:08
```

Page 142

```
 1    magazine found its way to my house on a regular

 2    basis.  Whether it was through the mail or through

 3    some other means, I don't recall.

 4    BY MR. RICHMOND:

 5        Q   Let's turn back to your complaint again,      11:53:14

 6    which is Exhibit 3 under Tab 1.

 7        A   I'm there.

 8        Q   Okay.  Do you see Paragraph 20 on Page 7?

 9    That's at the top of Page 7.

10        A   I do.                                          11:53:54

11        Q   Paragraph 20 says, "Unfortunately

12            the LDS Corporation's lies did not

13            stop there.  In fact, in the Church's

14            own official magazine dated

15            December 2006, the LDS Corporation           11:54:11

16            tripled down on its

17            misrepresentations, writing, 'The

18            Church first announced three years ago

19            it was planning to redevelop the

20            downtown area to energize the economy        11:54:22

21            of the city that houses its

22            headquarters and to bolster the area

23            near Temple Square.  No tithing funds

24            will be used in the redevelopment.'"

25            Do you see that?                             11:54:37
```

Page 158

1        A    I do.

2        Q    And the official magazine you're referring

3   to there is the Ensign, I take it.  Is that right?

4        A    I believe so, yes.

5        Q    And the quote that we've read, did you          11:54:48

6   actually read that in the Ensign magazine in 2006?

7        A    Yes.

8        Q    And was -- do you remember reading that

9   particular part of the statement in 2006?

10       A    I remember reading it.  I don't remember        11:55:04

11  when I read it.

12       Q    In 2006, do you believe the December issue

13  of the Ensign magazine was in your home?

14       A    I believe so --

15           MR. JONELIS:  Asked and answered.              11:55:20

16  BY MR. RICHMOND:

17       Q    Do you believe that you read the phrase,

18  "No tithing funds will be used in the redevelopment"

19  in 2006?

20           MR. JONELIS:  Asked and answered.              11:55:27

21           THE WITNESS:  I believe I read that

22  statement.  I'm not sure exactly when I did.

23  BY MR. RICHMOND:

24       Q    When you say you're not sure when, do you

25  mean within a couple of months of December 2006, or    11:55:39

Veritext Legal Solutions
866 299-5127

1  do you mean much more recently than that?

2        MR. JONELIS:  Asked and answered.

3        THE WITNESS:  It means I don't remember.

4  It could have been both.

5  BY MR. RICHMOND:                                    11:55:51

6     Q   Apart from the whistleblower document that

7  we've marked as Exhibit 5, do you have any reason to

8  believe that the statement, "No tithing funds will

9  be used in the redevelopment" was a lie?

10       MR. JONELIS:  Argumentative, vague and        11:56:11

11  ambiguous.

12       You can answer.

13       THE WITNESS:  No, I do not.

14  BY MR. RICHMOND:

15     Q   Let's turn to Tab 20, if you would, please.  11:56:31

16        Are you there at Tab 20, Mr. Huntsman?

17     A   I am.

18     Q   At the top of Tab 20, you'll see it says,

19  "Annual Charitable Cash Contributions."

20        Do you see that?                             11:56:55

21     A   I do.

22     Q   And then in the box, it says, "This

23        statement contains a record of

24        voluntary contributions to the Church

25        of Jesus Christ of Latter-day Saints         11:57:03

                                                       Page 160

1          by the named donor(s) in the year

2          2006."

3          Do you see that?

4     A    I do.

5     Q    And the named donors are you and your wife,    11:57:11

6   Marianne, correct?

7     A    That is correct.

8     Q    And the total contributions to the Church

9   in 2006 was $171,600, correct?

10    A    Correct.                                        11:57:31

11    Q    Of your $171,600 in contributions to the

12  Church in 2006, how much of that represented

13  tithing?

14    A    I believe all of it.

15          MR. RICHMOND:  All right.  That's it for       11:57:57

16  2006.  We're going to move -- oh, wait.

17          Let me mark as -- Tab 21 as Exhibit 11.

18          (Exhibit 11 was marked for

19          identification by the court reporter

20          and is attached hereto.)                       11:58:10

21          THE REPORTER:  "Tab 21"?  I heard that

22  correctly?

23          MR. RICHMOND:  No.  I said it wrong.  Thank

24  you for catching that, Madam Court Reporter.

25          MR. JONELIS:  We're at 11, Rick.              11:58:23

                                           Page 161

```
 1    contribution first.

 2           And that's with the page titled, "Annual

 3    Charitable Cash Contributions" at the top.

 4           Do you see that?

 5      A    I do.                                    12:01:27

 6      Q    There is a document that says, "This

 7           statement contains a record of

 8           voluntary contributions to the Church

 9           of Jesus Christ of Latter-day Saints

10           made by the named donor(s) during the   12:01:36

11           year 2007."

12           Do you see that?

13      A    I do.

14      Q    And the named donors are you and your wife,

15    Marianne, correct?                             12:01:46

16      A    Yes.

17      Q    And the total amount of cash contributions

18    to the Church in 2007 was $405,135, correct?

19           MR. JONELIS:  Objection.  Vague and

20    ambiguous, misstates the document.             12:02:02

21           You can answer.

22           THE WITNESS:  Yes.

23    BY MR. RICHMOND:

24      Q    Now, again, using 10 percent, $405,000

25    would suggest you had an increase in 2007 of over   12:02:14
```

Page 164

```
 1    $4 million.

 2            Would you agree?

 3        A    Sounds about right.

 4        Q    Can you say today even generally what

 5    accounts for that 4. -- or $4 million increase to      12:02:31

 6    you in 2007?

 7        A    I cannot.

 8        Q    All right.  In addition to your cash

 9    contribution, you also made two donations of

10    Sigma Designs stock:  One was on December 7th, and     12:02:56

11    one was on December 21st.

12            Do you see the two pieces of paper that

13    indicate --

14        A    Yes.

15        Q    -- that?                                      12:03:07

16            Okay.  We'll start with the earlier date,

17    December 7th, 2007.

18            Do you see a page under Tab 21 called,

19    "Donations-in-Kind Receipt" at the top?

20        A    I do.                                         12:03:25

21        Q    And the receipt is made out to you and your

22    wife, Marianne, correct?

23        A    Yes.

24        Q    The date of the donation is December 7th,

25    2007, correct?                                         12:03:41
```

Page 165

```
 1          If you look under your name and your wife's
 2    name and your address --
 3          A    I have -- oh, I'm sorry.  I was looking at
 4    the first page.
 5          December 7th, correct.  I was looking at      12:04:02
 6    the one that was December 21st.
```

```
 7          Q    Okay.  Let's -- just to be sure we're fair
 8    for the record, the page that represents
 9    December 7th is identified by what I believe to be a
10    unique number.                                      12:04:15
11          So if you look at the right hand at the
12    top, there is an "Account Name, Date Prepared" and
13    then is a number.  And I'm looking at the page that
14    has the number "270409."
15          Do you see that?                              12:04:29
16          MR. JONELIS:  The third page of this
17    exhibit, correct, Rick?
18          MR. RICHMOND:  Well, you know, because
19    these were put in binders, I can't be sure.
20          But, yes, in my binder, it's the third       12:04:43
21    page.  But I can't guarantee it's the third page.
22          MR. JONELIS:  That's consistent with what
23    I'm looking at, as well, if that's helpful, James.
24          THE WITNESS:  Yep.  I've got it.
25    BY MR. RICHMOND:                                    12:04:57
```

Page 166

```
 1       Q    All right.  So the number -- I think it's a
 2   unique number, 270409.  Do you see that?
 3            Okay.  On the third page under
 4   "Donations-in-Kind Receipt" on the top right, there
 5   is information called "Account Name, Date Prepared,"   12:05:12
 6   and "Number."
 7            Do you see that?
 8       A    "Number."  Got it.  Got it.  I was higher
 9   up.
10       Q    No.  Got it.  All right.  It's sort of       12:05:20
11   hidden.
12            All right.  So we'll refer to this page as
13   270409.
14            And then going over to the left under the
15   receipt with your name and your wife's name, there    12:05:32
16   is a date of donation of December 7th, 2007,
17   correct?
18       A    Correct.
19       Q    And on that day, you gave 1500 shares of
20   Sigma Designs stock to the Church, correct?           12:05:45
21       A    Yes.
22       Q    And you designated 1,357 of those shares to
23   tithing, correct?
24       A    Yes.
25       Q    And you designated the remainder of 143      12:05:57
```

Page 167

```
 1    shares to be for fast offerings, correct?

