1
2
3
4
5
6
7
8
9

**DAVID B. JONELIS, ESQ. (BAR NO. 265235)**
**JAKE A. CAMARA, ESQ. (BAR NO. 305780)**
**LAVELY & SINGER**
**PROFESSIONAL CORPORATION**
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone: (310) 556-3501
Facsimile: (310) 556-3615
djonelis@lavelysinger.com
jcamara@lavelysinger.com

Attorneys for Plaintiff
JAMES HUNTSMAN

10
11
12

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| JAMES HUNTSMAN, <br><br> Plaintiff, <br><br> vs. <br><br> CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; and Does 1-10, <br><br> Defendants. | CASE NO.:  2:21-cv-02504 SVW (SK) <br><br> Assigned to the Hon. Stephen V. Wilson, Ctrm. 10A <br><br> **PLAINTIFF JAMES HUNTSMAN'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................1

II.     RELEVANT FACTS ...........................................................................4

    A.  David Nielsen Learns Of The Church's Fraud And Blows The Whistle............4

    B.  After Years Of Donating Money To The Church Under False Pretenses, James Huntsman Learns Of The Church's Fraud Through Mr. Nielsen's Whistleblower Complaint......................................................................6

III.    LEGAL STANDARD ........................................................................7

IV.     THERE IS UNDENIABLY A TRIABLE ISSUE OF FACT AS TO WHETHER THE CHURCH MISREPRESENTED ITS USE OF TITHING FUNDS.............8

V.      IN ANY EVENT, THE CHURCH'S "EARNINGS"-BASED DEFENSE THEORY IS LEGALLY UNTENABLE .................................................9

VI.     THE CHURCH'S "RELIANCE" ARGUMENT IS MISPLACED AND NEGATED BY MR. HUNTSMAN'S TESTIMONY ........................................12

VII.    THE FIRST AMENDMENT DOES NOT SHIELD THE CHURCH FROM LIABILITY FOR FINANCIAL FRAUD............................................15

VIII.   CONCLUSION ................................................................................18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*9826 LFRCA, LLC v. Hurwitz*,
  2017 WL 1885668 (S.D. Cal. 2017) .................................................. 12

*Alliance Mortgage Co. v. Rothwell*,
  10 Cal.4th 1226 (1995) .................................................................... 12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................... 8

*In re Beckman*,
  14 A.2d 581 (1940) .......................................................................... 10

*Coca-Cola Co. v. Overland, Inc.*,
  692 F.2d 1250 (9th Cir. 1982) .......................................................... 8

*Cool Fuel, Inc. v. Connett*,
  685 F.2d 309 (9th Cir. 1982) .......................................................... 11

*Cornwell v. Electra Central Credit Union*,
  439 F.3d 1018 (9th Cir. 2006) .......................................................... 8

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003) ............................................................................ 8

*Dias v. Nationwide Life Ins. Co.*,
  700 F.Supp.2d 1204 (E.D. Cal. 2010) .............................................. 12

*Foley v. Aintabi*,
  2014 WL 11412672 (C.D. Cal. 2014) .............................................. 12

*GA Telesis, LLC v. GKN Aerospace, Chem-Tronics, Inc.*,
  2012 WL 5388888 (S.D. Cal. 2012) ................................................ 12

*Gaddy v. Corporation of the President of the Church of Jesus Christ of
  Latter-Day Saints*,
  -- F.Supp.3d --, 2021 WL 3194983 (D. Utah Jul. 28, 2021) .......... 3, 16, 17

*Gospel Missions of Am. v. City of Los Angeles*,
  328 F.3d 548 (9th Cir. 2003) .......................................................... 11

2

*Grisham v. Philip Morris U.S.A., Inc.*,
  40 Cal. 4th 623 (2007) ..................................................................... 13

*Keybank National Ass'n v. Moses Lake Industries, Inc.*,
  2010 WL 2028085 (C.D. Cal. 2010) ........................................... 12

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*,
  538 U.S. 600 (2003).......................................................................... 15

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*,
  182 F.3d 157 (2d Cir. 1999) ............................................................ 7

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
  210 F.3d 1099 (9th Cir. 2000) ........................................................ 7

*Phillips v. Washington Legal Found.*,
  524 U.S. 156 (1998)........................................................................... 10

*Schmidt v. Cath. Diocese of Biloxi*,
  18 So. 3d 814 (Miss. 2009) ............................................................ 15

*Stone v. Salt Lake City*,
  11 Utah 2d 196 (1960) ............................................................ 17, 18

*T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*,
  809 F.2d 626 (9th Cir. 1987) ........................................................ 8

*In re The Bible Speaks*,
  869 F.2d 628 (1st Cir. 1989)........................................................... 15

*U.S. v. Ballard*,
  322 U.S. 78 (1944) (R. Jackson, dissenting) ............................. 17

*U.S. v. Rasheed*,
  663 F.2d 843 (9th Cir. 1981) ........................................................ 15

*United States v. Ahrens*,
  530 F.2d 781 (8th Cir. 1976) ........................................................ 8

*United States v. One Tintoretto Painting*,
  691 F.2d 603 (2d Cir. 1982) ........................................................ 8

*Urzua v. Nat'l Veterans Servs. Fund, Inc.*,
  2014 WL 12160751 (S.D. Cal. 2014).......................................... 15

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Veteran's Rideshare, Inc. v. Navistar Int'l Corp.*,
    2021 WL 2206479 (S.D. Cal. 2021)........................................................................... 14

*Wolter v. Delgatto*,
    2006 WL 664214 (Tex. App. Mar. 16, 2006)............................................................ 18

**Other Authorities**

Fed. R. Civ. P. 56(c)......................................................................................................... 7

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff JAMES HUNTSMAN hereby submits this memorandum of points and authorities in opposition to the Motion for Summary Judgment [Dkt. 32] filed by Defendant THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINT (the "Church").

