Rick Richmond (SBN 194962)
rrichmond@larsonllp.com
Matthew S. Manacek (SBN 312834)
mmanacek@larsonllp.com
Nathaniel S. Wright (SBN 325061)
nwright@larsonllp.com
Troy S. Tessem (SBN 329967)
ttessem@larsonllp.com
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone:  (213) 436-4888
Facsimile:  (213) 623-2000

Attorneys for Defendant
THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JAMES HUNTSMAN,<br><br>    Plaintiff,<br><br>vs.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; and Does 1-10,<br><br>    Defendants. | Case No. 2:21-cv-02504 SVW (SK)<br><br>*Assigned to the Hon. Stephen V. Wilson, Ctrm. 10A*<br><br>**DEFENDANT THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS' REPLY IN SUPPORT OF SUMMARY JUDGMENT**<br><br>*[Filed concurrently with Declaration of Roger Clarke; Defendant's Reply to Plaintiff's Statement of Undisputed Facts; Objections to David A. Nielsen and James Huntsman Declarations; and Defendant's Response to Plaintiff's Evidentiary Objections]*<br><br>Date:    August 30, 2021<br>Time:    1:30 p.m.<br>Ctrm.:   10A<br><br>Trial Date:   None Set |

**[REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL]**

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................ 2
I.  THE CHURCH'S STATEMENTS WERE TRUE ............................................ 2
    A.  City Creek Was Funded with "Earnings of Invested Reserve Funds" and "Commercial Entities Owned by the Church" ............................................. 2
    B.  Nielsen's Declaration Creates No Factual Dispute ...................................... 4
        1.  There Is No Dispute of Material Fact Regardless of Whether the Church's Initial Grant to Ensign Peak Included Tithing Money .................. 5
        2.  There Is No Dispute of Material Fact Regardless of How Some Ensign Peak Employees Referred to the Church's Funds ......................................... 5
        3.  There Is No Dispute of Material Fact Regardless of Whether Tithing Funds and Earnings on Reserve Were Commingled ...................................... 6
        4.  The Idea that "Interest Follows the Principal" Does Not Mean that Earnings on Reserves Transform into Tithing ............................................... 7
    C.  Huntsman Cannot Retreat to General Allegations ........................................ 8
II. HUNTSMAN DID NOT REASONABLY RELY ON ANY OF THE CHURCH'S STATEMENTS WHEN MAKING CONTRIBUTIONS .............. 9
III. THE FIRST AMENDMENT PROHIBITS A FISHING EXPEDITION .......... 10
CONCLUSION ................................................................................................... 12

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*,
 387 F. Supp. 3d 71 (D.D.C. 2019) .................................................................11

*Brown v. Legal Found. of Washington*,
 538 U.S. 216 (2003)..........................................................................................6

*In re California Trade Tech. Sch., Inc.*,
 923 F.2d 641 (9th Cir. 1991)............................................................................6

*Gaddy v. Corporation of President of The Church of Jesus Christ of Latter-day Saints*,
 No. 219CV00554RJSDBP, 2021 WL 3194983 (D. Utah July 28, 2021) ........................................................................................................11, 12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
 565 U.S. 171 (2012).........................................................................................10

*United States v. Boone*,
 951 F.2d 1526 (9th Cir. 1991)..........................................................................6

*Watson v. Jones*,
 80 U.S. 697 (1871)...........................................................................................10

**California Cases**

*Blankenheim v. E. F. Hutton & Co.*,
 217 Cal. App. 3d 1463 (Ct. App. 1990)...........................................................9

*Hasso v. Hapke*,
 227 Cal. App. 4th 107 (2014)...........................................................................9

*Hoffman v. 162 N. Wolfe LLC*,
 228 Cal. App. 4th 1178 (2014).........................................................................9

*Wilkins v. Nat'l Broad. Co.*,
 71 Cal. App. 4th 1066 (1999)...........................................................................9

**Other State Cases**

*El Pescador Church, Inc. v. Ferrero*,
 594 S.W.3d 645 (Tex. Ct. App. 2019) ................................................................10

*Harris v. Matthews*,
 361 N.C. 265 (2007) ............................................................................................11

*Libhart v. Copeland*,
 949 S.W.2d 783 (Tex. App. 1997) ......................................................................11

*Schmidt v. Catholic Diocese of Biloxi*,
 18 So. 3d 814 (Miss. 2009) .................................................................................11

**Other Authorities**

The Constitution of the United States, Amendment 1 ....................................*passim*

Federal Rules of Civil Procedure 9(b) ........................................................................4

1      Huntsman's opposition ignores the most important fact in the case.  The funds for the City Creek project came from "earnings of invested reserve funds" with additional amounts from the Church's "commercial entities," exactly as President Hinckley said.  The 120 pages of financial records provided by the Church prove this is true.  Huntsman does not grapple with the documents, but his ignoring them will not make them go away.