 2        A    Yes.

 3        Q    All right.  Now, turning to the previous

 4    page, at least in the binder of Tab 21 which would

 5    be the second page of Tab 21, it also says          12:06:14

 6    "Donations-in-Kind Receipt" at the top.

 7            Do you see that?

 8        A    Yep.

 9        Q    And the number of this one which I believe

10    to be a unique number on the top right-hand portion  12:06:28

11    is 274418.

12            Do you see that?

13        A    Correct.

14        Q    All right.  And the receipt here for a

15    donation-in-kind is made out to you and your wife,   12:06:40

16    Marianne, correct?

17        A    Yes.

18        Q    And this donation was made on

19    December 21st, 2007, correct?

20        A    Correct.                                    12:06:54

21        Q    And you donated 500 shares of Sigma Designs

22    stock on December 21st, 2007, right?

23        A    Yes.

24        Q    And all 500 of those shares were designated

25    as tithing, correct?                                 12:07:08
```

Page 168

1      A   Yes.

2             MR. RICHMOND:   Okay.   Let's mark Tab 21 as

3      Exhibit 12.

4             (Exhibit 12 was marked for

5             identification by the court reporter      12:07:19

6             and is attached hereto.)

7      BY MR. RICHMOND:

8      Q   Now if you flip back to Exhibit 20,

9      Mr. Huntsman, the previous -- I'm sorry.

10            MR. JONELIS:   You mean Exhibit 12 or 11?      12:07:35

11            MR. RICHMOND:   It doesn't have the paper I

12     was looking for.   Give me one second.   Sorry.

13            Actually, flip back to Exhibit 10, which is

14     under Tab 18, Mr. Huntsman.

15     Q   Are you there at Exhibit 10, which is         12:08:05

16     Tab 18?

17     A   I am.

18     Q   There is some handwriting on the UBS

19     letters, the two UBS letters that deal with this

20     Sigma Designs stock that was donated.              12:08:20

21            Is that your handwriting or someone else's?

22     A   I don't know.

23     Q   It appears that UBS provided you with stock

24     price information on the day that you made each of

25     these two donations.                               12:08:42

                                            Page 169

```
 1        Q   All right.  Page 7 contains Paragraph 21.

 2            Are you there?

 3        A   I am.

 4        Q   Okay.  I'll just read Paragraph 21.

 5            "Continuing its fraudulent scheme,        12:12:05

 6            in a 2007 statement to DeseretNews,

 7            the LDS Corporation once again lied to

 8            the public concerning the source of

 9            funding for the City Creek Mall:

10            'Money for the project is not coming      12:12:19

11            from LDS Church members' tithing

12            donations.  City Creek Center is being

13            developed by Property Reserve Inc.,

14            the Church's real-estate development

15            arm, and its money comes from other       12:12:31

16            real-estate ventures.'"

17            Do you see that?

18        A   I do.

19        Q   In 2007, did you actually read that

20    statement in the Deseret News?                    12:12:43

21        A   I don't recall when I first read that

22    statement.

23        Q   When you say that, is that because you read

24    it only recently?

25        A   No --                                     12:12:51

                                                     Page 172
```

```
 1            MR. JONELIS:  Objection.  Leading,

 2      argumentative, calls for speculation, and lacks

 3      foundation.

 4            You can answer.

 5            THE WITNESS:  No, that would not assume      12:13:01

 6      that I read it recently.

 7      BY MR. RICHMOND:

 8         Q    You think you read it at or about the time

 9      it was published in 2007?

10         A    I really don't recall.                    12:13:10

11         Q    Other than the whistleblower document which

12      we've marked as Exhibit 5, do you have any other

13      basis for believing that it was a lie when the

14      Deseret News reported that money for the City Creek

15      project was not coming from tithing donations?      12:13:33

16         A    No.

17            MR. RICHMOND:  All right.  That's all for

18      2007, so assuming everybody is voting for a break,

19      this would be a good breaking point.

20            THE VIDEOGRAPHER:  Okay.  We are going off     12:13:52

21      the record at 12:13 P.M. Pacific Daylight Time, and

22      this is the end of media unit No. 5.

23

24      ///

25      ///
```

Page 173

```
 1    together, it's the second page of Tab 23.

 2          Do you see that?

 3    A    Yes.

 4    Q    And those are your signatures of you and

 5    your wife at the bottom there --            01:10:12

 6    A    Yes.

 7    Q    -- correct?  Yeah.

 8          And you and your wife are telling UBS to

 9    mail a check to Church headquarters in the amount of

10    $32,000, correct?                            01:10:30

11    A    That's what it says here, yes.

12    Q    And 30,000 of that would be for tithing and

13    2,000 for fast offering, correct?

14    A    Looks like it, yes.

15    Q    And then if you'd flip back to the previous  01:10:46

16    page, same kind of letter, same kind of date, but

17    this one is signed only by you.

18          Do you see that?

19    A    Yes.

20    Q    And this is the same kind of letter in      01:10:57

21    terms of you were asking UBS to mail a check for

22    $32,000 as a contribution to the Church, correct?

23    A    Yes.

24    Q    $30,000 for tithing and 20,000 for -- I'm

25    sorry.                                        01:11:20
```

Page 179

```
 1          30,000 for tithing and 20- -- 2,000 for

 2   fast offering, correct?

 3        A    Yes.

 4        Q    And this source of funds for this

 5   contribution is not coming from you personally but    01:11:34

 6   through Brownie Capital, correct?

 7             MR. JONELIS:  Calls for a legal conclusion,

 8   and the document speaks for itself.

 9             You can answer.

10             THE WITNESS:  That was the name of my       01:11:44

11   investment account --

12   BY MR. RICHMOND:

13        Q    And so --

14        A    -- income from that.

15        Q    Yeah.  So half of your contributions -- I'm  01:11:51

16   sorry.

17             $32,000 of the contributions in 2008 was

18   coming from you and your wife in a personal

19   capacity, correct?

20        A    My wife signed that page because she was    01:12:02

21   a -- a "joint" on the account, so it required her

22   signature.

23        Q    Right.

24        A    But the funds, as we've stated earlier, all

25   came from me because she had no income.            01:12:18
```

Page 180

```
 1          A    More than likely, yes.

 2               MR. RICHMOND:  All right.  Let's mark as

 3     Exhibit 14 the papers behind Tab 24.

 4               (Exhibit 14 was marked for

 5               identification by the court reporter        01:20:04

 6               and is attached hereto.)

 7     BY MR. RICHMOND:

 8          Q    And then let's turn to Tab 25, if you

 9     would, please.

10               Are you there at Tab 25, Mr. Huntsman?      01:20:24

11          A    I am.

12          Q    Okay.  Tab 25, do you see at the top it

13     says this document is from the Finance and Records

14     Department of the Church?

15          A    I see that, yes.                            01:20:40

16          Q    And it's to you and your wife, Marianne,

17     correct?

18          A    That is correct.

19          Q    And it shows that at least for you and your

20     wife, Marianne, a donation was received and recorded  01:20:52

21     in January 2009 for tithing.