## I.   INTRODUCTION

*It is important that people should not know.*  This is, in effect, what Roger Clarke (president of the Church's investment arm, Ensign Peak Advisors) told future whistleblower David Nielsen in March of 2013 – after Mr. Nielsen took issue with the fact that the Church had secretly spent over two billion dollars in tithing funds to develop the City Creek Mall and bail out the Beneficial Life Insurance company while simultaneously reassuring its members that no tithing funds were used for such purposes.  *See* Declaration of David Nielsen ("Nielsen Decl."), ¶¶9-10.  In fact, this calculated deception by Mr. Clarke and many of the Church's other higher-ups ultimately led Mr. Nielsen to file a whistleblower complaint with the Internal Revenue Service in 2019, in which he described in detail how the Church had improperly used its tax-exempt status to engage in numerous improper commercial ventures (including developing the City Creek Mall and bailing out Beneficial Life Insurance).[1]

The Church's present summary judgment motion is nothing more than its latest calculated effort to deceive the public and distort the facts.  More specifically, to support its untenable position that tithing funds were not solicited through fraudulent means, the

---

[1] In December 2019, after Plaintiff James Huntsman learned of the facts in Mr. Nielsen's whistleblower complaint, and after coming to the realization that he had been deceived by the Church for years about how his tithing donations would be used, he ***privately*** contacted the Church to request the return of those funds.  *See* Declaration of James Huntsman ("Huntsman Decl."), ¶¶9-13. Exs. C-F.  As the Church is well-aware, it was only <u>after</u> Mr. Huntsman's repeated attempts to resolve his grievance privately were rebuffed by the Church that he filed this lawsuit as a last resort.  In this regard, the Church's assertion that Mr. Huntsman somehow filed this lawsuit to generate publicity is patently disingenuous and provably false.

Church has painted a wildly-complex narrative (grounded in a rambling declaration from its "Director of Risk Management," Paul Rytting[2]), which is clearly intended to further obfuscate the truth about where tithing monies went.  Indeed, not only is Mr. Rytting's declaration heavily redacted to the extent that it is mostly indecipherable to the public (on the purported basis that the public should be prevented from learning how the Church has used its tax-exempt donations), but it merely purports to describe how ***unspecified sources of money*** were moved from one Church-affiliated entity to another to another to another – until those monies were ultimately spit out at the end of the chain to fund the City Creek Mall.[3]  Critically, however, Mr. Rytting's declaration does not unequivocally deny that tithing funds were used to develop the City Creek Mall or bail out the Beneficial Life Insurance company.

At best, to the extent Mr. Rytting's declaration can be deciphered, he apparently contends that the City Creek Mall was funded by the earnings on invested tithing funds, as opposed to the underlying funds themselves.[4]  However, even assuming this was the

---

[2] Contrary to how he holds himself out in his declaration, Mr. Rytting is actually the Church's long-time attorney and "director of risk management." https://www.linkedin.com/in/paul-rytting-5622303b/.  As such, his self-described "responsibilities include administration of the risk management functions and services (safety, insurance, claims, ***litigation***, contingency planning, etc.) for LDS Church operations in over 150 countries)."  *See* https://www.acc.com/sites/default/files/resources/vl/public/ProgramMaterial/20099_1.pdf at page 2 (emphasis added).  Of course, ***none*** of these responsibilities would appear to relate to the Church's internal financial affairs, much less the affairs of the Church's financial-arm (where Mr. Nielsen worked and obtained personal knowledge of the Church's fraud).  Consequently, it is unclear how Mr. Rytting is even qualified to attest to the matters at issue in this case.

[3] Per Mr. Nielsen's declaration, the tithing funds used to develop the City Creek Mall were first funneled through two other Church-affiliated entities (Property Reserve, Inc. and Deseret Management Corporation), so that people would not know the true source of this funding.  *See* Nielsen Decl., ¶10.

[4] Mr. Rytting's declaration is curiously silent as to the issue of Beneficial Life Insurance, and makes no attempt whatsoever to address where the money to bail out that for-profit company came from.

2

case (notwithstanding that Mr. Rytting's purported theory is directly refuted by the facts in Mr. Nielsen's sworn declaration[5]), it is a distinction without a difference – as any use of earnings necessarily stems from a use of the underlying principal itself.  Hence, even viewing the Church's tortured theory in the best light possible, it still admittedly misrepresented how the funds donated by Mr. Huntsman and countless other members would ultimately be used (*i.e.*, to generate earnings that would then fund a mall and bail out a private insurance company).