       Huntsman argues that "earnings of invested reserve funds" are the same thing as "tithing" and any distinction is "a distinction without a difference."  Opp. 10.  But President Hinckley made a clear distinction between "earnings of invested reserve funds" and "tithing," and that's what counts.  Huntsman's fraud claim is based on what President Hinckley said, not on what other people think.

       Huntsman tries to manufacture a factual dispute where none exists by submitting the Nielsen declaration as supposed proof that President Hinckley was wrong.  David Nielsen and his brother Lars are the purported source of the IRS document, which Huntsman identified in his complaint and confirmed in his deposition as the sole support for his fraud claim.  The IRS document has not been presented to the Court and it is not in the record.  Nielsen says nothing about it.  He substitutes instead a newly minted declaration, arguing that because Ensign Peak's seed money once came from tithing, and because of the way some of Ensign Peak's investment managers generically spoke of investment reserves as being sacred, all reserve earnings must be considered tithing no matter what President Hinckley said.

       Even if what Nielsen says is true, which it is not, none of what he says changes what actually happened.  President Hinckley said "earnings of invested reserve funds" would be used to fund City Creek.  The financial documents prove that is what happened.  Left with nothing else, Huntsman retreats to an untenable argument he abandoned in his deposition, which is that it is not "proper" for a nonprofit to invest surplus funds for future use.  As Huntsman puts it, to "use the

earnings on invested funds" for "commercial" investments is "contrary to how the funds are supposed to be used." Opp. 10-11. This would come as quite a surprise to all the nonprofits in our community that responsibly set aside some of their contributions to be invested in stocks, bonds, real estate, and other "commercial" endeavors. And it would be especially stunning to all churches whose investment of reserve funds could be second-guessed by congregants like Huntsman who have lost their faith and now wish the First Amendment was not an obstacle to clawing back the voluntary, unrestricted contributions they made while they were still believers.

Huntsman's fraud claim must be based on facts stated with particularity, but it rests on unfounded accusations and hollow rhetoric. In the argument section below, we explain that: (i) the Church's statements about funding City Creek were true, as proved by the undisputed financial documents, and nothing Huntsman or Nielsen has said or could say changes that dispositive fact; (ii) Huntsman's claimed reliance was unreasonable in these circumstances; and (iii) the First Amendment prevents Huntsman from second-guessing how the Church invests its reserve funds. The Court should grant the Church's motion for summary judgment.

## ARGUMENT

### I.   THE CHURCH'S STATEMENTS WERE TRUE

The core question is whether City Creek was funded with "earnings of invested reserve funds" and "commercial entities owned by the Church," as President Hinckley said it would be. The financial records provided by the Church prove that is exactly how City Creek was funded. Nothing in Huntsman's opposition or in the Nielsen declaration rebuts what is in those financial records.

#### A.   City Creek Was Funded with "Earnings of Invested Reserve Funds" and "Commercial Entities Owned by the Church"

President Hinckley's statements over the years explained that a portion of members' donations would be set aside to create a reserve for a rainy day and future

church needs.  (SUF 20.)  As the financial records reflect,[1] the Church's reserve funds described by President Hinckley and managed by Ensign Peak had grown to ▓▓▓▓▓▓ by the end of 2003.  (SUF 29.)  In that year alone, the Church's reserves accumulated ▓▓▓▓▓▓ in net investment earnings.  (SUF 30.)

From those earnings on reserves, the Church ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ for the development of City Creek.  (SUF 32-33.)  ▓▓▓▓▓▓ continued to grow from earnings on its own investments and reached ▓▓▓▓▓▓ by April 30, 2007 before any grants were issued from ▓▓▓▓▓▓ to City Creek Reserve, Inc. ("CCRI"), a 501(c)(3) organization created to manage and hold the Church's investment in City Creek.  (SUF 44.)  Throughout the development of City Creek, and while grants were made to CCRI, ▓▓▓▓▓▓ always maintained a positive balance, meaning it always had funds to support the grants issued to CCRI.  (SUF 42,46.)  In fact, on March 31, 2012, after the last grant to CCRI, ▓▓▓▓▓▓ had a market value of approximately ▓▓▓▓▓▓ of ungranted non-tithing funds.  (SUF 45.)  In addition to the earnings on invested reserve funds, additional funding came from the land and money granted by PRI, an affiliate of the Church that develops commercial real estate.  (SUF 48-49.)