22               Do you see that?

23          A    Yes.

24          Q    And the amount was $32,000.

25               Do you also see that?                       01:21:09
```

                                                    Page 187

```
 1          A    Yes.

 2          Q    Is that $32,000 the same $32,000 you asked

 3    UBS to send Church headquarters a few days earlier

 4    on December 30th?

 5          MR. JONELIS:  Calls for speculation, and        01:21:27

 6    misstates prior documents, and vague and ambiguous.

 7          THE WITNESS:  I don't know.

 8    BY MR. RICHMOND:

 9          Q    Do you know if -- let me ask it

10    differently.                                          01:21:44

11          Is it your best estimate that the UBS

12    people who were asked to give 30,000 in tithing in

13    2000 (phonetic) and fast offerings from you and your

14    wife, Marianne, on December 30th, 2008, goofed up

15    and sent it in late and designated it all            01:22:03

16    accidentally for tithing instead of splitting some

17    of it off to fast offerings?

18          Would that be your best estimate as to what

19    happened?

20          MR. JONELIS:  Compound, vague and              01:22:15

21    ambiguous, calls for speculation, and lacks

22    foundation.

23          THE WITNESS:  I don't know.  It could have

24    been a goof on the Church's part.

25    BY MR. RICHMOND:                                      01:22:28
```

Page 188

```
 1    that information behind Tab 27.

 2              (Exhibit 17 was marked for

 3              identification by the court reporter

 4              and is attached hereto.)

 5    BY MR. RICHMOND:                                    01:44:53

 6        Q    And now let's turn to Tab 28, if you would,

 7    please.

 8              Are you there at Tab 28?

 9        A    I am.

10        Q    There's two pages behind Tab 28.  One says,  01:45:08

11    "Donations in Kind Receipt" from the Church.

12              Do you see that?

13        A    I do.

14        Q    And this is a reflection of donations in

15    kind and the receipts made out to you and your wife,  01:45:23

16    Marianne, correct?

17        A    That is correct.

18        Q    And just to make sure, because I think it's

19    a unique number, we get it right.  Over on that

20    right-hand side, there is a number associated with   01:45:36

21    this donation, which is 339643.

22              Do you see that?

23        A    Yes.

24        Q    Okay.  Just to make sure we've got the

25    right page, the date of this donation was            01:46:00
```

Page 206

```
 1   December 14th, 2010, correct?

 2        A    Yes.

 3        Q    You donated 6,310 shares of Huntsman

 4   Corporation stock to the Church on December 14th,

 5   2010, correct?                                    01:46:17

 6        A    Correct.

 7        Q    And of those 6,310 shares of Huntsman

 8   Corporation stock, 5,679 were allocated toward

 9   tithing and 631 were allocated toward fast

10   offerings, correct?                               01:46:36

11        A    Correct.

12        Q    The other page behind Tab 28 is a one-page

13   document on the Church letterhead made out to you

14   and your wife.

15             Do you see that?                        01:46:51

16        A    I do.

17        Q    And it's signed by a Robert Woods.

18             Do you see that?

19        A    I do.

20        Q    Do you know who he is?                  01:47:05

21        A    No idea.

22        Q    And it shows that you made contributions in

23   January of 2010 for humanitarian aid specifically

24   with respect to an emergency response in Haiti.

25             Do you see that?                        01:47:28
```

Page 207

```
 1        A   I do.

 2        Q   And am I correct that the Huntsman

 3   Corporation stock of 6,310 shares and $600 in

 4   humanitarian aid were your contributions to the

 5   Church in 2010?                                01:47:49

 6        A   It appears so.

 7            MR. RICHMOND:   All right.   We'll have those

 8   two documents behind Tab 28 marked as Exhibit 18.

 9            (Exhibit 18 was marked for

10            identification by the court reporter   01:48:03

11            and is attached hereto.)

12   BY MR. RICHMOND:

13        Q   All right.   We'll move on to 2011,

14   Mr. Huntsman, and we'll do that by turning to

15   Tab 29.                                        01:48:16

16            Do you have that?

17        A   I do.

18        Q   All right.   At the bottom of the first page

19   of Tab 29, you'll see this is a Huntsman Corporation

20   14A filing to the SEC on March 23, 2012.       01:48:35

21            Do you see that?

22        A   I do.

23        Q   And this is from the SEC Page 71.

24            Do you see that?

25        A   I do.                                 01:48:51
```

Page 208

```
 1        Q    Do you believe in 2011 the Huntsman

 2   Corporation granted you 9- -- I'm sorry, 4,974

 3   restricted stock awards?

 4        A    I believe.

 5             MR. RICHMOND:  We'll mark as Exhibit 19      01:50:25

 6   that information behind Tab 29.

 7             (Exhibit 19 was marked for

 8             identification by the court reporter

 9             and is attached hereto.)

10   BY MR. RICHMOND:                                       01:50:34

11        Q    And now if you'll turn to Tab 30, please.

12             Do you have Tab 30, Mr. Huntsman?

13        A    I do.

14        Q    All right.  The top of that page, it says

15   "Annual Charitable Cash Contributions Official Tax     01:50:56

16   Summary Statement" from the Church.

17             Do you see that?

18        A    I do.

19        Q    And it's made out to you.

20             Do you see that?                             01:51:09

21        A    Yes.

22        Q    And it says that your total contributions

23   to the Church were $100,000.

24             Do you see that?

25        A    I do.                                        01:51:24
```

Page 210

```
 1        Q    And your contributions were paid such that

 2   $95,000 of that was allocated to tithing and 5,000

 3   was allocated to fast offerings, correct?

 4        A    Correct.

 5        Q    And then it also shows that the total          01:51:41

 6   amount of money, $100,000, was donated in two

 7   separate times:  Once on March 29th and another time

 8   on December 30th.

 9             Do you see that?

10        A    I do.                                          01:51:57

11        Q    And $100,000 in cash was your contribution

12   to the Church in 2010 -- 2011, as best you know?

13        A    It appears so.

14             MR. RICHMOND:  Okay.  And let's -- if I

15   have not already said it, let's mark Tab 30            01:52:19

16   materials as Exhibit 20.

17             (Exhibit 20 was marked for

18             identification by the court reporter

19             and is attached hereto.)

20   BY MR. RICHMOND:                                       01:52:29

21        Q    And we'll move on to 2012, if you would

22   turn to Tab 31, please.

23             Do you have Tab 31 in front of you?

24        A    I do.

25        Q    Do you see at the bottom of the first page,  01:52:45
```

Page 211

```
 1        A   Couple years ago.

 2        Q   Is that when your brother became the chair

 3   of the Salt Lake Tribune?

 4        A   It's when my father purchased the paper.

 5        Q   And do you know what year that was,        01:56:46

 6   offhand?

 7        A   I do not.

 8        Q   Let's turn back to Exhibit 3, which is

 9   under Tab 1.  It's your complaint in this case.