As set forth herein, there are a plethora of reasons why this Court can (and should) deny the Church's Motion.  First, given the conflicting sworn statements of Mr. Rytting and Mr. Nielsen, there is an obvious question of fact that precludes summary judgment. Second, even looking past this glaring triable core issue, the Church's own "earnings versus principal" defense theory is untenable under both the law and common sense. Third, contrary to the Church's assertion, the evidence shows that Mr. Huntsman actually and reasonably relied on the subject misrepresentations (and in any event, reasonable reliance is not an appropriate subject for summary judgment).  And finally, the Church's fallback First Amendment argument flies in the face of well-settled law preventing a religious organization from committing fraud under the guise of faith.[6]

Accordingly, Mr. Huntsman respectfully submits that the Court should deny the Church's Motion.  Moreover, based on the Church's own untenable defense theory as well as the undisputable evidence in Mr. Nielsen's declaration proving fraud by the Church, it

---

[5] Per Mr. Nielsen, the Church commingled principal tithing funds with the interest thereon, and <u>all</u> of the funds managed by the Church's investment arm were referred to as "tithing" funds. *See* Nielsen Decl., ¶6.

[6] Indeed, the exact same First Amendment argument was just rejected two weeks ago by a federal court in the Church's home state of Utah, where the Church is similarly being sued for lying about the funding of the City Creek Mall. *See Gaddy v. Corporation of the President of the Church of Jesus Christ of Latter-Day Saints,* -- F.Supp.3d --, 2021 WL 3194983 (D. Utah Jul. 28, 2021).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

is appropriate for the Court to *sua sponte* enter summary judgment against the Church and in Mr. Huntsman's favor should the Court be inclined to do so.

## II.   **RELEVANT FACTS**

Notwithstanding the Church's attempt to confuse things through its long-and-winding (and highly redacted) factual assertions, the following facts (some of which are material and some of which are merely contextual) are the only facts that matter for the purpose of the present motion.

### A.   **David Nielsen Learns Of The Church's Fraud And Blows The Whistle**

From 2010 until 2019, an individual named David Nielsen worked for a company called Ensign Peak Advisors, Inc. ("EPA"). [Plaintiff's Undisputed Fact ("PUF") 1]. EPA is the entity that was established by the Church in 1997 to invest money on its behalf, and which was seeded with tithing money from the Church. [PUF 5; Declaration of David Nielsen ("Nielsen Decl."), ¶5].

Mr. Nielsen's position at EPA was as its Senior Portfolio Manager.  [PUF 2]. As such, he had scores of meetings, both formal and informal, with EPA's top brass – including Roger Clarke (EPA's President and Managing Director), Robert Nydegger (EPA's former Head of Fixed Income and later its Chief Investment Officer), Richard Willes (EPA's Head of Fixed Income), and Michael Connors (EPA's Head of Fixed Income). [PUF 4].

On account of his job responsibilities and his meetings and communications with EPA's senior leadership, Mr. Nielsen obtained an understanding of how EPA operated its business.  [Nielsen Decl., ¶4].

Critically, during Mr. Nielsen's employment at EPA, EPA's senior leadership and other EPA employees referred to and revered **all** EPA funds as "tithing" money, regardless of whether they were referring to principal or earnings on that principal.  [PUF 6]. Such a reference was unsurprising, given that tithing donations from the Church's members were commingled with earnings that EPA had realized thereon. [PUF 7]. Every penny was referred to as the "widow's mite." [Nielsen Decl., ¶6].

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Further, while Mr. Nielsen was at EPA, EPA's funds were administered by a committee known as the Council on the Disposition of the Tithes (the "Council"). [PUF 8]. The Council was responsible for approving any distributions and/or withdrawals of the tithing funds maintained by EPA. [PUF 9].

***Over a five-year period, the Council approved EPA's withdrawal of approximately $1.4 billion in tithing funds to pay for the commercial development of the City Creek Mall, located in Salt Lake City – notwithstanding that the Church was simultaneously assuring its members that tithing funds were not being used for such a purpose.*** [PUF 10].

***In 2009, the Council likewise approved EPA's withdrawal of $600 million in tithing funds to bail out a commercial, for-profit company called Beneficial Life Insurance – notwithstanding that the Church was promising its members that tithing funds were being used solely for non-commercial purposes.*** [PUF 11].

In March 2013, Mr. Nielsen attended a meeting led by EPA senior leadership. At that meeting, EPA's President Roger Clarke, along with its Chief Investment Officer Robert Nydegger, gave a presentation in which they described the various ways that EPA had been distributing its tithing funds – including in connection with the development of the City Creek Mall and to bail out Beneficial Life Insurance.  [PUF 10-11; Nielsen Decl., ¶¶8-9].  Indeed, one of the slides from that presentation specifically referenced the monies used for the City Creek Mall and Beneficial Life Insurance. [Nielsen Decl., ¶¶8-9, Ex. A].