---

[1] Huntsman criticizes Rytting's declaration on the basis that Rytting does not know as much as Nielsen does about Ensign Peak.  Opp. 2. n.2.  But Huntsman ignores that Rytting is a director in the Church's Finance Department, who is "familiar with Church policies and practices relating to the management of funds," Rytting Decl. ¶ 1, and is thus in an appropriate position to authenticate the financial records and provide a basic roadmap into them.  Nevertheless, as a belt-and-suspenders foundation for the business records, we provide the declaration of Roger Clarke who is identified by Nielsen as the president of Ensign Peak while Nielsen worked there.  Nielsen Decl. ¶¶ 4, 9, 10.  Clarke does not repeat or add any substance to the Rytting declaration, but simply confirms that the attachments to the Rytting declaration are accurate copies of the business records of Ensign Peak.  (Supp. Clarke Decl., ¶¶ 5-12.)

Nielsen's assertion that the Church used $1.4 billion in what he calls "tithing" funds to develop City Creek ignores the reality that, no matter how Nielsen describes them, the funds actually came from "earnings of invested reserve funds" and other "commercial entities owned by the Church," just as President Hinckley said they would.[2]  (Declaration of David Nielsen ("Nielsen Decl."), ¶ 8; SUF 28, 37.)  Nielsen's contrary claim can be most charitably understood as a narrow, incorrect, and incomplete understanding of how Church finances operate.[3]

### B.   Nielsen's Declaration Creates No Factual Dispute

Huntsman refuses to confront the financial records.  Relying on Nielsen's declaration, he instead asks the Court to reject the distinction President Hinckley made between "tithing" and "earnings of invested reserve funds," based on allegations that: (1) Ensign Peak was originally seeded with tithing money; (2) some Ensign Peak personnel considered all Church funds sacred; (3) Ensign Peak

---

[2] Huntsman also argues that tithing funds were used to support Beneficial Life.  But Huntsman must identify specific statements by the Church, on which he supposedly relied, that tithing funds would not be used to support Beneficial Life and he has not done so.  Fed. R. Civ. P. 9(b).  As a result, Huntsman's Beneficial Life accusation must be dismissed.  Even if the claim were allowed to proceed, the facts would conclusively show, like with the City Creek project, Ensign Peak had sufficient earning on reserves to provide the money Beneficial Life received.

[3] This is not the time or the place to prove Nielsen wrong, but the Court can take note from Nielsen's declaration that he did not begin working at Ensign Peak until 2010, long after the 1997 creation and funding of Ensign Peak, after the 2003 statement by President Hinckley, after the 2004 establishment of ▇▇▇▇▇▇▇▇▇▇, after the 2007 start of the City Creek project, and after almost all of the grants were made from ▇▇▇▇▇▇▇▇▇▇ before the project was completed in early 2012.  Nielsen Decl., ¶ 2.  Once on board, Nielsen says he managed an "Emerging Market Debt" fund, *id*., ¶ 3, which suggests he was buying and selling, not doing anything with respect to financing the City Creek investment or related to internal Church budget processes.  In addition, the purported statements by Roger Clarke and others provide no evidence because they are inadmissible, as explained in the Church's objections.  In short, everything Nielson reports in his declaration is second-hand hearsay, not based on his personal knowledge.

commingled reserve funds and earnings; and (4) "interest follows the principal." But Nielsen's declaration on these issues does not create a dispute of material fact.

### 1. There Is No Dispute of Material Fact Regardless of Whether the Church's Initial Grant to Ensign Peak Included Tithing Money

Huntsman argues that the Church's initial grant to Ensign Peak consisted entirely of tithing funds and, therefore, any earnings from the investment of the Church's reserve funds is also tithing. He cites no evidence and no legal authority for this remarkable proposition. Opp. 4. Regardless of whether tithing was some or all of the initial endowment to Ensign Peak, the nature of the initial principal does not mean that interest on the principal is the same as the principal. That is akin to saying that earnings on an employee's invested salary is the same as his or her salary, which is wrong; it is capital gains, interest, dividends, etc. Huntsman's argument cannot transubstantiate earnings on invested reserve funds into tithing.