10            Do you have that in front of you,          01:57:15

11   Mr. Huntsman?

12        A   I do.

13        Q   If you'll go to Page 7, I want to focus on

14   Paragraph 22.

15            Do you have that in front of you,          01:57:38

16   Mr. Huntsman?

17        A   I do.

18        Q   All right.  I'll read Paragraph 22.  It

19   says, "And yet again, in 2012, the LDS

20            Corporation for the fifth time lied        01:57:49

21            about its intentions concerning

22            tithing donations.  Keith B. McMullin,

23            who for 37 years served within the

24            Church's leadership and headed a

25            Church-owned holding company, Deseret      01:58:03
```

Page 215

1          Management Corp., unequivocally

2          misrepresented to the public (via

3          a quote in The Salt Lake Tribune) that

4          tithing funds had not been and would

5          not be used for commercial purposes.          01:58:16

6          "'McMullin said not one penny of

7          tithing goes to the Church's

8          for-profit endeavors.  Specifically,

9          the Church has said no tithing went

10         towards City Creek Center.'"          01:58:27

11         Do you see that?

12      A   I do.

13      Q   In or around 2012, did you read what you've

14   quoted there from the Salt Lake Tribune?

15      A   I don't recall exactly when I read that          01:58:43

16   quote.

17      Q   Would it have been more recently that

18   you're referring to when you say you don't remember

19   when?

20      A   Unlikely.  It was probably closer to 2012.          01:58:54

21      Q   You think you read that part of the Salt

22   Lake Tribune at that time?

23      A   At what time?

24      Q   2012.

25      A   I said closer to 2012.  I don't know -- I          01:59:11

Page 216

1      don't recall when I exactly read that quote, but it

2      was likely closer to 2012 than recent.

3          Q    Why do you say that?

4          A    Because that's my recollection.

5          Q    If you didn't read it in the paper at the        01:59:35

6      time, how else would you have read it?

7          A    Online.

8          Q    And what was it that you were looking at

9      online that would show that quote from the Salt Lake

10     Tribune in 2012?                                          01:59:51

11         A    I don't recall the website.  Perhaps the

12     Salt Lake Tribune's website.

13         Q    And so you were just looking at the Salt

14     Lake Tribune website years later and happened upon

15     that quote from 2012?  Is that what you think?            02:00:06

16              MR. JONELIS:  Misstates prior testimony,

17     argumentative, and leading.

18              THE WITNESS:  I always followed local news.

19     I spent a lot of time growing up in Utah, so looking

20     at the Salt Lake Tribune, the Deseret News and other     02:00:20

21     news sources in the neighbor- -- in the valley were

22     not uncommon for me.

23     BY MR. RICHMOND:

24         Q    Other than the whistleblower document which

25     we've marked as Exhibit 5, do you have any basis --       02:00:35

                                                    Page 217

```
 1    any other basis for saying that the comment no

 2    tithing went toward City Creek Center is a lie?

 3         A    Not at this time.

 4              MR. RICHMOND:  I did say to mark the Tab 31

 5    as Exhibit 21?  Did I say that, Chris?           02:01:13

 6              Okay.

 7         Q    Let's turn to Tab 33, Mr. Huntsman.

 8              Do you have Tab 33 there, Mr. Huntsman?

 9         A    I do.

10         Q    The first page of Tab 33 says,          02:01:30

11    "Donations-in-Kind Receipt."

12              Do you see that?

13         A    I do.

14         Q    And the receipt is made out to you and your

15    wife, Marianne?                                  02:01:42

16         A    Correct.

17         Q    And it shows that in late December 2012,

18    you made a donation of 5,472 shares of Huntsman

19    Corporation stock to the Church, correct?

20         A    Correct.                               02:02:04

21         Q    And you allocated 4,843 of those shares to

22    tithing and 629 of those shares to fast offerings,

23    correct?

24         A    Correct.

25         Q    And just so we keep clear in the same way  02:02:18
```

Page 218

```
 1    we have before, the unique number associated with

 2    this receipt is towards the top right hand, and the

 3    number is 394695, correct?

 4         A   Correct.

 5         Q   All right.  Then the second page behind          02:02:35

 6    Tab 33 is a letter from UBS to you a couple of weeks

 7    after this donation on January 15, 2013.

 8             Do you see that?

 9         A   I do.

10         Q   And here, again, do you see UBS is               02:02:55

11    providing you with high and low share-price figures

12    for the day you donated those Huntsman shares to the

13    Church?

14         A   I do see that.

15         Q   And they were doing that so your                 02:03:15

16    accountants could figure out how to value the

17    donation for charitable purposes for your taxes,

18    correct?

19         A   I don't know why they were giving a high

20    and low.                                                  02:03:28

21         Q   If you'll turn to the third page of the

22    Tab 33, you'll see another acknowledgement or

23    receipt from the same Robert Woods from the Church.

24             Do you see that?

25         A   I do.                                            02:03:50
```

```
 1        Q    And it shows that you made a $1,000

 2   donation to humanitarian aid in November of 2012.

 3             Do you see that?

 4        A    I do.
```

```
 5        Q    And do you remember what prompted that       02:04:02

 6   particular donation?  We saw one earlier that was

 7   directed toward a particular purpose.  But do you

 8   remember why you made this one?

 9        A    I do not recall.

10        Q    At some point, your father was very moved    02:04:20

11   by a tragedy that happened in Armenia and provided a

12   lot of money there.

13             Were you part of that effort yourself in

14   any way?

15             MR. JONELIS:  Objection.  Lacks foundation.  02:04:39

16   The attorney's testifying.

17             You may answer.

18             MR. RICHMOND:  Oh, well, I'll just -- you

19   know, there have been a lot of these objections

20   today.                                                 02:04:47

21        Q    Mr. Huntsman, do you know what I'm talking

22   about?  You know when your dad gave a lot of money

23   in the wake of an Armenian tragedy.  You know that,

24   don't you?

25        A    I do know that.                              02:04:58
```

Page 220

```
 1        Q    That's okay.  I won't tattle to your wife

 2   or your kids on this one.  I know how it is.

 3        A    Oh, they -- believe me, they already know.

 4        Q    And do you call him "Michael" or "Charles,"

 5   or what should I call him?                           02:09:55

 6        A    Michael.

 7        Q    Michael.

 8             When your son Michael went on his mission,

 9   am I correct that he and your family were expected

10   to provide the basic funds necessary to fund his     02:10:06

11   missionary efforts?

12        A    That was the expectation.

13        Q    So now turn to Tab 35, if you would,

14   please.

15             Tab 35 is several pieces of paper, the      02:10:29

16   first one of which I want to focus on has a heading

17   of "Annual Charitable Cash Contributions."

18             Do you see that?

19        A    Yes.

20        Q    And the donor is named as you.             02:10:49

21             Do you see that?

22        A    Correct.

23        Q    All right.  And it says, "This

24             statement contains a record of

25             voluntary contributions to The Church       02:11:01
```

Page 225

```
 1            of Jesus Christ of Latter-day Saints
 2            made by the above named donor...during
 3            the year 2013."
 4            Do you see that?
 5       A   I do.                                    02:11:13
 6       Q   There were three donations made in cash
 7   throughout the course of 2013 that added up to
 8   $6,800.
 9            Do you see that?
10       A   I do.                                    02:11:33
11       Q   And this particular receipt is signed by
12   somebody new that we haven't seen before, and it
13   says it is the bishop or branch president of your
14   "Woodlands 1st Ward."
15            Do you see that?                        02:11:48
16       A   I do.
17       Q   Do you believe that that $6,800 cash
18   contribution was made to the missionary fund in
19   light of the fact that your son Michael had begun to
20   serve a two-year mission in Chile?              02:12:00
21            MR. JONELIS:  Calls for speculation, vague
22   and ambiguous.
23            THE WITNESS:  I would need to verify where
24   those funds were specifically intended.
25   BY MR. RICHMOND:                                02:12:14
```

Page 226

```
 1        Q    But -- let me ask it differently, then.

 2             Do you have a general recollection that in

 3   the 2013-to-'15 time frame you did make some amount

 4   of contribution to the missionary fund in light of

 5   your son Michael being on mission in Chile?        02:12:31

 6        A    I believe that to be the case.  But, again,

 7   whether it went to the missionary fund or general

 8   fund, as we can see in my documentation,

 9   humanitarian fund, fast offering, tithing, I gave to

10   many different categories within the Church.        02:12:47

11             So as to where this specifically went, it

12   probably was tied to a missionary fund.  But, again,

13   I would have to just go back and verify to come --

14   you know, so I don't give any type of false

15   misrepresentation.                                  02:13:02

16        Q    Got it.

17             All right.  Let's turn to the second page

18   of what's behind Tab 35, and this is titled,

19   "Donations-in-Kind Receipt."