Prior to the March 2013 meeting, Mr. Nielsen and other EPA employees were well-aware of the Church's public statements that no tithing funds would be used to develop City Creek Mall or other for-profit businesses.  [PUF 13-14; Nielsen Decl., ¶¶10-11]. Consequently, after being presented with the truth at the March 2013 meeting – *i.e.*, that tithing funds were in fact being used for purely commercial purposes – Mr. Nielsen pointed out to Mr. Clarke the direct contradiction between (1) what the Church was telling the public about its use of tithing funds, and (2) how the Church was actually using those funds.  [Nielsen Decl., ¶10]. Mr. Clarke responded that because the EPA funds distributed

5

for the benefit of the City Creek Mall and Beneficial Life Insurance were first funneled through two other Church-affiliated entities (Property Reserve, Inc. and Deseret Management Corporation), people would not know that EPA was the source of this funding. [Nielsen Decl., ¶10]. ***Mr. Clarke also stated to Mr. Nielsen that it was important people should not know EPA's role as the source of the funds.*** [PUF 12].

Ultimately, based on the Church's intentional deception concerning EPA's use of tithing funds for City Creek Mall and Beneficial Life, Mr. Nielsen filed a whistleblower complaint with the Internal Revenue Service (the "IRS"). While the complaint is still pending with the IRS, the Washington Post ran a highly-publicized story about the complaint in December 2019.[7]

**B.**   **After Years Of Donating Money To The Church Under False Pretenses, James Huntsman Learns Of The Church's Fraud Through Mr. Nielsen's Whistleblower Complaint.**

In December 2019, Mr. Huntsman learned of the facts contained in David Nielsen's IRS Whistleblower Complaint, and realized for the first time in his life that the Church had lied to him about where his tithing donations had gone. [Declaration of James Huntsman ("Huntsman Decl., ¶6). Up until then, he had understandably believed – based on the Church's longstanding repeated representations and teachings – that his tithing donations had been used for purely non-commercial purposes. [PUF 13-17].

For example, on at least five separate occasions beginning in 2003, Mr. Huntsman had read and/or heard statements by the Church promising that no tithing funds were being used to develop the City Creek Mall. [Huntsman Decl., ¶3]. He had also been assured through the Church's teachings that tithing funds would only be used for maintaining meeting houses and temples, sustaining missionary work, educating members, and other charitable endeavors, and he relied on those assurances. [Huntsman Decl., ¶4]. By the

---

[7] https://www.washingtonpost.com/investigations/mormon-church-has-misled-members-on-100-billion-tax-exempt-investment-fund-whistleblower-alleges/2019/12/16/e3619bd2-2004-11ea-86f3-3b5019d451db_story.html

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

same token, the Church's official tithing donation form had indicated unequivocally that Mr. Huntsman's donations to the Church would be used solely for non-commercial purposes.  [Huntsman Decl., ¶4, Ex. B].

Had Mr. Huntsman known the truth, as he ultimately discovered in 2019 – *i.e.*, that the Church was using his tithings to, among other things, build a mall and bail out a private, for-profit insurance company – he never would have made any tithing donations in the first place.  [Huntsman Decl., ¶4].

Notably, however, rather than file a lawsuit, Mr. Huntsman repeatedly reached out to the Church to attempt to request the return of his fraudulently-obtained donations and resolve his grievance privately. [Huntsman Decl., ¶¶9-11]. These efforts included letters sent to the Church's attorneys in December 2020 and February 2021, as well as a conversation with Elder Ronald A. Rasband (of the Church's Quorum of the Twelve Apostles) on February 28, 2021.[8] [Huntsman Decl., ¶¶9-11, Exs. C-F]. It was only after the Church staunchly rebuffed these efforts that Mr. Huntsman was forced to seek recourse in the court system. [*Id.*].

## III.   <u>LEGAL STANDARD</u>

As the party moving for summary judgment, the Church has both the initial burden of production <u>and</u> the ultimate burden of persuading the Court that there is "no genuine issue as to any material fact and that [the Church] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).  Because summary judgment is a "drastic device" which "cuts off a party's right to present his case to the jury," demonstrating an absence of any triable issue of material fact is a "heavy burden."  *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc*., 182 F.3d 157, 160 (2d Cir. 1999).

---

[8] Notably, Mr. Huntsman did not even tell his siblings about his initial letter to the Church. Rather, it was only after two of the Church's senior elders reached out to one of his brothers and disclosed the letter that Mr. Huntsman's siblings and his mother first became aware of his then-private grievance. [Huntsman Decl., ¶9].

The Court's function on a motion for summary judgment is "issue-finding, not issue-resolution." *United States v. One Tintoretto Painting*, 691 F.2d 603, 606 (2d Cir. 1982). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions…." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Stated otherwise, for the purpose of ruling on the Church's motion, Mr. Huntsman's evidence "must be taken as true." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

Circumstantial evidence alone may create a genuine issue of material fact sufficient to defeat a motion for summary judgment. *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1029–30 (9th Cir. 2006); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). A party opposing summary judgment is also entitled to the benefit of any relevant presumptions that would be available at trial. *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254 (9th Cir. 1982); *see also United States v. Ahrens*, 530 F.2d 781, 784 (8th Cir. 1976).