In any event, whether Ensign Peak was initially capitalized with tithing does not undermine or contradict President Hinckley's statement that the Church would use earnings on the Church's reserve funds to invest in City Creek. What is more, President Hinckley made clear in 1991 and 1995 exactly how the Church had created its reserve fund—by taking a portion of each year's donations and setting them aside for the future. (SUF 20-21.)

### 2. There Is No Dispute of Material Fact Regardless of How Some Ensign Peak Employees Referred to the Church's Funds

Next, Huntsman asserts, based on Nielsen's declaration, that some of Ensign Peak's employees "referred to and revered all funds . . . as tithing." Opp. 4. Huntsman maintains that this "fact" refutes how the Church invested in City Creek, but he does not explain how. Even assuming Nielsen's declaration is accurate, Huntsman does not explain how the colloquial vernacular of some of Ensign Peak's employees regarding the sacredness of the Church's reserve funds contradicts

5

President Hinckley's distinction between "earnings of invested reserve funds" and "tithing."  Indeed, the Church's funds (principal and earnings alike) are sacred because they are used or invested with the ultimate purpose of building the Kingdom of God.  Calling those funds "tithing" and the "widow's mite" is a way of expressing the sacred stewardship felt by those administering these funds, regardless of whether donations are invested in stocks and bonds (to generate additional funds) or in City Creek (to invest in the area surrounding one of the Church's holiest sites).

At bottom, it is President Hinckley's statement that Huntsman alleges is a misrepresentation—not the internal vernacular of Ensign Peak's employees.  President Hinckley's statement is all that matters.

### 3. There Is No Dispute of Material Fact Regardless of Whether Tithing Funds and Earnings on Reserve Were Commingled

In the same vein, Huntsman alleges that the Church's tithing and earnings on reserves were commingled.  Opp. 3 n.5, 4, 10.  Huntsman appears to insinuate that if tithing and earnings on reserves were commingled in a single investment strategy, then everything constitutes tithing.  Huntsman's theory means a drop of tithing in an ocean of earnings creates an ocean of tithing.  That cannot be right, and Huntsman fails to point to any case law that could even arguably support this proposition.

As the Court knows, the commingling of funds is illegal or problematic when, for example, an attorney commingles a clients' funds with the attorneys' funds, or a trustee commingles trust funds with individual funds, or an individual commingles funds from several investors and then uses the investor funds for personal expenses.[4]

---

[4] *See, e.g., Brown v. Legal Found. of Washington*, 538 U.S. 216, 220–21 (2003) ("It has long been recognized that they have a professional and fiduciary obligation to avoid commingling their clients' money with their own . . . ."); *In re California Trade Tech. Sch., Inc.*, 923 F.2d 641, 646 (9th Cir. 1991); *United States v. Boone*, 951 F.2d 1526, 1538 (9th Cir. 1991).  In these kinds of situations, a third-party has a property interest in a portion of the commingled funds.  *Id.*

None of that occurred here. Huntsman voluntarily made unrestricted donations to the Church and by doing so divested his property interest. (SUF 83.) He has no legal basis to require that tithing and earnings on reserves be held in separate investment accounts.

Beyond this, it is a prudent and accepted practice of corporations, financial institutions, and brokerage firms to aggregate funds into common accounts for efficient cash management, as Ensign Peak does for the Church. Aggregating funds does not mean the source of funds for City Creek was not tracked according to standard accounting practices. The very documents Huntsman ignores shows that funds for the City Creek investment came solely from earnings on reserves.

### 4. The Idea that "Interest Follows the Principal" Does Not Mean that Earnings on Reserves Transform into Tithing

Huntsman's final argument is that "interest follows the principal," meaning if the principal here was once tithing then the interest it accrues is necessarily tithing. Opp. 9-11. Huntsman's argument is irrelevant because President Hinckley clearly said the Church would use earnings from the principal to fund City Creek, and for fraud that is what matters. (SUF 28.) Moreover, Huntsman's assertion is supported only by cherry picking this phrase from two cases that are inapposite.