20             Do you see that?                          02:13:14

21        A    Yes.

22        Q    And this has a receipt number like the

23   others we've seen over on sort of the top right

24   hand, and this receipt is 14593.

25             Do you see that?                          02:13:31
```

Page  227

```
 1        A    I do.

 2        Q    Okay.  This receipt is made out to you and

 3   your wife, correct?

 4        A    It appears so, yes.

 5        Q    The receipt reflects that you made a          02:13:43

 6   donation of 10,200 shares of Huntsman Corporation

 7   stock to the Church on December 18, 2013, correct?

 8        A    Correct.

 9        Q    Of that donation, 10,000 shares were

10   attributed to tithing and 200 shares were attributed   02:14:06

11   to fast offerings, correct?

12        A    Correct.

13        Q    Let's turn to the third page of Tab 35.

14   You see a UBS letter to you dated February 12th,

15   2014, which was three or four weeks after your          02:14:30

16   contribution of Huntsman Corporation stock.

17             Do you see that?

18        A    I do.

19        Q    And, here again, UBS is providing you with

20   the high and low stock price amounts for Huntsman       02:14:44

21   Corporation stock on the day of your contribution of

22   December 18th, 2013?

23             Do you see that?

24        A    I do.

25        Q    Here again, do you have any idea why UBS      02:14:59
```

Page 228

```
 1    was providing you with this information?

 2         A    I don't know why they -- you'd have to ask

 3    them.

 4         Q    All right.   The fourth page behind Tab 35

 5    is a one-page acknowledgement from the Church to you    02:15:15

 6    and your wife.

 7              Do you see that?

 8         A    Yes.

 9         Q    This one is to the Humanitarian Aid Fund in

10    the amount of $2,000.                                   02:15:31

11              Do you see that?

12         A    I do.

13         Q    Do you have any idea sitting here today

14    what prompted you to make that specific Humanitarian

15    Aid Fund contribution in 2013?                          02:15:44

16         A    Likely a hurricane.

17         Q    Why do you say that?

18         A    In -- well, I believe in 2013 it was a

19    hurricane year for Texas when I lived down there.

20         Q    You were living in Texas so you were aware    02:16:05

21    of the hurricanes coming up through the Gulf of

22    Mexico, I take it.

23         A    And there would have been requests --

24    multiple requests over the pulpit for such funds.

25         Q    Do you believe that the materials we've       02:16:20
```

Page 229

1    looked at behind Tab 34 [sic] reflect your

2    contributions to the Church in 2013?

3         A    I do.

4              MR. RICHMOND:  Let's mark the materials

5    behind Tab 34 [sic] as Exhibit 24.                    02:16:36

6              (Exhibit 24 was marked for

7              identification by the court reporter

8              and is attached hereto.)

9              MR. RICHMOND:  Now we're on to 2014, so if

10   you would turn to Tab 36, please.                     02:16:48

11             THE REPORTER:  Before we go there, might we

12   take a short break?

13             MR. RICHMOND:  Absolutely.  And any time

14   the court reporter wants a break, she gets one.

15             MR. JONELIS:  Okay.                          02:16:58

16             MR. RICHMOND:  Is 10 minutes sufficient,

17   Madam Court Reporter?

18             THE REPORTER:  Sure.

19             MR. RICHMOND:  Okay.

20             THE VIDEOGRAPHER:  Okay.  We're going off    02:17:08

21   the record.  The time is 2:16 P.M. Pacific Daylight

22   Time, and this is the end of media unit No. 6.

23             (Recess taken.)

24             THE VIDEOGRAPHER:  Okay.  We're going back

25   on the record.  The time is 2:31 P.M. Pacific         02:31:51

                                              Page 230

```
 1        Q    And as with your son Michael, your son

 2   Joshua and his family were expected to provide the

 3   funds necessary for him to do that missionary

 4   service in Uruguay, correct?

 5        A    That is the expectation.                02:36:28

 6        Q    Let me have you turn to Tab 38, please.

 7             Tab 38 is a one-page document called,

 8   "Annual Charitable Cash Contributions" from the

 9   Church.

10             Do you see that?                         02:36:57

11        A    I do.

12        Q    And it says, "This statement contains

13             a record of voluntary contributions to

14             the Church of Jesus Christ of

15             Latter-day Saints made by the above      02:37:09

16             donor(s) during the year 2014."

17             Do you see that?

18        A    I do.

19        Q    And the donor is you, correct?

20        A    Correct.                                 02:37:18

21        Q    There were two donations made in this year

22   of cash that totaled up to $6,400.

23             Do you see that?

24        A    I do.

25        Q    And do you believe the $6,400 was        02:37:32
```

                                            Page 234

```
 1    contributed in 2014 to the missionary fund in light

 2    of the fact that your son Joshua had been called to

 3    the two-year mission in Uruguay?

 4         A    I'll need to verify my documents.
```

```
 5              MR. RICHMOND:  All right.  Why don't we    02:37:56

 6    have what's behind Tab 38 marked as Exhibit 26.

 7              (Exhibit 26 was marked for

 8              identification by the court reporter

 9              and is attached hereto.)

10    BY MR. RICHMOND:                                     02:38:05

11         Q    And I accidentally skipped a tab,

12    Mr. Huntsman.

13              But, in addition to the salary, stock

14    awards, option awards and non-equity incentive plan

15    compensation in 2014, I needed to direct your        02:38:20

16    attention to one other thing and that's found behind

17    Tab 37, if you could turn there.

18              Do you have that Tab 37?

19         A    I do.

20         Q    Do you see at the bottom, it says that it's 02:38:42

21    from the Huntsman Corporation SEC 14a filing on

22    March 28, 2014.

23              Do you see that?

24         A    I do.

25         Q    All right.  At the top, the explanation --  02:38:54
```

Page 235

```
 1    donations-in-kind, in stock or other things?

 2         A    I don't believe so.

 3         Q    And was there a particular reason, or did

 4    you -- let me ask it a different way.

 5              Let's turn to Tab 39, if you would, please.    02:41:47

 6              Are you at Tab 39, Mr. Huntsman?

 7         A    I am.

 8         Q    All right.  If you'll look at Tab 39, this

 9    is a "Donations-in-Kind Receipt."  And just to keep

10    it clear, this has a unique number toward the top of    02:42:09

11    the right-hand side of 65598.

12              Do you see that?

13         A    Yes.

14         Q    All right.  This is a receipt made out to

15    you and your wife, Marianne, correct?                   02:42:21

16         A    Correct.

17         Q    It's for 1,550 shares of the Huntsman

18    Corporation stock.

19              Do you see that?

20         A    I do.                                         02:42:30

21         Q    And all 100 percent of those 1,550 shares

22    were attributed to tithing, correct?

23         A    Yes.

24         Q    The date of the donation is January 9th,

25    2015.                                                   02:42:46
```

Page 238

```
 1            Do you see that?
 2       A   I do.
 3       Q   It made me wonder if this donation was
 4  actually intended for 2014 and somehow just slipped
 5  over into the new year of 2015.                    02:42:59
 6            So with just that observation in mind, do
 7  you know why you did not make a larger contribution
 8  in 2014 but then you made a very large donation in
 9  early 2015?
10       A   I don't recall.                           02:43:18
11            MR. RICHMOND:  Let's have, then, what was
12  behind Tab 39 marked as Exhibit 28.
13            (Exhibit 28 was marked for
14            identification by the court reporter
15            and is attached hereto.)                 02:43:31
16  BY MR. RICHMOND:
17       Q   Let's move on now to 2015 and go to Tab 40,
18  if you would, please.
19            Are you there at 2000 -- I'm sorry.  Are
20  you there at Tab 40?                               02:43:52
21       A   I am.
22       Q   The first page of Tab 40, you'll see at the
23  bottom it says it's from a Huntsman Corporation 14A
24  SEC filing on March 25th, 2016.
25            Do you see that?                         02:44:07
```

Page 239

```
 1              Houston's a pretty flat market.  There

 2      might have been a two-point appreciation or flat.