As set forth below, there is (at a bare minimum) a triable issue of fact that precludes the granting of the Church's motion.

## IV. THERE IS UNDENIABLY A TRIABLE ISSUE OF FACT AS TO WHETHER THE CHURCH MISREPRESENTED ITS USE OF TITHING FUNDS

Looking past the Church's long-winded attempt to confuse and complicate the issues in this case, the core dispute here actually boils down to nothing more than the following simple question: <u>Did the Church use tithing funds to develop the City Creek Mall and bail out Beneficial Life Insurance notwithstanding its repeated representations that tithing funds were not used for such non-charitable purposes?</u> If the answer is yes

(which it is), Mr. Huntsman wins the case. If the answer is no (as the Church has misled its members to believe), Mr. Huntsman loses.

Critically, with respect to this core question, there is unmistakably a triable issue of fact. More specifically, while the Church has offered up the sworn declaration of its "Director of Risk Management," Paul Rytting, who apparently claims (to the extent his declaration can be deciphered) that tithing funds were not used for an improper purpose, Mr. Huntsman has offered up the sworn declaration of former EPA employee David Nielsen, who attests based on personal knowledge that tithing funds were improperly used to fund the City Creek Mall and bail out Beneficial Life Insurance. More specifically, Mr. Nielsen confirms in his declaration that (1) at least 1.4 billion dollars in tithing funds were used by EPA in a five-year period to develop the City Creek Mall, and (2) at least 600 million dollars in tithing funds were used in 2009 to bail out Beneficial Life Insurance. [PUF 10-11]. Moreover, Mr. Nielsen describes how the Church was well-aware that its actions were in direct contravention of the representations that it had made to the public, and yet intentionally concealed its actions from the public so that the public would not know the truth. [PUF 12-14].

Simply put, because Mr. Nielsen's declaration is at direct odds with the Church's purported "evidence," a jury will ultimately need to determine who is telling the truth. Hence, summary judgment cannot be granted. End of story.

## V.   IN ANY EVENT, THE CHURCH'S "EARNINGS"-BASED DEFENSE THEORY IS LEGALLY UNTENABLE

Even assuming that David Nielsen's declaration did not exist to create a triable issue of fact here (and it does), the Church's own apparent position concerning the use of tithing funds does not in and of itself negate Mr. Huntsman's fraud assertions. Specifically, to the extent the Church's position can be deciphered, it appears to defend itself on the basis that it only used the "earnings" from invested tithing funds to pay for the City Creek Mall (as opposed to the underlying tithing funds themselves). This is most apparent from Mr. Rytting's declaration, wherein he describes how (1) the Church set aside a portion of

9

tithing donations to "build a reserve fund," (2) EPA then invested the reserve funds, and (3) the City Creek Mall was then funded from the earnings on the invested reserve funds. *See, e.g.,* Rytting Decl., ¶¶6, 8, 12. Stated otherwise, the Church apparently believes it was appropriate to use the "earnings" on its members' invested tithing funds for non-charitable purposes, so long as the "principal" – *i.e.*, the initial tithing monies in the reserve – was not actually used.

However, even looking past the fact that EPA commingled tithing funds with the interest thereon [PUF 7], whether principal tithing funds or earnings were used for a commercial purpose is a distinction without a difference – as these are two sides of the same financial coin. Indeed, it has long been a maxim of Anglo-American law that "interest follows the principal as the shadow does the substance." *In re Beckman*, 14 A.2d 581, 583 (1940). As explained by our Supreme Court: "The rule that 'interest follows principal' has been established under English common law since at least the mid-1700's. Not surprisingly, this rule has become firmly embedded in the common law of the various States." (internal citations omitted). *See Phillips v. Washington Legal Found.*, 524 U.S. 156, 165 (1998).

To illustrate the absurdity of the Church's apparent defense, imagine if an organization solicited members of the LGBTQ community for donations under the pretense that the donations would be used for the benefit of that community. And then imagine if it turned out that those donations had been invested by the organization and the "earnings" used for a purpose completely at odds with the LGBTQ community (*e.g.*, to support the abolishment of gay marriage). Would the organization be able to defend its actions on the basis that only the "earnings" were used for an offensive purpose? Of course not! But for the donations themselves, there would have been no "earnings."

And the same is true here under the Church's defense theory. But for the tithings given to the Church by Mr. Huntsman and others under the pretense that their money would be used solely for charitable purposes, there would have been no "earnings" to pay for the development of the City Creek Mall or bail out Beneficial Life Insurance.