In *In re Beckman*, a Pennsylvania superior court used the phrase for the proposition that a creditor's claim on the principal extends to the interest earned if there is an outstanding debt. *Id.*, 316-320. But here, Huntsman is not the Church's creditor and he has no claim on the Church's reserves because he voluntarily donated his tithing without restriction. (SUF 83.) The unremarkable view that a creditor has claim on both the principal and the interest held by the debtor is quite different from the startling proposition that earnings on voluntary, unrestricted contributions are legally the same as the original contributions. They are not.

Similarly, in *Phillips*, the Supreme Court (applying Texas law) held that the interest earned from a client's funds held in a Texas Interest on Lawyers Trust Account was the private property of the client for purposes of the Takings Clause. *Id.* at 156. But the Court never suggested that there was no difference between client funds and interest on those funds, only that the client owned both. Here, Huntsman is not the owner and has no claim on the Church's reserves. Once Huntsman willingly donated to the Church without restriction, he divested his property interest in the donations. (SUF 83.)

### C. Huntsman Cannot Retreat to General Allegations

Facing financial records proving the truth of President Hinckley's statement, Huntsman attempts to recast his failing fraud theory on general allegations about Church teachings. Huntsman alleges that the Church generally represented that tithing would be used only for charitable purposes. Opp. 6-7. The First Amendment bars Huntsman from basing his claim on doctrinal statements about tithing. Further, these broad allegations regarding Church teachings do not satisfy the particularized pleading requirement of a fraud claim; Huntsman must point to specific statements and state when he heard them, where he heard them, and who said them, all of which he has failed to do. And, most importantly, Huntsman has failed to identify any statement by the Church that it would not set aside a portion of the donations it receives and invest them to earn a return for future religious uses.

The one document Huntsman has identified is a donation slip, which he claims establishes that donations would be used solely for non-commercial purposes. (Huntsman Decl., ¶ 4, Ex. B.) The donation slip says no such thing. *Id.* Instead, it outlines several possible categories to which a donor may donate. *Id.* To the extent the donation slip says anything about how funds will be used, it states: "All donations to the Church's missionary fund become the property of the Church to be used at the Church's sole discretion in its missionary program." *Id.* No other

representations are made about any other potential donation categories, including tithing, which is the focus of Huntsman's fraud claim. *Id.*; *see also* Complaint ¶¶ 31-42 (discussing only tithing).

In summary, the Church has unequivocally established that President Hinckley's and the other Church statements were true. City Creek was developed using earnings on invested reserve funds. (SUF 37.) No tithing funds were used. (SUF 37, 49.) The Court should grant summary judgment on this ground alone.

## II. HUNTSMAN DID NOT REASONABLY RELY ON ANY OF THE CHURCH'S STATEMENTS WHEN MAKING CONTRIBUTIONS

Huntsman argues that questions regarding reliance are usually a question of fact for the jury. Opp. at 12-13. But this is an unusual case, similar to others where courts have granted summary judgment because reliance was unreasonable as a matter of law.[5]

Huntsman could not have relied on President Hinckley's statement because that statement was about how the Church would invest then existing funds. It was not a solicitation of new funds based on a promise to spend them in a particular way. There is no evidence that any of Huntsman's tithing contributions after President Hinckley's statement were used to develop City Creek. Huntsman's tithing donations were not solicited or needed for that purpose because the Church already had sufficient earnings on existing reserve funds to pay for City Creek.

---

[5] *E.g., Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1193 (2014) (granting summary adjudication because no evidence of justifiable reliance); *Wilkins v. Nat'l Broad. Co.,* 71 Cal. App. 4th 1066, 1082 (1999) (granting summary judgment in part because plaintiff would have engaged in the same conduct even if no misrepresentation had been made); *Hasso v. Hapke*, 227 Cal. App. 4th 107, 139 (2014) (reversing judgment where reliance was unreasonable because of the plaintiff's intelligence and sophistication pertaining to investments). *Blankenheim v. E. F. Hutton & Co*., 217 Cal. App. 3d 1463, 1474 (Ct. App. 1990) explains: "If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery."

Moreover, Huntsman testified he paid tithing because he believed it was a commandment, not because he thought the Church would immediately spend it all on Huntsman's preferred priorities rather than invest a portion for later use. (SUF 51-127.) The only reason Huntsman stopped paying tithing was because he stopped believing in certain Church doctrines. (SUF 87.) Huntsman knew the Church had invested in entities such as ZCMI, *Deseret News*, Deseret Book, and Deseret Gym. (SUF 89-92.) Huntsman also claims that he always listened to or read General Conference addresses by the President of the Church, meaning he would have read President Hinckley's 1991 and 1995 addresses explaining how the Church would set aside some of his donations to create a reserve. (SUF 20-21.)[6]

Especially in light of this context, Huntsman cannot prove actual reliance, materiality, and reasonable reliance with respect to his payment of future tithing based on President Hinckley's narrow statement about how the Church would invest existing earnings on reserve funds in the development of City Creek.