 3      I'd have to check my financial records.

 4          Q    After your contribution to the Church of

 5      Huntsman Corporation stock on January 9th, 2015, you    02:55:09

 6      never made another contribution to the Church of any

 7      kind at any time, correct?

 8              MR. JONELIS:  Misstates prior testimony,

 9      vague and ambiguous, lacks foundation.

10              THE WITNESS:  That appears to be correct.     02:55:21

11      BY MR. RICHMOND:

12          Q    Your decision to stop making tithing and

13      other contributions to the Church had nothing to do

14      with how City Creek was funded, correct?

15              MR. JONELIS:  Argumentative, leading, lacks    02:55:35

16      foundation.

17              THE WITNESS:  That's probably a fair

18      assumption at that time.

19      BY MR. RICHMOND:

20          Q    Something else happened late in the year of   02:55:49

21      2015 that caused you and your family enough concern

22      that you quit making contributions, correct?

23              MR. JONELIS:  Lacks foundation, vague and

24      ambiguous, leading, and assumes facts not in

25      evidence.                                              02:56:04
```

Page  248

| | |
|---|---|
| 1 | THE WITNESS:  That is a fair assumption. |
| 2 | BY MR. RICHMOND: |
| 3 | Q   And the thing that happened in late 2015 |
| 4 | was the Church's handling of an issue related to gay |
| 5 | marriage and the children within gay marriages,      02:56:16 |
| 6 | correct? |
| 7 | MR. JONELIS:  Same objections. |
| 8 | THE WITNESS:  No. |
| 9 | BY MR. RICHMOND: |
| 10 | Q   Do you remember in 2015 in the fall there   02:56:29 |
| 11 | was a media storm over the Church's policy or new |
| 12 | position with respect to the children of gay |
| 13 | marriages? |
| 14 | MR. JONELIS:  Same objection. |
| 15 | THE WITNESS:  I do remember that policy       02:56:43 |
| 16 | that was leaked to the public, yes. |
| 17 | BY MR. RICHMOND: |
| 18 | Q   For example, your niece, Mary Anne Huntsman |
| 19 | was very vocal on social media about her |
| 20 | disagreement with the new Church policy, correct?     02:56:57 |
| 21 | A   I don't -- I don't recall. |
| 22 | Q   Let's turn to tab 41. |
| 23 | Do you have tab 41 there? |
| 24 | A   Yes. |
| 25 | Q   And when you mentioned a moment ago that    02:57:23 |

Page 249

```
 1              MR. JONELIS:  Leading, vague and ambiguous,
 2      argumentative.
 3              THE WITNESS:  I don't believe so.
 4      BY MR. RICHMOND:
 5         Q   When you say you "don't believe so," I want    03:01:06
 6      to make sure we're clear here.
 7              Did your decision not to pay tithing in
 8      2015 have anything to do with the funding of City
 9      Creek?
10         A   I don't think so.                              03:01:20
11         Q   Let's move on to 2016.
12              In 2016, you quit working for the family
13      company for a second time, correct?
14         A   That is correct.
15         Q   You resigned from the Huntsman Corporation     03:01:37
16      effective June 1st, 2016?
17         A   Sounds about right.
18         Q   Let's turn to Tab 42.
19              MR. JONELIS:  Rick, can we go off for
20      another five-minute bathroom break, if that's all    03:01:58
21      right with you?
22              MR. RICHMOND:  Sure.  Absolutely.
23              THE VIDEOGRAPHER:  Okay.  We're going off
24      the record.  The time is 3:01 P.M. Pacific Daylight
25      Time, and this is the end of media unit No. 7.       03:02:09
```

                                                    Page 253

```
 1        Q    You don't know?

 2        A    I probably did.

 3        Q    But you really don't know one way or the

 4   other whether you have pioneer ancestors?

 5        A    I probably do.  If I -- I don't know their      03:18:17

 6   specific names but more than likely, they were.

 7        Q    On your father's side of the family or your

 8   mother's, or both?

 9        A    Probably both.

10        Q    Why did you and your wife decide to resign      03:18:36

11   your memberships in the Church in 2020?

12             MR. JONELIS:  Calls for speculation.

13             THE WITNESS:  I can answer it for me.

14             Because I stopped believing certain

15   doctrines unique to Mormonism.                            03:18:51

16   BY MR. RICHMOND:

17        Q    Which doctrines were those?

18        A    A polygamous heaven and polygamy,

19   generally.

20        Q    Any others?                                     03:19:02

21        A    That's -- that's probably the key one.

22        Q    And since your wife resigned her membership

23   on the same day, I assume you and your wife talked

24   about doing that at the same time and it was not

25   just a coincidence.  Correct?                             03:19:28
```

Page 263

```
 1        A    Correct.
 2        Q    So do you have some understanding of why
 3   your wife decided to resign her membership in the
 4   Church?
 5        A    I think she stopped believing certain      03:19:39
 6   doctrines unique to Mormonism.
 7        Q    Do you know which doctrines those were?
 8        A    Probably the marginalizations of women,
 9   blacks, gays, nonmembers and other peoples targeted
10   by the doctrine of the Church.                       03:20:04
11        Q    Any others?
12        A    That's probably the foundation of her
13   resignation.
14        Q    Where did you live in 2020?
15        A    Salt Lake City, Utah.                      03:20:16
16        Q    All right.  Let's go now to 2021.
17             Where did you live in January 2021?
18        A    That's this year, right?  20- -- so I would
19   have lived in California.
20        Q    When did you start living in California?   03:20:41
21        A    October 31st, 2020.
22        Q    Was there a reason you left Utah in 2020
23   and came to California?
24        A    Yes.
25        Q    What was the reason?                       03:20:58
```

Page 264

```
1          A    Primarily work.

2          Q    And when you say "primarily work," do you

3    mean with your employment with Blue Fox

4    Entertainment?

5          A    Correct.                              03:21:12

6          Q    And apart from Blue Fox Entertainment

7    employment, were there other reasons you moved to

8    California?

9          A    That was the primary reason, and to be

10   closer to the ocean.                             03:21:24

11         Q    Are you a surfer?

12         A    No.

13         Q    Do -- so you sold your house in

14   Beverly Hills.

15              Do you live somewhere else now in     03:21:37

16   California?

17         A    I do.

18         Q    Do you live in your home in Coronado

19   Island?

20         A    Correct.                              03:21:44

21         Q    And have you lived there the whole time in

22   2021?

23         A    Yes.

24         Q    Do you know who Michelle Boorstein is?

25         A    I do.                                 03:21:54
```

Page 265

1      Q    Who is she?

2      A    She is a religion reporter for the

3  Washington Post.

4      Q    And how do you know Ms. Boorstein?

5      A    I don't know her personally.  I know of          03:22:06

6  her.  She was the one that broke --

7           (Speaking simultaneously.)

8      Q    Go ahead.  Sorry.

9      A    Pardon?

10      Q    Let's start over.  I'm sorry.  I keep            03:22:19

11  interrupting you.

12           So how do you know Ms. Boorstein?

13           MR. JONELIS:  Again, misstates prior

14  testimony, assumes facts not in evidence, vague and

15  ambiguous, and lacks foundation.                          03:22:32

16           You can answer.

17           THE WITNESS:  So I first came across her

18  name during the -- after the article that she wrote

19  during the initial whistleblower documents being

20  released to the public.                                   03:22:52

21  BY MR. RICHMOND:

22      Q    And did you read her reports or her

23  article, or how did you become aware of her?

24      A    I read the article.

25      Q    Are you a subscriber to the Washington          03:23:04

                                              Page 266

1    Post?

2         A    No.

3         Q    Have you ever talked with Ms. Boorstein?

4         A    Not directly.

5         Q    Have you ever communicated with her in some    03:23:19

6    other way than talking?

7         A    I have.

8         Q    How's that?

9         A    Email.

10        Q    And what was the nature of your    03:23:27

11   communications with Ms. Boorstein by email?

12        A    That I was not inclined to speak with her

13   when I filed the initial complaint and that at some

14   point in the future maybe we could have a

15   conversation.    03:23:52

16        Q    Your understanding is she had a copy of

17   your complaint before it was ever filed, though,

18   correct?

19             MR. JONELIS:  Calls for speculation, lacks

20   foundation.    03:24:06

21             You can answer.

22             THE WITNESS:  Correct.

23   BY MR. RICHMOND:

24        Q    Do you know how she got that complaint?

25        A    I do.    03:24:12

Page 267

```
 1        Q    How did she?