Thus, it is unsurprising that the Church has failed to cite even a single case supporting the notion that it is somehow proper to use the earnings on invested funds for a purpose contrary to how the funds themselves were supposed to be used – and Mr. Huntsman is likewise unaware of such authority.  Indeed, to the extent the Church has purported to cite any cases, those cases are clearly distinguishable on their face.[9]

In sum, the Church's apparent "earnings versus principal" defense theory is untenable irrespective of the evidence offered in support thereof.   For this reason, should the Court wish to substantially expedite this case, the Court may properly enter summary judgment <u>against the Church</u> and <u>in Mr. Huntsman's favor</u> on Mr. Huntsman's fraud claim.  *See Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 553 (9th Cir. 2003) ("even when there has been no cross-motion for summary judgment, a district court may enter summary judgment *sua sponte* against a moving party if the [moving] party has had a full and fair opportunity to ventilate the issues involved in the matter") (internal citations and quotations omitted); *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982) ("the overwhelming weight of authority supports the conclusion that if one party moves for summary judgment and, at the hearing, it is made to appear from all the records, files, affidavits and documents presented that there is no genuine dispute respecting a material fact essential to the proof of movant's case and that the case cannot be proved if a trial should be held, the court may *sua sponte* grant summary judgment to the non-moving party").

---

[9] *Jesse v. Malmacher* merely stands for the unremarkable premise that "[a]n intentional misrepresentation claim requires an actual misrepresentation." 2016 WL 9450683, at *7 (C.D. Cal. Apr. 5, 2016). And *Vess v. Ciba-Geigy Corp. USA* concerned a situation where (unlike here) the plaintiff had failed to "identify any specific misrepresentations or specify when and where they occurred." 317 F.3d 1097, 1107 (9th Cir. 2003).

## VI.   THE CHURCH'S "RELIANCE" ARGUMENT IS MISPLACED AND NEGATED BY MR. HUNTSMAN'S TESTIMONY

Although this case is still in its relative infancy, Mr. Huntsman has already proffered sufficient evidence to, *at minimum*, establish a genuine dispute of material fact concerning his reliance on the Church's numerous misrepresentations. [*See, e.g.,* PUF 13-17]. Yet, the Church asks this Court to take the extraordinary step of ruling, as a matter of law, that Mr. Huntsman's reliance was unreasonable. The Church's position has absolutely no merit, and summary judgment on the issue of reliance would run afoul of well-established Ninth Circuit and California law.

As a threshold matter, California and Ninth Circuit law is clear that a plaintiff's justifiable reliance is *almost always* a question of fact for the jury and not the proper subject of a motion for summary judgment.  Only in the *rarest of cases* has a court held that a plaintiff's justifiable reliance may be summarily adjudicated. *See Foley v. Aintabi*, 2014 WL 11412672, *2 (C.D. Cal. 2014) (denying defendant's summary  judgment motion and holding that "reasonableness of reliance is almost always a question of fact for the jury"); *Keybank National Ass'n v. Moses Lake Industries, Inc.*, 2010 WL 2028085 (C.D. Cal. 2010) ("Justifiable reliance is almost always a question of fact for the jury, unless it is absolutely *absolutely clear* from the face of the pleadings that the party did not rely justifiably") (emphasis added); *GA Telesis, LLC v. GKN Aerospace, Chem-Tronics, Inc.*, 2012 WL 5388888, *7 (S.D. Cal. 2012) (same); *Dias v. Nationwide Life Ins. Co.*, 700 F.Supp.2d 1204, 1218 (E.D. Cal. 2010) ("Justifiable reliance is  normally a question of fact for a jury, and [Defendant] has not shown this to be one of the 'rare cases' in which there is only one conclusion that reasonable minds could reach.") (emphasis added); *9826 LFRCA, LLC v. Hurwitz*, 2017 WL 1885668, *1 (S.D. Cal. 2017) ("After further consideration of the issue, the Court concludes it was error to resolve the issue of justifiable reliance as a matter of law. Whether [Plaintiff's] reliance was justified is an issue of fact that belongs to the jury"); *see also Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 1239 (1995) ("Except in the *rare case* where the undisputed facts leave no

12

room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact") (emphasis added); *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (2007) ("[W]hether reliance was reasonable is a question of fact for the jury, and may be decided as a matter of law only if the facts permit reasonable minds to come to ***just one conclusion***.") (emphasis added).

Hence, whether Mr. Huntsman reasonably relied on the Church's misrepresentations here is a question of fact for the jury. Indeed, the Church's assertion that "Huntsman does not remember when he read or heard the purported misrepresentations" is in and of itself premised on a mischaracterization of the record. [Motion at 18:2-3,10-12]. Mr. Huntsman has submitted admissible evidence of his reasonable reliance both in testimony at his deposition and in his declaration submitted herewith. [PUF 16, 17; Defendant's Disputed Facts ("DDF") 108, 112, 116, 119, 122].

Specifically, Mr. Huntsman has attested that he "read and/or heard each of [the misrepresentations] shortly after they were published, and relied upon them in continuing to pay tithings to the Church." Huntsman Decl., ¶3. Further, as he testified at his deposition and in his declaration submitted herewith, Mr. Huntsman's "practice was to read the complete conference sessions – and especially any remarks by the president of the Church – when they were printed in the Ensign Special Edition, approximately two months after each conference." *Id.*; Richmond Decl., ¶ 2, Ex. A, 79:7-12. Mr. Huntsman also testified specifically that he did in fact read President Hinckley's statement in mid-2003 and relied upon it in continuing to pay tithings to the Church. Richmond Decl., ¶ 2, Ex. A, 79:13-16. Mr. Huntsman likewise testified that he read each of the subsequent alleged misrepresentations at or soon after the time the statements were published, and that he relied on those statements to his detriment by donating substantial tithing funds to the Church. Huntsman Decl. ¶3. *See also* Richmond Decl., ¶ 2, Ex. A, 126:25-127:2 ("I relied on their statements as to what tithing would be used for"); *Id.* at 128:20 ("I relied on Church leaders").