## III. THE FIRST AMENDMENT PROHIBITS A FISHING EXPEDITION

Huntsman contends that "the First Amendment provides no shelter" from his attack on the Church's investment decisions and that "the church autonomy doctrine is inapplicable." Opp. 16-17. He is mistaken.

For 150 years, the Supreme Court has held that courts have "no jurisdiction" to decide any matter that is "ecclesiastical in its character." *Watson v. Jones*, 80 U.S. 697, 733 (1871); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 185-186 (2012) (discussing *Watson*). Tithing and other religious donations are "uniquely ecclesiastical" and thus covered by the church autonomy doctrine. *El Pescador Church, Inc. v. Ferrero*, 594 S.W.3d 645, 658 (Tex. Ct. App.

---

[6] Huntsman says earnings on reserve tithing funds should not have been used to develop City Creek, Opp. 10, but that position is unreasonable in light of President Hinckley's 1991, 1995, and 2003 explanations that a reserve was being created and that earnings on those invested reserves would be used. (SUF 20-21, 27-28.)

2019).  "How a church spends worshippers' contributions is, like the question of who may worship there, central to the exercise of religion."  *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71, 80 (D.D.C. 2019).  Hearing a claim involving a church's finances can "require the Court to decide who is rightfully empowered to make financial decisions for the Church."  *Id.  See also Harris v. Matthews*, 361 N.C. 265, 273 (2007).  Courts defer to churches in such matters to "avoid[] becoming impermissibly entangled" in a contest over religious beliefs or ecclesiastical authority.  *Id.*

To survive First Amendment scrutiny, Huntsman's fraud claim must fit into one of two narrow exceptions.  It fits neither.  (1) Huntsman does not say that President Hinckley or any other Church leader solicited tithing to enrich himself.  *See Libhart v. Copeland*, 949 S.W.2d 783, 794 (Tex. App. 1997).  (2) Nor can Huntsman show that President Hinckley solicited tithing for one purpose and then devoted it to another like the Catholic priest in *Schmidt v. Catholic Diocese of Biloxi*, 18 So. 3d 814, 832 (Miss. 2009).  City Creek was funded by investment earnings and the proceeds of commercial enterprises, exactly as President Hinckley said it would.  Since neither exception applies, Huntsman's fraud claim is barred by the First Amendment.

Huntsman's complaint and new arguments impermissibly challenge the Church on how it spends and invests unrestricted donations.  It requires the Court to decide whether the Church's use of tithing and investment revenues was appropriate under its doctrine, teachings, and definitions of tithing and under Huntsman's notion of good church governance.  Adjudicating such a claim would violate the First Amendment.  *Cf. Ambellu*, 387 F. Supp. 3d at 80.

Huntsman gets no help from *Gaddy v. Corporation of President of The Church of Jesus Christ of Latter-day Saints*, No. 219CV00554RJSDBP, 2021 WL 3194983 (D. Utah July 28, 2021).  Unlike here, *Gaddy* involved bare allegations in a

motion to dismiss, whereas here the Court has extensive undisputed evidence on summary judgment.[7]

## Conclusion

For the foregoing reasons, and for those set forth in our moving papers, the Court should enter summary judgment in favor of the Church.

Dated:  August 23, 2021         LARSON LLP

By:        */s/ Rick Richmond*
   Rick Richmond
   Matthew S. Manacek
   Nathaniel S. Wright
   Troy S. Tessem
Attorneys for Defendant
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

---

[7]  The *Gaddy* court relied on the complaint's truncated recitation of President Hinckley's statement, which omitted the explanation that funds would come from the Church's "commercial entities" and "the earnings of invested reserve funds." *Id.* *5. Stripped of those qualifications, the statement cannot be assessed fairly. The *Gaddy* complaint also says nothing about the religious reasons for the development of City Creek nor did the complaint or the Court reach the issue of whether the issue of reliance (why a person pays tithes) can be decided without delving into areas prohibited by the First Amendment.