 2        A    I believe she was given it by my attorney.

 3        Q    Did -- did you complain to your attorney

 4   when that happened?

 5             MR. JONELIS:  I'm going to instruct the      03:24:28

 6   witness not to answer to the extent it discloses

 7   attorney-client privileged information, which I

 8   believe any answer would.

 9             (Instruction not to answer.)

10   BY MR. RICHMOND:                                       03:24:37

11        Q    Mr. Huntsman, did you want Ms. Boorstein to

12   have a copy of your complaint before it was filed?

13             MR. JONELIS:  Vague and ambiguous, calls

14   for speculation, argumentative.

15             THE WITNESS:  I was fine either way.  If     03:24:47

16   she did, great.  If she didn't, great.  I honestly

17   didn't think it was a huge story.

18             And my purpose in this process is more of

19   coming to a resolution and a settlement and not

20   publicity.                                             03:25:11

21             So whether or not she had it early on,

22   fine.  If she didn't, fine.  I'm probably neutral.

23   BY MR. RICHMOND:

24        Q    So was it someone else who was interested

25   in publicity besides you?                              03:25:25
```

Page 268

```
 1        A    No.  I'm interested in publicity.  I'm just

 2   saying that it wasn't a big deal one way or the

 3   other.

 4        What the priority was was to resolve the

 5   issue, my dispute with the Mormon Church.  My          03:25:39

 6   priority was not publicity.

 7        Q    If it turns out you're wrong and no tithing

 8   money was ever used for the funding of City Creek,

 9   are you going to give an interview to Ms. Boorstein

10   and apologize?                                          03:25:57

11        MR. JONELIS:  Calls for speculation,

12   argumentative, and harassing the witness.

13        THE WITNESS:  I guess if the Church

14   afforded me the same luxury, perhaps we could come

15   to an agreement.                                        03:26:09

16        MR. RICHMOND:  I don't have any further

17   questions at this time, Mr. Huntsman, but obviously

18   I reserve my right for further questioning once we

19   get into the discovery process and we're past this

20   initial stage.                                          03:26:23

21        But I thank you for your time today.

22        MR. JONELIS:  Just before we conclude, just

23   pursuant to 30(e), I'm going to request the

24   opportunity to have the deponent review the

25   transcript in the requisite 30-day period.             03:26:33
```

Page 269

1                MR. JONELIS:  It doesn't matter to me.

2                THE REPORTER:  Let's go off the record.

3                THE VIDEOGRAPHER:  Okay.  We are off the

4      record at 3:30 P.M. Pacific Daylight Time, and this

5      concludes today's testimony given by James Huntsman.   03:30:57

6                The total number of media units used was

7      eight and will be retained by Veritext Legal

8      Solutions.

9

10               (TIME NOTED:  3:30 P.M. )

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        Page  274

1

2

3

4

5

6

7

8          I, JAMES H. HUNTSMAN, do hereby declare

9     under penalty of perjury that I have read the

10    foregoing transcript; that I have made any

11    corrections as appear noted, in ink, initialed by

12    me, or attached hereto; that my testimony as

13    contained herein, as corrected, is true and correct.

14

15          EXECUTED this _____ day of _____,

16    20_____, at _____, _____.
                          (City)                    (State)

17

18

19

            _____

20          JAMES H. HUNTSMAN

            Volume I

21

22

23

24

25

                                        Page  275

1         I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4         That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn;

8         That a record of the proceedings was made

9    by me using machine shorthand which was thereafter

10   transcribed under my direction;

11        That the foregoing transcript is a true

12   record of the testimony given;

13        That if the foregoing pertains to the

14   original transcript of a deposition in a Federal

15   Case, before completion of the proceedings, review

16   of the transcript [ X ] was [ ] was not requested;

17        That if the foregoing proceedings were

18   reported stenographically remote from the witness

19   and parties, the transcript of the proceedings

20   reflects the record that I could hear and understand

21   to the best of my ability.

22        I further certify I am neither financially

23   interested in the action nor a relative or employee

24   of any attorney or party to this action.

25   ///

Page 276

1           IN WITNESS WHEREOF, I have this date

2   subscribed my name.

3   Dated: July 20, 2021

4

                  LORI SCINTA, RPR

5               CSR No. 4811

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              Page 277

```
1    RE: HUNTSMAN VS. CORPORATION OF THE PRESIDENT OF

         THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

2    JAMES H. HUNTSMAN, JOB NO. 4700665

3                    E R R A T A   S H E E T

4    PAGE 185    LINE 22    CHANGE Answer should be "No" instead of "Yeah."

5    _____

             I do not recall saying "Yeah" so this may be a clerical error; in any event, "Yeah" would be
6    REASON inconsistent with what actually happened as reflected by my later testimony.

7    PAGE 253    LINE 3     CHANGE Answer should be "No" instead of "I don't believe so."

8    _____

             I was confused by the question. Consistent with the rest of my testimony, I obviously could not
9    REASON have known in 2015 that tithing was being used to fund the mall since that fact was not discovered
             by me until 2019. So that fact could not (and did not) impact my decision to pay tithing in 2015.

10   PAGE 253    LINE 10    CHANGE Answer should be "No" instead of "I don't think so."

11   _____

             I was confused by the question. Consistent with the rest of my testimony, I obviously could not
12   REASON have known in 2015 that tithing was being used to fund the mall since that fact was not discovered
             by me until 2019. So that fact could not (and did not) impact my decision to pay tithing in 2015.