Further, to the extent the Church infers that Mr. Huntsman was aware that the Church possessed "large investments" and thus should have inquired as to where the money came from, this is a red herring. [Motion at 19:24-26; DDF 89-94].   As Mr. Huntsman confirmed at his deposition, he had no reason to question if the Church's earlier investments were made using tithing funds, as "the answer at the time was provided in Church manuals, priesthood manuals, General Conference, Church Magazines, and Sunday School." *See* Richmond Decl., ¶ 2, Ex. A at 30:11-16.   Nor did he have any knowledge of the Church's finances when these purported "large investments" were made. *See* Richmond Decl., ¶ 2, Ex. A at pp. 28-30.

The fact that Mr. Huntsman stopped paying tithes in 2015 is likewise a red herring. When Mr. Huntsman decided to stop paying tithes in 2015, he did so because of the Church's doctrines in support of polygamy and its open disdain for members of the LGBTQ community.  Huntsman Decl. ¶6.  However, he never had any intention of asking for his tithings back at that time.  *Id.*  Rather, it was only after Mr. Huntsman learned of the Church's fraud through David Nielsen's IRS whistleblower complaint, and after he discovered for the first time that the Church had lied about where tithing donations had gone, that Huntsman asked for his tithing donations back on December 21, 2020. *Id.*

In sum, Mr. Huntsman has proffered admissible evidence in support of his reliance on the Church's numerous and repeated misrepresentations. At a minimum, there is a triable issue of material fact, that must, in accordance with well-established Ninth Circuit and California law, be weighed and adjudicated by a jury. The Church's Motion must therefore be denied.[10]

---

[10] The Church's citation to *Veteran's Rideshare, Inc. v. Navistar Int'l Corp.*, 2021 WL 2206479 (S.D. Cal. 2021) is misplaced. Not only did *Veteran's Rideshare* concern a motion to dismiss (rather than a motion for summary judgment), but the court merely dismissed the plaintiff's complaint with leave to amend because the plaintiff failed to allege which statements it "[was] aware of and relied on." *Id.* at *11. Here, Mr. Huntsman has both alleged and proffered admissible evidence as to the substance of the Church's

## VII. THE FIRST AMENDMENT DOES NOT SHIELD THE CHURCH FROM LIABILITY FOR FINANCIAL FRAUD

Contrary to the Church's fallback assertion, the First Amendment does <u>not</u> provide a cognizable defense to Mr. Huntsman's cause of action for fraud because the misrepresentations at issue here concern the use and misappropriation of Church funds (as opposed to the religious teachings underpinning the practice of tithing or any other dogma). Simply stated, this is a case about fraud, not faith, and implicates no religious principles or tenets of Mormonism.[11]

To be clear, Mr. Huntsman does not dispute the well-settled notion that the "First Amendment protects absolutely the freedom of belief" and that "[t]he government is foreclosed from interference with one's faith." *U.S. v. Rasheed*, 663 F.2d 843, 847 (9th Cir. 1981). However, it is equally well-settled (both here in the Ninth Circuit and in other jurisdictions) that "[t]he First Amendment does not protect ***fraudulent*** activity performed in the name of religion." *Id.* (emphasis added); *see Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 624 (2003) ("Consistent with our precedent and the First Amendment… fraud actions [may be maintained] when fundraisers make false or misleading representations designed to deceive donors about how their donations will be used."); *Urzua v. Nat'l Veterans Servs. Fund, Inc.*, 2014 WL 12160751, at *3 (S.D. Cal. 2014) (same), *In re The Bible Speaks*, 869 F.2d 628, 645 (1st Cir. 1989) (the First Amendment "does not allow purely secular statements of fact to be shielded from legal action merely because they are made by officials of a religious organization."), *Schmidt v. Cath. Diocese of Biloxi*, 18 So. 3d 814, 830-31 (Miss. 2009) ("Where a religious society raises a fund by subscription for a particular purpose, it cannot divert the funds to another

---

specific misrepresentations, the time and manner in which he became aware of the statements, and his reliance thereon in paying his tithes.

[11] As stated succinctly in the Mormon scripture, greed is incompatible with faith. *See* 1 Timothy 6:10 ("For the love of money is the root of all evil: which while some coveted after, they have erred from the faith, and pierced themselves through with many sorrows").

purpose, and, if it abandons such purpose, the donors may reclaim their contributions… [t]he cloak of religion does not shield religious institutions from civil responsibility for fraud."). Hence, because the core issue here – *i.e.*, the Church's misrepresentation about how Mr. Huntsman's tithing money would be used – has ***nothing*** to do with faith, the First Amendment provides no shelter.