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____        July 28 2021

24   WITNESS                                      Date

25

                                                  Page 280
```

**EXHIBIT B**

1  **DAVID B. JONELIS, ESQ. (BAR NO. 265235)**
   **JAKE A. CAMARA (BAR NO. 305780)**
2  **LAVELY & SINGER PROFESSIONAL CORPORATION**
3  2049 Century Park East, Suite 2400
   Los Angeles, California 90067-2906
4  Telephone: (310) 556-3501
   Facsimile: (310) 556-3615
5  djonelis@lavelysinger.com
6  jcamara@lavelysinger.com

7  Attorneys for Plaintiff
8  JAMES HUNTSMAN

9

10                  **UNITED STATES DISTRICT COURT**

11                 **CENTRAL DISTRICT OF CALIFORNIA**

12

13  JAMES HUNTSMAN,                   ) CASE NO. 2:21-cv-02504 SVW (SKx)
                                      )
14            Plaintiff,             )
                                      )
15       vs.                         ) **PLAINTIFF'S INITIAL**
                                      ) **DISCLOSURES**
16                                    )
17  CORPORATION OF THE                )
    PRESIDENT OF THE CHURCH OF       )
18  JESUS CHRIST OF LATTER-DAY       )
    SAINTS; and Does 1-10,           )
19                                    )
20            Defendants.            )
                                      )
21                                    )
                                      )
22                                    )
                                      )
23  _____  )

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD HEREIN:**

Plaintiff JAMES HUNTSMAN ("Plaintiff") hereby provides the following initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.

These initial disclosures are based on information, documents and writings presently known by and available to Plaintiff and his attorneys.  Discovery in this action will continue for as long as permitted by rule, statute or stipulation of the parties, and the investigation of Plaintiff's attorneys and agents will continue to and through any hearing, judicial proceeding or trial in this action. Plaintiff reserves the right, prior to or at the time of any hearing, judicial proceeding or trial, to introduce any evidence from any source that hereafter may be discovered and testimony of witnesses whose identities may hereafter be discovered.

Should any information or documents be omitted from these initial disclosures, Plaintiff reserves the right to make such subsequent disclosures as may be necessary. No incidental or implied admissions, nor waiver of any rights are intended by these initial disclosures.

As discovery proceeds, witnesses, facts and evidence may be discovered that are not set forth herein but that may have otherwise been responsive to Rule 26(a)(1). In addition, facts and evidence now known may be imperfectly understood, or the relevance or the consequence of such facts and evidence may be imperfectly understood and, accordingly, such facts and evidence may, in good faith, not be included in these initial disclosures. It is anticipated that further discovery, independent investigation, legal research and analysis may supply additional facts, add meaning to the known facts and/or establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in and variations from the initial disclosures set forth herein.

1

PLAINTIFF'S INITIAL DISCLOSURES

The following initial disclosures are given without prejudice to Plaintiff's right to produce evidence of any subsequently discovered facts or witnesses of whom Plaintif may later learn or recall. Accordingly, Plaintiff reserves the right to change, add to, or modify any of these initial disclosures as appropriate.

A.    **Federal Rule of Civil Procedure 26(a)(1)(A)(i)**

Pursuant to Rule 26(a)(1)(A)(i), the following are the names and last known contact information of those individuals presently known to Plaintiff who are likely to have discoverable information that he may use to support his claims in this action.  Plaintiff reserves the right to call other witnesses at trial for the purposes of impeachment.

1.    James Huntsman, c/o Lavely & Singer P.C., 2049 Century Park East, Suite 2400, Los Angeles, California 90067, (310) 556-3501, is likely to possess discoverable information concerning the allegations of fraud at issue in this case.

2.    Lars P. Nielsen, lars.pauling.nielsen@gmail.com, is likely to possess discoverable information concerning the allegations of fraud at issue in this case, including with respect to the whistleblower complaint filed by his brother, David A. Nielsen, which led to the discovery of the fraud herein.

3.    David A. Nielsen, contact currently unknown, is likely to possess discoverable information concerning the allegations of fraud at issue in this case, including with respect to his own whistleblower complaint which led to the discovery of the fraud herein.

4.    Peter R. Huntsman, Peter_huntsman@huntsman.com, is likely to possess discoverable information concerning the allegations of fraud at issue in this case.

5.    Roger Clarke, c/o Ensign Peak Advisors, (801) 715-0199, 60 East South Temple Street, Suite 400, Salt Lake City, UT 84111-1040, is likely to possess discoverable information concerning the allegations of fraud at issue in

PLAINTIFF'S INITIAL DISCLOSURES

1  this case, including with respect to the use of tithing funds by Defendant and
2  Ensign Peak Advisors.

3      6.     Don Clouse, c/o Ensign Peak Advisors, (801) 715-0199, 60 East
4  South Temple Street, Suite 400, Salt Lake City, UT 84111-1040, is likely to
5  possess discoverable information concerning the allegations of fraud at issue in
6  this case, including with respect to the use of tithing funds by Defendant and
7  Ensign Peak Advisors.

8      7.     H David Burton, c/o Defendant's counsel, is likely to possess
9  discoverable information concerning the allegations of fraud at issue in this case,
10 including with respect to the use of tithing funds by Defendant and Ensign Peak
11 Advisors.

12     8.     Keith Brigham McMullin, c/o Defendant's counsel, is likely to
13 possess discoverable information concerning the allegations of fraud at issue in
14 this case, including with respect to the use of tithing funds by Defendant and
15 Ensign Peak Advisors.

16     9.     Gary E Stevenson, c/o Defendant's counsel, is likely to possess
17 discoverable information concerning the allegations of fraud at issue in this case,
18 including with respect to the use of tithing funds by Defendant and Ensign Peak
19 Advisors.

20     10.    Gerald Causse, c/o Defendant's counsel, is likely to possess
21 discoverable information concerning the allegations of fraud at issue in this case,
22 including with respect to the use of tithing funds by Defendant and Ensign Peak
23 Advisors.

24     11.    Russel M. Nelson, c/o Defendant's counsel, is likely to possess
25 discoverable information concerning the allegations of fraud at issue in this case,
26 including with respect to the use of tithing funds by Defendant and Ensign Peak
27 Advisors.

28

PLAINTIFF'S INITIAL DISCLOSURES

12. Dallin H. Oaks, c/o Defendant's counsel, is likely to possess discoverable information concerning the allegations of fraud at issue in this case, including with respect to the use of tithing funds by Defendant and Ensign Peak Advisors.

13. Henry B. Eyring, c/o Defendant's counsel, is likely to possess discoverable information concerning the allegations of fraud at issue in this case, including with respect to the use of tithing funds by Defendant and Ensign Peak Advisors.

14. Defendant's PMK, c/o Defendant's counsel, is likely to possess discoverable information concerning the allegations of fraud at issue in this case, including with respect to the use of tithing funds by Defendant and Ensign Peak Advisors.

15. Ensign Peak Advisors' PMK, (801) 715-0199, 60 East South Temple Street, Suite 400, Salt Lake City, UT 84111-1040, is likely to possess discoverable information concerning the allegations of fraud at issue in this case, including with respect to the use of tithing funds by Defendant and Ensign Peak Advisors.

Anticipating that there may be other individuals with discoverable information, Plaintiff reserves the right to supplement this list of witnesses and/or otherwise provide notice of such additional witnesses.

**B.      Federal Rule of Civil Procedure 26(a)(1)(A)(ii)**

Pursuant to Rule 26(a)(1)(A)(ii), the following are the categories of documents, electronically stored information, and tangible things in Plaintiff's possession, custody or control, that he may use to support his claims in this action. Plaintiff reserves the right to use the other documents at trial for purposes of impeachment:

1. Documents evidencing Plaintiff's charitable contributions to Defendant from 2003 to the present;

PLAINTIFF'S INITIAL DISCLOSURES

2.  Documents evidencing the misrepresentations alleged in Plaintiff's Complaint;

3.  David A. Nielsen's whistleblower complaint and related documents.

Plaintiff reserves the right to supplement this list of documents and/or otherwise provide notice of additional responsive documents.

**C.      Federal Rule of Civil Procedure 26(a)(1)(A)(iii)**

Plaintiff's damages are to be determined and calculated according to proof at the time of trial, but are in an amount of no less than $1,836,470, plus accrued and accruing interest, plus punitive damages, plus costs of suit.  The sum of $1,836,740 constitutes the total, currently ascertainable, charitable contributions that Plaintiff made to Defendant under false pretenses between 2003 and the present.  Plaintiff will make available for inspection and copying the documentation evidencing these contributions.

Plaintiff reserves the right to amend this section after Plaintiff has had a reasonable opportunity to conduct discovery and further investigate the facts relevant to this action.

**D.      Federal Rule of Civil Procedure 26(a)(1)(A)(iv)**

Not applicable to Plaintiff.

Dated:  June 23, 2021

LAVELY & SINGER
PROFESSIONAL CORPORATION
DAVID B. JONELIS
JAKE A. CAMARA


By:   /s/David B. Jonelis
            DAVID B. JONELIS
Attorneys for Plaintiff
JAMES HUNTSMAN

PLAINTIFF'S INITIAL DISCLOSURES