The Church's attempt to invoke the First Amendment is particularly curious here, given that this ***very same argument*** was rejected just two weeks ago by a district court in the Church's home state of Utah. *See Gaddy v. Corporation of the President of the Church of Jesus Christ of Latter-Day Saints,* -- F.Supp.3d --, 2021 WL 3194983 (D. Utah Jul. 28, 2021). In *Gaddy,* Chief Judge Robert J. Shelby of the Utah District Court, guided by well-established precedent (and common sense), rejected the Church's argument that the First Amendment somehow provided a shield against fraudulent use of tithing funds in connection with the City Creek Mall. Specifically, in denying the Church's motion to dismiss the plaintiff Gaddy's claim of fraud in connection with the City Creek Mall (which claim was premised on one of the exact same fraudulent statements at issue here[12]), Judge Shelby explained:

> Here, Gaddy does not challenge the Church's tithing doctrine or teachings related to it. The court does not read her Amended Complaint to advance a claim that the doctrine is false. Gaddy instead points to specific factual statements allegedly made by the Church through its representatives concerning the Church's use of tithing funds and alleges those statements are false. The inquiry required to adjudicate this claim does not implicate religious principles of the Church or the truth of the Church's beliefs concerning the doctrine of tithing. This claim further does not require the court to determine whether the Church or its members were acting in accord with what they perceived to be the commandments of their faith. Gaddy has instead challenged secular representations concerning the use of money received by

---

[12] *See* 2021 WL 3194983 at *5 (quoting Prophet Hinckley's 2003 statement).

the Church. While the statements were made by Church officials, the church autonomy doctrine does not apply as a defense.[13]

2021 WL 3194983 at *14 (internal citations omitted).  Here, by the same token, the church autonomy doctrine is inapplicable.[14]

Finally, the Church's reliance on the *Stone* decision is completely misplaced.  While *Stone* involved a dispute over a church's property transaction, the plaintiff critically did not allege that "that there was any secrecy, subterfuge, fraud or other impropriety" involved in the transaction.  *Stone v. Salt Lake City*, 11 Utah 2d 196, 204 (1960).  Rather, *Stone* involved the Constitutional issue of the separation of church and state, not a cause of action for fraud. *Ibid.*   Indeed, in reaching its decision, the court in *Stone* specifically noted the "significan[ce]" of the fact that the plaintiff did "not claim that there was any express trust or any condition or restriction placed upon the funds he contributed to the Church." *Id.* at 200.  Here, Mr. Huntsman does not claim that the purchase of the City Creek Mall and the bailout of the Beneficial Life Insurance Company was itself unconstitutional or improper, but rather that it was unlawful for the Church to use tithing funds for such purposes <u>after making contrary representations to Plaintiff</u>.  Accordingly,

---

[13] In reaching his decision, Judge Shelby referenced the following quote from Justice Jackson's dissent in the U.S. Supreme Court decision of *U.S. v. Ballard* as a "helpful example" of the principle: "I do not doubt that religious leaders may be convicted of fraud for making false representations on matters other than faith or experience, ***as for example if one represents that funds are being used to construct a church when in fact they are being used for personal purposes.***" *U.S. v. Ballard*, 322 U.S. 78, 95 (1944) (R. Jackson, dissenting) (emphasis added).

[14] Notably, the Church is represented in *Gaddy* by David Jordan, the very same attorney who initially corresponded with Mr. Huntsman's attorneys in this case.  *See* Huntsman Decl., ¶9, Exs. D, F.  Thus, there can be no doubt that the Church representatives pulling the strings in this case were well-aware of the import of the *Gaddy* decision, and nonetheless raised the same untenable arguments here.

17

unlike in *Stone*, the First Amendment and related constitutional issues do not have any bearing on Mr. Huntsman's claim here.[15]

## VIII.  CONCLUSION

Based on the foregoing, Mr. Huntsman respectfully requests that the Court deny the Church's Motion for Summary Judgment.  Moreover, because (1) Mr. Huntsman has provided undisputable evidence of the Church's misrepresentations by way of the David Nielsen declaration, and (2) the Church's own "earnings" defense theory is legally untenable – *i.e.*, there is fraud irrespective of whether the Church used tithing principal or the earnings thereon for a commercial purpose – Mr. Huntsman submits that it is appropriate for the Court to enter summary judgment *sua sponte* against the Church and in Mr. Huntsman's favor.

Dated:  August 16, 2021                           LAVELY & SINGER, P.C.
                                                  DAVID B. JONELIS
                                                  JAKE A. CAMARA

                                                         */s/ David B. Jonelis*
                                                  By: _____
                                                         DAVID B. JONELIS
                                                  Attorneys for Plaintiff
                                                  JAMES HUNTSMAN

---

[15] The Church's reliance on the *Wolter* case is likewise inappropriate insofar as there was no claim in that case that the church had <u>misrepresented</u> where its funds were going. Rather, the dispute only concerned whether the church (which, unlike here, had honestly disclosed the actual use of its funds) was allowed to deviate from its own doctrine when investing funds. *Wolter v. Delgatto*, 2006 WL 664214, at *1 (Tex. App. Mar. 16, 2006). While the court found that how the church decided to "spend its resources" was "ecclesiastic in nature," it did not address the issue here – namely, whether a church's solicitation of donations based on misrepresentations was a religious issue. *Id.* at *2.

18